UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FIRST HORIZON NATIONAL CORPORATION, FTN FINANCIAL SECURITIES CORP., and FIRST TENNESSEE BANK NATIONAL ASSOCIATION, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) CIVIL ACTION<br>) NO. 2:11-cv-02608 |
| CERTAIN UNDERWRITERS AT LLOYD'S, Specifically Syndicate Nos. 2987 BRT and 2488 AGM, Subscribing to Policy Nos. QA051908/1 and QA052008/1, **and** | )<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED |
| ASPEN INSURANCE UK LIMITED, Subscribing to Policy Nos. QA051908/1 and QA052008/1, | )<br>)<br>)<br>) |
| U.S. SPECIALTY INSURANCE COMPANY, and | )<br>)<br>) |
| FEDERAL INSURANCE COMPANY, | )<br>) |
| Defendants. | )<br>) |

**FIRST AMENDED COMPLAINT**

Plaintiffs First Horizon National Corporation, FTN Financial Securities Corp., and First Tennessee Bank National Association (together, "First Horizon" or "Plaintiffs"), for their First Amended Complaint against Defendants, allege and aver as follows:

**PRELIMINARY STATEMENT**

1.  The Defendants in this case are large insurance companies that received substantial premiums from Plaintiffs in exchange for broad insurance coverage. Among other

things, the insurance protected Plaintiffs against losses arising from third-party claims alleging wrongful acts related to Plaintiffs' rendering of, or failure to render, professional services. This action arises from Defendants' refusal to honor the promises in their insurance policies with respect to losses incurred in two underlying suits against Plaintiffs and other insureds. Both underlying suits raised claims squarely within the policies' insuring agreement for professional services coverage, and no exclusion in the policies bars or limits coverage owed to Plaintiffs. Yet, Defendants have nonetheless repudiated their contractual coverage obligations and refused to reimburse Plaintiffs for losses covered by the policies. As a result of Defendants' wrongful denial of coverage, to receive the benefit of the insurance coverage purchased from Defendants, Plaintiffs have been forced to file this action for breach of contract and declaratory judgment.

**PARTIES, RELATED PERSONS AND ENTITIES**

2.      Plaintiff First Horizon National Corporation is a corporation organized under the laws of the State of Tennessee with its principal place of business at 165 Madison Avenue, Memphis, Tennessee.

3.      Plaintiff FTN Financial Securities Corp. ("FTN Financial") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 845 Crossover Lane, Suite 150, Memphis, Tennessee. FTN Financial is ultimately a wholly-owned subsidiary of First Horizon National Corporation.

4.      Plaintiff First Tennessee Bank National Association ("First Tennessee") is a banking institution chartered by the Office of the Comptroller of the Currency with its principal place of business in Memphis, Tennessee. First Tennessee is the immediate parent company of FTN Financial and a wholly-owned subsidiary of First Horizon National Corporation.

5.      Defendants Certain Underwriters at Lloyd's, specifically Syndicate Nos. 2987 BRT and 2488 AGM, are insurers engaged in the business of selling insurance contracts to

commercial entities such as Plaintiffs in Tennessee and elsewhere. Syndicate Nos. 2987 BRT and 2488 AGM, which both maintain their principal places of business in the United Kingdom, subscribed to certain insurance policies covering Plaintiffs.

6. Defendant Aspen Insurance UK Limited ("Aspen," and together with Syndicate Nos. 2987 BRT and 2488 AGM, the "Underwriter Defendants") is, upon information and belief, a subsidiary of Aspen Insurance Holdings Limited and a private limited liability company organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. Aspen is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere.

7. Underwriter Defendants subscribed to and provided coverage to Plaintiffs under Blended Insurance Programme Policy Number QA051908/1 (the "Primary Policy"), First Excess Blended Insurance Programme Policy Number QA052008/1 (the "First Excess Policy"), and Fourth Excess Blended Insurance Programme Policy Number QA052108/1 (the "Fourth Excess Policy") (together, the "Underwriters' Policies").

8. Underwriter Defendants issued the Underwriters' Policies to First Horizon National Corporation as the Named Insured. The Underwriters' Policies provide coverage to, among others, First Horizon National Corporation, FTN Financial, First Tennessee, and certain of the foregoing entities' current or former employees. The Underwriters' Policies were delivered to First Horizon National Corporation at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Underwriters' Policies are located in Nashville, Tennessee.

9. In exchange for the Underwriters' Policies, First Horizon National Corporation paid Defendants substantial premiums from its Memphis, Tennessee headquarters.

10. Defendant U.S. Specialty Insurance Company ("U.S. Specialty") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, U.S. Specialty is incorporated under the laws of Texas and maintains its principal place of business in Texas.

11. U.S. Specialty provided excess insurance coverage to Plaintiffs under Excess Indemnity Policy Number 24-MGU-08-A17157 (the "Second Excess Policy"). U.S. Specialty issued the Second Excess Policy to First Horizon National Corporation as the Insured, and it provides coverage to, among others, First Horizon National Corporation, FTN Financial, First Tennessee, and certain of the foregoing entities' current or former employees. The Second Excess Policy was delivered to First Horizon National Corporation at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Second Excess Policy are located in Nashville, Tennessee.

12. In exchange for the Second Excess Policy, First Horizon National Corporation paid U.S. Specialty substantial premiums from its Memphis, Tennessee headquarters.

13. Defendant Federal Insurance Company ("Federal," together with Underwriter Defendants and U.S. Specialty, "Defendants") is an insurer engaged in the business of selling insurance contracts to commercial entities such as Plaintiffs in Tennessee and elsewhere. Upon information and belief, Federal is incorporated under the laws of Indiana and maintains its principal place of business in New Jersey.

14. Federal provided excess insurance coverage to Plaintiffs under Excess Policy Number 7042-7157 (the "Third Excess Policy," and together with the Primary Policy, the First Excess Policy, the Second Excess Policy, and the Fourth Excess Policy, the "Policies"). Federal

issued the Third Excess Policy to First Horizon National Corporation as the Insured, and it provides coverage to, among others, First Horizon National Corporation, FTN Financial, First Tennessee, and certain of the foregoing entities' current or former employees.  The Third Excess Policy was delivered to First Horizon National Corporation at its headquarters in Memphis, Tennessee, and the insurance brokers that assisted in the placement of the Third Excess Policy are located in Nashville, Tennessee.

15. In exchange for the Third Excess Policy, First Horizon National Corporation paid Federal substantial premiums from its Memphis, Tennessee headquarters.

16. The losses sustained by Plaintiffs to date in the underlying lawsuits also were paid, and will continue to be paid, from Plaintiffs' Memphis, Tennessee headquarters.

17. The Underwriters' Policies, and the Second Excess Policy and Third Excess Policy as follow form, contain a "Service of Suit Clause (U.S.A.)" which provides, in pertinent part, as follows:

> It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. . . .
>
> It is further agreed that service of process in such suit may be made upon Mendes & Mount, LLP, 750 Seventh Avenue, New York, NY 10[0]19-6829, U.S.A., and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

18. Stephen M. Folan ("Folan") was, at the relevant times, employed by FTN Financial.

19. Jacques de St. Phalle ("de St. Phalle") was, at the relevant times, employed by FTN Financial.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

21. This Court has personal jurisdiction over Defendants because Defendants have submitted to jurisdiction in this state by (a) transacting business in Tennessee, by virtue of selling the Policies at issue in this case to Plaintiffs in Tennessee; and (b) entering into contracts of insurance covering an entity located within Tennessee at the time of contracting. In addition, Defendants have consented, by the terms of the Policies, to suit in a court of competent jurisdiction in the United States, including this Court.

22. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Memphis, Tennessee.

## FACTUAL ALLEGATIONS

23. Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-22 above.

### The Insurance Policies

24. Plaintiffs purchased the Primary Policy from Underwriter Defendants with an effective date of August 1, 2008 to August 1, 2009 (the "Policy Period"). The Primary Policy has an applicable limit of $10 million and is the first layer of insurance coverage for Plaintiffs above a $15 million self-insured retention (similar to a deductible) maintained by Plaintiffs. The Primary Policy provides broad insurance protection for Plaintiffs against losses arising from third-party claims alleging wrongful acts on the part of Plaintiffs and their current or former employees. A true and correct copy of the Primary Policy is attached to this Complaint as Exhibit A.

25. The Primary Policy contains several separate coverage sections providing different types of insurance to Plaintiffs, including the "Financial Institution Professional Liability" coverage section ("Professional Liability coverage section"). The Professional Liability coverage section of the Primary Policy contains the following insuring agreement:

> This policy shall indemnify the Insured for Loss arising from a Claim first made against the Insured during the Policy Period . . . and reported in writing to Underwriters pursuant to terms of this policy for any actual or alleged Wrongful Act of any Insured (or of any other person for whose actions the Insured is legally responsible) in the rendering or failure to render Professional Services.

26. If a particular claim against Plaintiffs is covered under the Primary Policy, Underwriter Defendants are obligated to pay Plaintiffs' "Loss," which is defined to include, among other things, "damages, judgments, settlements and Defense Costs."

27. "Defense Costs" are defined in the Primary Policy to include, among other things, fees, costs, and expenses resulting from "the investigation, adjustment, defense and/or appeal of a Claim, Loss or against [sic] an Insured."

28. Plaintiffs also purchased the First Excess Policy from Underwriter Defendants. Except as otherwise provided in the First Excess Policy, it adopts all of the same conditions, limitations, and other terms provided in the Primary Policy, including the same insuring agreement in the Professional Liability coverage section. The First Excess Policy provides Plaintiffs an additional $15 million in insurance for the Policy Period, above the $15 million retention and the $10 million first layer of insurance provided by the Primary Policy. A true and correct copy of the First Excess Policy is attached to this Complaint as Exhibit B.

29. Plaintiffs purchased the Second Excess Policy from Defendant U.S. Specialty. Except as otherwise provided in the Second Excess Policy, it adopts all of the same conditions,

limitations, and other terms provided in the Primary Policy, including the same insuring agreement in the Professional Liability coverage section. The Second Excess Policy provides Plaintiffs an additional $10 million in insurance for the Policy Period, above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy, and the $15 million in insurance provided by the First Excess Policy. A true and correct copy of the Second Excess Policy is attached to this Complaint as Exhibit C.

30. Plaintiffs purchased the Third Excess Policy from Defendant Federal. Except as otherwise provided in the Third Excess Policy, it adopts all of the same conditions, limitations, and other terms provided in the Primary Policy, including the same insuring agreement in the Professional Liability coverage section. The Third Excess Policy provides Plaintiffs an additional $10 million in insurance for the Policy Period, above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy, the $15 million in insurance provided by the First Excess Policy, and the $10 million in insurance provided by the Second Excess Policy. A true and correct copy of the Third Excess Policy is attached to this Complaint as Exhibit D.

31. Plaintiffs purchased the Fourth Excess Policy from Underwriter Defendants. Except as otherwise provided in the Fourth Excess Policy, it adopts all of the same conditions, limitations, and other terms provided in the Primary Policy, including the same insuring agreement in the Professional Liability coverage section. The Fourth Excess Policy provides Plaintiffs an additional $20 million in insurance for the Policy Period, above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy, the $15 million in insurance provided by the First Excess Policy, and the $10 million in insurance provided by

the Second Excess Policy, and the $10 million in insurance provided by the Third Excess Policy. A true and correct copy of the Fourth Excess Policy is attached to this Complaint as Exhibit E.

32. Together, the Policies provide Plaintiffs with $65 million in insurance coverage above a $15 million self-insured retention for a third-party claim covered under the Policies.

33. The Policies provide that Plaintiffs must obtain the consent of Defendants to enter into any settlement, which consent shall not be unreasonably withheld by Defendants.

### The Lawsuits Underlying This Coverage Action

34. During the Policy Period, FTN Financial and de St. Phalle were served by Frederick J. Grede, Liquidation Trustee (the "Trustee") of Sentinel Management Group, Inc. ("Sentinel"), with two lawsuits. Folan was served by the Trustee with one of the two lawsuits. First Tennessee was subsequently added as a defendant in both lawsuits. These lawsuits are captioned as follows: *Frederick J. Grede v. Stephen M. Folan, et al.*, Case No. 08CV6587 (N.D. Ill.) (the "Estate Case"), and *Frederick J. Grede v. FTN Financial Securities Corp., et al.*, Case No. 09CV2258 (N.D. Ill.) (the "Customer Case") (collectively, "the Grede Lawsuits"). The Estate Case and Customer Case were filed on November 17, 2008 and April 13, 2009, respectively. True and correct copies of the most recent operative complaints in the Estate Case and the Customer Case are attached to this Complaint as Exhibits F and G, respectively.

35. Plaintiffs provided timely notice to Defendants of the Grede Lawsuits.

36. In the Estate Case, the Trustee alleged that Folan, de St. Phalle, and FTN Financial engaged in certain errors and omissions in the rendering of or failure to render professional services for a fee in the course of selling certain structured finance products known as "PreTSLs" to Sentinel, which resulted in losses to Sentinel. Among other claims, the Trustee contended that FTN Financial, de St. Phalle, and Folan knew that the PreTSLs were unsuitable investments for

9

Sentinel, yet continued to sell the PreTSLs to Sentinel. The Trustee sought approximately $114 million in damages from the Defendants in the Estate Case based on the unsuitability claims alone, in addition to other unspecified damages. The Trustee also alleged that First Tennessee was involved in the creation and placement of the PreTSLs that were sold to Sentinel.

37. In the Customer Case, the Trustee alleged that de St. Phalle and FTN Financial engaged in certain errors and omissions in the rendering of or failure to render professional services for a fee in the course of selling the PreTSLs to Sentinel, which resulted in losses to Sentinel's customers. Among other claims, the Trustee contended that FTN Financial and de St. Phalle aided and abetted breaches of fiduciary duty by Sentinel and Sentinel's head trader related to Sentinel's purchases of allegedly unsuitable securities from Plaintiffs. The Trustee sought approximately $85 million in damages from the Defendants in the Customer Case based on the unsuitability claims alone, in addition to other unspecified damages. The Trustee also alleged that First Tennessee was involved in the creation and placement of the PreTSLs that were sold to Sentinel.

38. On July 25, 2011, following a mediation, all parties to the Grede Lawsuits accepted the mediator's recommendation to settle the Grede Lawsuits for $38.5 million.

39. Plaintiffs vigorously defended against the Trustee's allegations in the Grede Lawsuits and have incurred more than $9 million in defense costs in excess of the Policy's $15 million retention.

40. Defendants' coverage obligations under the Policies are triggered by the $38.5 million settlement and the more than $9 million in defense costs incurred in excess of the self-insured retention.

**Defendants' Refusal to Honor**
**Their Policy Obligations to Plaintiffs**

41. Plaintiffs have kept Defendants apprised of material events in the defense of the Grede Lawsuits. Specifically, Plaintiffs have provided Defendants with various documents related to the Grede Lawsuits containing detailed information about the Trustee's claims, including the alleged potential liability and damages sought in the Grede Lawsuits. Such documents include, among others, the various amended complaints, multiple expert and rebuttal expert reports, and legal briefing filed by the parties to the Grede Lawsuits.

42. Defendants also have participated in numerous of Plaintiffs' quarterly claims-update conference calls, during which Plaintiffs provided updates on the Grede Lawsuits and responded to any document or information requests from Defendants regarding the Grede Lawsuits.

43. During these quarterly calls and at other times, Plaintiffs have notified Defendants of the current defense costs incurred by Plaintiffs in the Grede Lawsuits and that Plaintiffs are seeking recovery from Defendants for those defense costs in excess of the $15 million self-insured retention. In defending the Grede Lawsuits Plaintiffs have incurred more than $9 million in defenses costs in excess of the retention.

44. In a letter to Plaintiffs dated October 12, 2010, Underwriter Defendants state that "coverage is unavailable for the Grede Litigation." In this letter, Defendants cite and wrongfully rely upon the Policy's "insolvency exclusion" as the reason for their denial of coverage.

45. Plaintiffs responded to Underwriter Defendants in a letter dated April 25, 2011. In their letter, Plaintiffs explained that, based on the terms of the insolvency exclusion, Underwriter Defendants have no substantial or sound legal basis for invoking that exclusion to preclude coverage for the Grede Lawsuits.

46. In June and July 2011, Plaintiffs communicated with Defendants regarding Plaintiffs' plans to engage, at the Trustee's request, in mediation of the Grede Lawsuits. In anticipation of the mediation, and in anticipation that Defendants would participate in the mediation based on their contractual obligations to insure Plaintiffs for covered loss incurred related to the Grede Lawsuits, Plaintiffs provided Defendants with additional documents and information related to the Grede Lawsuits.

47. While Plaintiffs believed and continue to believe that the Trustee's claims were without merit and that Plaintiffs had sound defenses, in light of the uncertainties and risks inherent in any jury trial, Plaintiffs requested that Defendants authorize and agree to fund any settlement that might be reached with the Trustee to resolve the Grede Lawsuits up to $38.5 million.

48. On July 14, 2011, Underwriter Defendants authorized Plaintiffs to settle the Grede Lawsuits with their own funds up to the limits of the Primary and First Excess Policies, but refused to pay any amount to cover a potential settlement or any loss Plaintiffs incur in the Grede Lawsuits. Underwriter Defendants' letter constituted a complete denial of coverage under the Policies for the claims in the Grede Lawsuits. In addition, on July 25, 2011, Underwriter Defendants informed Plaintiffs that they would not raise the issue of consent as a defense if Plaintiffs accepted a $38.5 million settlement.

49. Despite Underwriter Defendants' having had months to consider Plaintiffs' explanations for why the insolvency exclusion cannot apply to bar coverage for the claims in the Grede Lawsuits, Underwriter Defendants' July 14, 2011 letter did not address those explanations, but merely reiterated the same unsupported assertion stated in Underwriter Defendants' earlier October 12, 2010 letter.

12

50. On July 25, 2011, Defendant Federal informed Plaintiffs that "Federal has denied coverage for this matter, and continues to do so.  In light of this coverage position, the insureds should proceed as would a prudent uninsured to protect its interests."  Federal refused to pay any amount to cover a potential settlement or any loss Plaintiffs incur in the Grede Lawsuits.

51. On July 25, 2011, Defendant U.S. Specialty informed Plaintiffs that U.S. Specialty continues to deny coverage for the Grede Lawsuits, but consented to a settlement of the Grede Lawsuits for up to the $38.5 million "mediator's recommendation."  U.S. Specialty refused to pay any amount to cover a potential settlement or any loss Plaintiffs incur in the Grede Lawsuits.

52. Defendants have no substantial legal grounds for taking the position that the insolvency exclusion applies to bar coverage for the Grede Lawsuits.  By denying coverage, Defendants are violating the terms of the Policies.

53. Defendants' denials of coverage and failure to respond to Plaintiffs' explanations for why the insolvency exclusion is not viable has left Plaintiffs without insurance coverage for nearly $50 million in loses that are covered by the plain terms of the Policies issued to Plaintiffs by Defendants.  Defendants have wrongfully denied and refused coverage, putting their financial interests above their insureds'.

54. The defense costs incurred in defending the Grede Lawsuits exceed Plaintiffs' retention by more than $9 million, thereby triggering coverage under the Policies.  Plaintiffs continue to incur defense costs related to the Grede Lawsuits that are covered under the Policies.

55. Acting with Defendants' consent, Plaintiffs incurred $38.5 million in covered loss to settle the Grede Lawsuits.  The $38.5 million settlement, in addition to the more than $9 million in defense costs in excess of the self-insured retention, is covered loss under the Policies.

13

## COUNT I
## BREACH OF CONTRACT

### (FOR REFUSING TO REIMBURSE PLAINTIFFS FOR DEFENSE COSTS INCURRED IN DEFENDING THE GREDE LAWSUITS)

56. Plaintiffs incorporate by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-55 above.

57. The Policies are insurance contracts pursuant to which Defendants were paid substantial premiums in exchange for providing broad insurance coverage, including coverage for losses arising from the Grede Lawsuits.

58. By denying coverage to Plaintiffs for defense costs incurred in the Grede Lawsuits, Defendants have expressly and wrongfully repudiated their coverage obligations and declined to honor the promises they made when they issued the Policies.  Defendants' wrongful repudiation of their coverage obligations to Plaintiffs is a breach of the Policies.

59. As a result of Defendants' breach of the Policies, Plaintiffs have sustained and will continue to sustain substantial damages, in an amount to be established at trial, for which Defendants are liable to Plaintiffs.

## COUNT II
## BREACH OF CONTRACT

### (FOR REFUSING TO FUND THE $38.5 MILLION SETTLEMENT OF THE GREDE LAWSUITS)

60. Plaintiffs incorporate by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-59 above.

61. The Policies are insurance contracts pursuant to which Defendants were paid substantial premiums in exchange for providing broad insurance coverage, including coverage for losses arising from the Grede Lawsuits.

62. By denying coverage to Plaintiffs for the $38.5 million settlement of the Grede Lawsuits, Defendants have expressly and wrongfully repudiated their coverage obligations and declined to honor the promises they made when they issued the Policies. Defendants' wrongful repudiation of their coverage obligations to Plaintiffs is a breach of the Policies.

63. As a result of this breach of the Policies, Plaintiffs have sustained and will continue to sustain substantial damages, in an amount to be established at trial, for which Defendants are liable to Plaintiffs.

## COUNT III
## DECLARATORY JUDGMENT

64. Plaintiffs incorporate by reference, as if fully set forth herein, the facts set forth above in paragraphs 1-63 above.

65. The Policies are insurance contracts pursuant to which Defendants were paid substantial premiums in exchange for providing broad insurance coverage, including coverage for losses arising from the Grede Lawsuits.

66. By denying coverage for loss related to the Grede Lawsuits, Defendants have expressly and wrongfully repudiated their coverage obligations and declined to honor the promises they made when they issued the Policies. Defendants' wrongful repudiation of their coverage obligations to Plaintiffs includes their failure to reimburse covered losses related to defense costs and future defense costs incurred in the Grede Lawsuits, settlement of the Grede Lawsuits, or other losses incurred in the Grede Lawsuits.

67. An actual case or controversy exists regarding Plaintiffs' rights and Defendants' obligations under the Policies to pay losses incurred by Plaintiffs related to the Grede Lawsuits.

68. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court establishing the following:

    (a)    Plaintiffs' losses arising from the defense and settlement of the Grede Lawsuits are insured losses under the Policies, and

    (b)    Defendants are obligated to pay Plaintiffs for the full amount of their respective shares of the defense costs incurred in the Grede Lawsuits, the $38.5 million settlement of the Grede Lawsuits, and any other insured losses that may be incurred in the Grede Lawsuits, up to the full applicable $65 million limit of the Policies.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray that the Court:

(1)    enter judgment on Count I of the Complaint in favor of Plaintiffs and against all Defendants;

(2)    enter judgment on Count I of the Complaint for compensatory damages in favor of Plaintiffs and against all Defendants in an amount sufficient to compensate Plaintiffs for all losses sustained as a result of Defendants' breach of the Policies and refusal to pay Plaintiffs for defense costs incurred in the Grede Lawsuits;

(3)    enter judgment on Count II of the Complaint in favor of Plaintiffs and against all Defendants;

(4)    enter judgment on Count II of the Complaint for compensatory damages in favor of Plaintiffs and against all Defendants in an amount sufficient to compensate Plaintiffs for all losses sustained as a result of Defendants' breach of the Policies and wrongful repudiation of their contractual obligations to fund the $38.5 million settlement and other losses incurred in the Grede Lawsuits;

(5)    enter a declaratory judgment on Count III of the Complaint in favor of Plaintiffs and against all Defendants, declaring as follows:

    (a)    Plaintiffs' losses arising from the defense and settlement of the Grede Lawsuits are insured losses under the Policies, and

    (b)    Defendants are obligated to pay Plaintiffs for the full amount of their respective shares of the defense costs incurred in the Grede Lawsuits, the $38.5 million settlement of the Grede lawsuits, and any other insured losses that may be incurred in the Grede Lawsuits, up to the full applicable $65 million limit of the Policies.

(6)    award to Plaintiffs and against Defendants prejudgment interest, to be calculated according to law, to compensate Plaintiffs for the loss of use of funds caused by Defendants' wrongful refusal to pay Plaintiffs for losses arising from the defense and settlement costs and to cover any other losses related to the Grede Lawsuits;

(7)     award Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand that all claims in this action be tried to a jury.

Dated:  August 3, 2011

                Respectfully submitted,

*/s/ Thomas Lang Wiseman*
Anthony P. Tatum
Georgia Bar No. 306287
Michael B. Wakefield
Georgia Bar No. 950517
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, GA  30309
404-572-4600 (Phone)
404-572-5138 (Fax)
ttatum@kslaw.com
mwakefield@kslaw.com

Thomas Lang Wiseman
Tennessee Bar No. 18293
Christopher Lynn Patterson
Tennessee Bar No. 23823
WISEMAN BRAY PLLC
1665 Bonnie Lane, Suite 106
Memphis, TN 38016

*Attorneys for Plaintiffs*