IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| **FIRST HORIZON NATIONAL** ) | |
| **CORPORATION, et al.,** ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
| **v.** ) | No. 11-2608 |
| ) | |
| **CERTAIN UNDERWRITERS AT** ) | |
| **LLOYD'S, et al.,** ) | |
| ) | |
|     **Defendants.** ) | |

---

**ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

---

Plaintiffs First Horizon National Corporation, FTN Financial Securities Corp., and First Tennessee Bank National Association (collectively, "First Horizon" or "Plaintiffs") filed suit against Defendants Certain Underwriters at Lloyd's, specifically Syndicate Nos. 2987 BRT and 2488 AGM, Aspen Insurance UK Limited, U.S. Specialty Insurance Company, and Federal Insurance Company (collectively, "Defendants") after Defendants denied First Horizon coverage under a series of insurance policies. (Second Am. Compl., ECF No. 79.) Defendants have answered. (Def.'s Ans., ECF Nos. 80, 81, & 82.) Before the Court is First Horizon's April 1, 2013 Motion for Partial Judgment on the Pleadings (the "Motion"). (Mot. for Partial J. on Plead., ECF No. 101.) Defendants responded on May

2, 2013. (Resp., ECF No. 102.) First Horizon replied on May 20, 2013. (Reply, ECF No. 103.) First Horizon asks the Court to determine that Defendants' interpretation of the "Insolvency Exclusion" (or the "Exclusion"), the principal basis for their denial of coverage to First Horizon, is unreasonable as a matter of law. (Mot., ECF No. 101 at 2.) For the following reasons, the Motion is GRANTED. Defendants' December 13, 2013 Motion for Summary Judgment on the Insolvency Exclusion and the Bad Faith Count ("Defendants' Motion") is DENIED. (Mot., ECF No. 139.)

I. **Background**

Through a series of policies, First Horizon purchased error and omissions ("E&O") professional liability insurance from Defendants. (Second Am. Compl. ¶ 24.) E&O policies cover financial institutions for loss arising from third-party claims that allege wrongful acts related to an insured institution's rendering of professional services. (Id. ¶¶ 2, 24.) Sentinel Management Group, Inc. ("Sentinel") is a cash-management firm and former customer of First Horizon. (Id. ¶ 36.) This dispute arises from Defendants' denial of coverage to First Horizon for loss incurred as a result of alleged wrongdoing by First Horizon in rendering professional services to Sentinel. (Id. ¶¶ 36, 37, 44.)

The Motion addresses a narrow issue. Defendants admit that they issued the policies alleged in the pleadings. (Def's.

2

Ans., ECF Nos. 80, 81, & 82 ¶¶ 65.) They admit that the policies indemnify First Horizon for loss arising from claims for any "alleged Wrongful Act . . . in the rendering or failure to render Professional services." (Id. ¶¶ 25.) Defendants do not dispute that they denied coverage, in part, based on the Insolvency Exclusion. (Id. ¶¶ 44.) Although the parties dispute its interpretation, the parties do not dispute that the Insolvency Exclusion is binding and contained in each of the relevant policies. (See generally id.; Second Am. Compl.) The issue is whether Defendants' interpretation of the Insolvency Exclusion justified denial of coverage.

Defendant Aspen Insurance UK Limited and Certain Underwriters at Lloyd's, specifically Syndicate Nos. 2987 BRT and 2488 AGM (the "Underwriter Defendants") provided coverage to First Horizon under Blended Insurance Programme Policy Number QA51908/1 (the "Primary Policy), First Excess Blended Insurance Programme Policy Number QA052008/1 (the "First Excess Policy"), and Fourth Excess Blended Insurance Programme Policy Number QA052108/1 (the "Fourth Excess Policy") (together, the "Underwriters' Policies"). (Second Am. Compl. ¶¶ 5, 6, 7.) The Underwriter Defendants issued the Underwriters' Policies to First Horizon National Corporation as the Named Insured providing coverage to Plaintiffs and certain of Plaintiffs' current and former employees. (Id.)

3

Defendant U.S. Specialty Insurance Company ("U.S. Specialty") provided excess insurance coverage to First Horizon under Excess Policy Number 24-MGU-08-A17157 (the "Second Excess Policy"). (Id. ¶ 11.) U.S. Specialty issued the Second Excess Policy to First Horizon National Corporation as the Named Insured, providing coverage to Plaintiffs and certain of Plaintiffs' current and former employees. (Id.)

Defendant Federal Insurance Company ("Federal") provided excess insurance coverage to First Horizon under Excess Policy Number 7042-7157 (the "Third Excess Policy") (together with the Primary Policy, the First Excess Policy, the Second Excess Policy, and the Fourth Excess Policy, the "Policies"). (Id. ¶ 14.) Federal issued the Third Excess Policy to First Horizon National Corporation as the Named Insured, providing coverage to Plaintiffs and certain of Plaintiffs' current and former employees. (Id.)

First Horizon purchased the Primary Policy from the Underwriter Defendants effective from August 1, 2008 to August 1, 2009 (the "Policy Period"). (Id. ¶ 24.) The Primary Policy has an applicable limit of $10 million and is the first layer of insurance coverage for Plaintiffs above a $15 million self-insured retention (similar to a deductible) maintained by First Horizon. (Id.) The Professional Liability Coverage Section of the Primary Policy contains the following insuring agreement:

4

> This policy shall indemnify the Insured for Loss arising from a Claim first made against the Insured during the Policy Period . . . and reported in writing to Underwriters pursuant to terms of this policy for any actual or alleged Wrongful Act of any Insured (or of any other person for whose actions the Insured is legally responsible) in the rendering or failure to render Professional Services.

(Primary Policy, ECF No. 6-1 at 66.) If a particular claim against First Horizon is covered under the Primary Policy, the Underwriter Defendants are obligated to pay First Horizon's "Loss," which is defined to include "damages, judgments, settlements and Defense Costs." (Id. at 68.) "Defense Costs" are defined in the Primary Policy to include fees, costs and expenses resulting from "the investigation, adjustment, defense and/or appeal of a Claim, Loss or against [sic] an Insured." (Id. at 13.)

Except as otherwise provided in each policy, the First Excess Policy, the Second Excess Policy, the Third Excess Policy, and the Fourth Excess Policy adopt all of the conditions, limitations, and other terms of the Primary Policy. (Second Am. Compl ¶¶ 28, 29, 30, 31.) The First Excess Policy provides First Horizon an additional $15 million of insurance for the Policy Period, above the $15 million retention and the $10 million first layer of insurance provided by the Primary Policy. (Id.) The Second Excess Policy provides First Horizon an additional $10 million of insurance for the Policy Period,

5

above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy and the $15 million of insurance provided by the First Excess Policy. (Id. ¶ 29.) The Third Excess Policy provides First Horizon an additional $10 million of insurance for the Policy Period, above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy, the $15 million of insurance provided by the First Excess Policy, and the $10 million of insurance provided by the Second Excess Policy. (Id. ¶ 30.) The Fourth Excess Policy provides First Horizon an additional $20 million of insurance for the Policy Period, above the $15 million retention, the $10 million first layer of insurance provided by the Primary Policy, the $15 million of insurance provided by the First Excess Policy, the $10 million of insurance provided by the Second Excess Policy, and the $10 million of insurance provided by the Third Excess Policy. (Id. ¶ 31.) Together, the Policies provide Plaintiffs with $65 million of insurance, above a $15 million self-retention, for a third-party claim covered under the Policies. (Id. ¶ 32; Underwriter Def.'s Ans. ¶ 32.)

Sentinel filed for Chapter 11 bankruptcy in August 2007. In 2008 and 2009, Sentinel's Liquidation Trustee (the "Trustee") filed two cases against First Horizon, the "Estate Case" and the "Customer Case" (collectively, the "Grede Lawsuits"). (Second

6

Am. Compl. ¶ 34.) In the Estate Case, the Trustee alleged that First Horizon had sold Sentinel structured financial products known as "PreTSLs" that were highly illiquid and that First Horizon knew were unsuitable for Sentinel's portfolio. (Id. ¶ 36.) In the Customer Case, the Trustee alleged that First Horizon had committed certain errors and omissions in rendering or failing to render professional services for a fee in the course of selling the PreTSLs to Sentinel, resulting in losses. (Id. ¶ 37.)

First Horizon defended the Grede Lawsuits and incurred more than $20 million in defense costs in excess of the Primary Policy's $15 million retention. (Id. ¶ 39.) First Horizon kept Defendants apprised of the material events in the defense of the Grede Lawsuits, providing Defendants the various amended complaints, multiple expert and rebuttal expert reports, and legal memoranda. (Id. ¶ 41.) Defendants also participated in numerous of First Horizon's quarterly claims-update conference calls, during which First Horizon notified Defendants of the accumulating costs of defending the Grede Lawsuits. (Id. ¶ 43.)

In an October 12, 2010 letter to First Horizon, the Underwriter Defendants stated that "coverage is unavailable for the Grede Litigation," invoking the Insolvency Exclusion. (Second Am. Compl. ¶ 44.) They reserved the right to raise other defenses under the Policies. (Underwriter Def.'s Ans. ¶

7

44.)  First Horizon responded in a letter dated April 25, 2011, arguing that there was no sound basis for invoking the Exclusion to preclude coverage for the Grede Lawsuits.  (Second Am. Compl. ¶ 45.)

In June and July 2011, First Horizon told Defendants that First Horizon intended to participate in mediating the Grede Lawsuits at the Trustee's request.  (Id. ¶ 46.)  First Horizon asked Defendants to authorize and fund any settlement that might be reached with the Trustee up to $38.5 million.  (Id. ¶ 47.)  In July 2011, the Underwriter Defendants authorized First Horizon to settle the Grede Lawsuits with First Horizon's own funds up to the limits of the Primary and First Excess Policies, waiving the defense of consent but refusing to pay any amount.  (Id. ¶ 48.)  In separate letters on July 25, 2011, Federal and U.S. Specialty informed First Horizon that they also would not raise consent as a defense if First Horizon settled the Grede Lawsuits, but that they also denied coverage.  (Id. ¶ 50; U.S. Specialty Ans., ECF No. 81 ¶ 50; Fed. Ans., ECF No. 82 ¶ 50.)

By letter dated August 4, 2011, First Horizon demanded that Defendants fulfill their legal obligations under the Policies by agreeing to fund the settlement and defense costs of the Grede Lawsuits.  (Second Am. Compl. ¶ 56; Def's. Ans., ECF Nos. 80, 81, & 82 ¶¶ 56.)  After protracted litigation, First Horizon

8

settled the Grede Lawsuits for approximately $36.7 million. (Second Am. Compl. ¶ 38.)

The Insolvency Exclusion provides that an insurer:

> shall not be liable to make any payment for Loss in connection with a Claim made against an Insured . . . arising out of . . . the bankruptcy . . . of . . . any . . . investment company . . .; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with an Insured's investment on behalf of the claimant in the stock of one of the foregoing entities.

(Primary Policy, ECF No. 6-1 at 73.) According to Defendants, First Horizon's loss arose from the bankruptcy of Sentinel, an investment company. First Horizon argues that the Insolvency Exclusion applies only to loss arising from the bankruptcy of third-party investment companies, not the customer that alleged the wrongful acts against the insured. The dispute is one of contractual interpretation, and First Horizon asks the Court to determine that its interpretation is correct to "significantly streamline the remaining issues to be tried in this case." (Plaint. Mot. Mem. of Law, ECF No. 101-1 at 3.)

## II. Jurisdiction and Choice of Law

Under 28 U.S.C. § 1332(a), this Court has original jurisdiction of all civil actions between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs". 28 U.S.C. § 1332(a)(1).

Plaintiff First Horizon National Corporation is a Tennessee corporation with its principal place of business in Memphis, Tennessee. (Second Am. Compl. ¶ 2.) Plaintiff Financial Securities Corp. is a Tennessee corporation with its principal place of business in Memphis, Tennessee. (Id. ¶ 3.) Plaintiff First Tennessee Bank National Association is a banking institution chartered by the Office of the Comptroller of the Currency with its principal place of business in Memphis, Tennessee. (Id. ¶ 4.)

Defendant Syndicate 2987 BRT is managed by Brit Syndicates Limited, a company organized under the laws of the United Kingdom. (Def. Corp. Discl. Stat, ECF No. 25 ¶ 3.) Syndicate 2987 BRT's principal place of business is in the United Kingdom. (Second Am. Compl. ¶ 5.) Defendant Syndicate 2488 AGM is managed by ACE Underwriting Limited, a company organized under the laws of the United Kingdom. (Def. Corp. Disc. Stat. ¶ 4.) Syndicate 2488 AGM's principal place of business is in the United Kingdom. (Second Am. Compl. ¶ 5.) Defendant Aspen Insurance UK Limited is a company organized under the laws of the United Kingdom with its principal place of business in the United Kingdom. (Id. ¶ 6.) Defendant U.S. Specialty is a Texas corporation with its principal place of business in Texas. (Id. ¶ 10.) Defendant Federal is an Indiana corporation with a principal place of business in New Jersey. (Id. ¶ 13.) First

Horizon has alleged millions of dollars in damages. (Id. ¶ 84.) The parties are completely diverse, and the amount in controversy requirement is satisfied.

In a diversity action, state substantive law governs. See Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 894 (6th Cir. 1997) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). When the parties agree that a certain state's substantive law applies, the court will not conduct a "choice of law" analysis *sua sponte*. GBJ Corp. v. Eastern Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998). The parties agree that Tennessee substantive law applies. (See Mot. at 8; Resp, ECF No. 102 at 7.)

**III. Standard of Review**

The standard of review governing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as the standard for a motion to dismiss under Rule 12(b)(6). Monroe Retail, Inc. v. RBS Citizens, N.A., 589 F.3d 274, 279 (6th Cir. 2009) (internal citation omitted). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir. 2007).

To survive a plaintiff's Rule 12(c) motion, a defendant's pleadings must contain sufficient facts "to 'state a [defense] that is plausible on its face'". See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Bare allegations without a factual context do not create defenses that are plausible. Ctr. For BioEthical Reform, Inc. v. Napolitano, 648 F.3d 365, 374 (6th Cir. 2011). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [the defendant] has acted []lawfully." Id. (citing Twombly, 550 U.S. at 556).

**IV. Analysis**

First Horizon argues that it is entitled to partial judgment on the pleadings because Defendants denied coverage based on an unreasonable interpretation of the "Insolvency Exclusion." (Mot., ECF No. 101-1 at 14.) According to First Horizon, the purpose of the Insolvency Exclusion is to protect Defendants from covering damages arising from loss to a First Horizon customer resulting from the bankruptcy of third parties with whom First Horizon invests a customer's assets. (Id. at 17.) First Horizon argues that it is not sensible that it would purchase insurance from Defendants that covers loss to a customer only up to the point the customer enters bankruptcy. (Id. at 16.)

12

Defendants urge a broad application of "any investment company," arguing that Sentinel, First Horizon's former customer, is an investment company and that the loss arose from its bankruptcy. (Resp., ECF No. 102 at 7.) According to Defendants, "'[a]ny' means 'any.' There is no carve out for 'customers of First Horizon.'" (Id.)

Interpreting an insurance contract "is a matter of law to be determined by the Court." VanBebber v. Roach, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007). Like other contracts, "the terms of an insurance policy should be given their plain and ordinary meaning." Garrison v. Bickford, 377 S.W.3d 659, 664 (Tenn. 2012) (internal quotation marks omitted). Disputed language "should be examined in the context of the entire agreement." Id. If a provision of an insurance policy is "susceptible to more than one plausible meaning, the meaning of the insured controls." Id. In particular, exclusions and limitations "in policies of insurance are to be most strongly construed against the insurer." Warfield v. Lowe, 75 S.W.3d 923, 925 (Tenn. Ct. App. 2002) (internal quotation marks omitted). "The insurer must establish that the exclusion applies in the particular case and that it is subject to no other reasonable interpretation." Blaine Constr. Corp. v. Ins. Co. of N. Am., 171 F.3d 343, 354 (6th Cir. 1999) (en banc). When denied coverage based on an exclusion, a plaintiff is

13

entitled to a judgment on the pleadings against an insurer when the plaintiff can "clearly" show that a reasonable interpretation of the exclusion allows for coverage. See JPMorgan, 510 F.3d at 581.

A plain reading of the text of the disputed provision, including the exception to the Insolvency Exclusion, shows that "any investment company" does not refer to customers of the insured, but only to third-party investment companies in which the insured invests a customer's money. No reasonable interpretation justifies application of the Exclusion when the loss arises from the bankruptcy of a customer of the insured. The Exclusion provides that an insurer:

> shall not be liable to make any payment for Loss in connection with a Claim made against an Insured . . . arising out of . . . the bankruptcy . . . of . . . any . . . investment company . . .; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with an Insured's investment on behalf of the claimant in the stock of one of the foregoing entities.

(Primary Policy, ECF No. 6-1 at 73.) The Exclusion contemplates four categories: Defendants, First Horizon, investment companies in which an insured places a customer's money, and "claimants," customers aggrieved by the loss of their money. Placing their names in the Exclusion clarifies it:

> [Defendants] shall not be liable to make any payment for Loss in connection with a Claim made against . . . [First Horizon] . . . arising out of . . . the bankruptcy . . . of . . . any . . . investment company

14

> . . .; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with . . . [First Horizon's] investment on behalf of the [customer] in the stock of one of the [investment companies].

(Id.) The text of the Exclusion plainly distinguishes investment companies and customers. Whether the customer allegedly wronged by the insured enters bankruptcy is not material. Instead, the Exclusion excludes coverage when the loss to the customer, and ultimately to the insured, arises from the bankruptcy of an investment company in which an insured places a customer's money.

Defendants' interpretation that "any investment company" includes a customer of the insured is not supported by the text of the Exclusion. It also makes little sense given the purpose of the Policies. The purpose of an E&O policy is to provide insurance for loss to insureds resulting from claims of wrongdoing made by the insureds' customers. Under Defendants' interpretation, the Insolvency Exclusion would arbitrarily limit coverage based on the ability of a customer to absorb the cost of an insured's wrongdoing. For example, if an insured's wrongdoing causes a $15 million dollar loss, but the customer avoids bankruptcy, a policy would cover a $15 million settlement between the insured and its customer. If an insured's wrongdoing causes a lesser loss, for example $10 million, but

15

that loss causes the customer to file for bankruptcy, a policy would not cover the loss.

Even if Defendants' interpretation of the Exclusion were reasonable, First Horizon's interpretation allows for coverage and is also "clearly" reasonable. See JPMorgan, 510 F.3d at 581; Blaine Constr., 171 F.3d at 354. First Horizon's interpretation is the more natural reading of the plain language of the Exclusion and is consistent with the Policies' purpose. Defendants' interpretation requires ignoring words in the Exclusion that narrow the meaning of "any investment company" and limits coverage on the arbitrary basis of a customer's ability to absorb an insured's wrongdoing.

Defendants' December 13, 2013 Motion for Summary Judgment on the Insolvency Exclusion and the Bad Faith Count asserts that (1) First Horizon's interpretation of the Exclusion is unreasonable as a matter of law, and (2) First Horizon cannot prove bad faith because the "plain language" of the Exclusion supports denial of coverage. (Mot. Mem. of Law, ECF No. 140 at 19-20.) Both parts of Defendants' Motion rest on flawed assertions addressed above.

**V. Conclusion**

For the foregoing reasons, First Horizon's Motion for Partial Judgment on the Pleadings is GRANTED. Defendants'

16

Motion for Summary Judgment on the Insolvency Exclusion and the Bad Faith Count is DENIED.

So ordered this 28th day of March, 2014.


                                              s/ Samuel H. Mays, Jr.
                                              SAMUEL H. MAYS, JR.
                                              UNITED STATES DISTRICT JUDGE