# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **FIRST HORIZON NATIONAL CORPORATION, FTN FINANCIAL SECURITIES CORP., and FIRST TENNESSEE BANK NATIONAL ASSOCIATION,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 2:11-cv-02608** |
| **CERTAIN UNDERWRITERS AT LLOYD'S,** Specifically Syndicate Nos. 2987 BRT and 2488 AGM, Subscribing to Policy Nos. QA051908/1 and QA052008/1, **and** | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **ASPEN INSURANCE UK LIMITED,** Subscribing to Policy Nos. QA051908/1 and QA052008/1, | ) ) ) ) | |
| **U.S. SPECIALTY INSURANCE COMPANY, and** | ) ) ) | |
| **FEDERAL INSURANCE COMPANY,** | ) ) | |
| **Defendants.** | ) ) | |
| _____ | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF BRIAN P. VAHEY, JR.

Thomas Lang Wiseman
Christopher Lynn Patterson
WISEMAN BRAY PLLC
1665 Bonnie Lane, Suite 106
Memphis, TN 38016

Meghan Magruder
Anthony P. Tatum
Shelby S. Guilbert
Sarah E. Statz
Michael B. Wakefield
J. Bradford Odom
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................2

I.      Mr. Vahey's Opinions.....................................................................................2

II.     Mr. Vahey's Lack of Relevant Experience .....................................................4

III.    Mr. Vahey's Analysis .....................................................................................5

ARGUMENT ..............................................................................................................6

I.      Mr. Vahey's Opinions Should Be Excluded As Irrelevant Unless the Court
        Determines that the Market Maker Exclusion Is Ambiguous.............................7

II.     Mr. Vahey Is Not Qualified to Opine on the Functions of Market Makers in
        PreTSLs............................................................................................................8

        A.      A "Financial Services" Generalist Is Not Qualified to Opine on the
                Functions of Market Makers in PreTSLs.................................................8

        B.      Mr. Vahey Has No Experience As a Broker-Dealer in Securities, And
                Therefore Is Not Qualified to Opine On the Manner in Which Broker-
                Dealers Trade...........................................................................................9

        C.      Mr. Vahey Has No Experience Trading PreTSLs. ................................13

III.    Mr. Vahey's Opinion Is Inherently Unreliable................................................14

        A.      Mr. Vahey's Lack of Experience Makes His Opinion Unreliable.........14

        B.      Mr. Vahey's Failure to Consider Relevant Evidence Inconsistent With
                His Conclusions Renders His Opinion Unreliable.................................15

        C.      The Evidence Mr. Vahey Relied On to Form His Opinions Is Unreliable...........17

        D.      Mr. Vahey's Testimony Undermines His Conclusion that the Activities
                He Has Identified Count As Market Making Activities. .......................19

CONCLUSION............................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Brown v. Raymond Corp.*,
  318 F. Supp. 2d 591 (W.D. Tenn. 2004) (Mays, J.), *aff'd*, 432 F.3d 640 (6th Cir.
  2005) ........................................................................................................................8

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)..............................................................................................2, 11, 15

*Certain Underwriters at Lloyd's, London v. Inlet Fisheries, Inc.*,
  389 F. Supp. 2d 1145 (D. Ala. 2005) ......................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...........................................................................................2, 6, 7, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................................15

*Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*,
  136 F. Supp. 2d 901 (W.D. Tenn. 2001).................................................................7

*E.E.O.C. v. AutoZone, Inc.*,
  No. 00-2923, 2005 WL 3591641 (W.D. Tenn. Dec. 29, 2005) (Mays, J.) ............15

*Ellipsis, Inc. v. The Color Works, Inc.*,
  428 F. Supp. 2d 752 (W.D. Tenn. 2006)....................................................... passim

*Exch. Servs., Inc. v. S.E.C.*,
  797 F.2d 188 (4th Cir. 1986) ................................................................................11

*Johnson v. Manitowoc Boom Trucks, Inc.*,
  484 F.3d 426 (6th Cir. 2007) .................................................................................7

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).............................................................................................6, 9

*Morrison v. Nat'l Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010)..........................................................................................11

*N. Am. Specialty Ins. Co. v. Myers*,
  111 F.3d 1273 (6th Cir. 1997) .............................................................................7, 8

*S.E.C. v. Smith*,
  No. C2-CV-04-739, 2005 WL 2373849 (S.D. Ohio Sept. 27, 2005) .....................17

*S.E.C. v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................9

*Sigler v. Am. Honda Motor Co.*,
    532 F.3d 469 (6th Cir. 2008) ....................................................................................7

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
    No. 12 Civ. 3040(KBF), 2014 WL 464769 (S.D.N.Y. Jan. 28, 2014) ...................18

*United States v. Cunningham*,
    679 F.3d 355 (6th Cir. 2012) .............................................................................7, 8

**STATUTES**

15 U.S.C. § 78c(a)(38)........................................................................................11, 17

15 U.S.C. § 78o(a)-(b) ................................................................................................10

iii

## <u>INTRODUCTION</u>

The Insurers[1] have offered Brian P. Vahey, Jr. to rebut the expert reports offered by First Tennessee's experts, former SEC Commissioner Paul S. Atkins, and Robert Pak, a broker-dealer with substantial experience trading PreTSLs.  Messrs. Atkins and Pak will explain at trial why FTN Financial Securities Corp. ("FTN") was not a market maker in PreTSLs, from both a regulatory perspective and the standpoint of an experienced trader, because FTN never held itself out as willing to buy and sell PreTSLs for its own account on a regular or continuous basis.  In response, the Insurers have proffered Mr. Vahey, who has absolutely no regulatory or trading experience, to opine that, based on his arbitrary identification of purported "activities of market makers," FTN functioned as a market maker for PreTSLs.

Of course, none of the market maker opinions should reach the jury if the Court grants First Tennessee's Motion for Partial Summary Judgment, and finds as a matter of law that the exclusion does not apply.  (Doc. 146.)  However, if the market maker issue does survive summary judgment, the expert opinions of Messrs. Atkins and Pak should be admitted, while Mr. Vahey's rebuttal opinion should still be excluded because he is not an "expert."

As an initial matter, Mr. Vahey's opinion is unhelpful because, in identifying what he calls the "activities of market making," he supplies no definition of the term "market maker" anywhere in his report.  And like the Insurers, who at the outset of these proceedings defined market maker in accordance with the Securities Exchange Act of 1934 (the "Exchange Act") definition that FTN does not meet (Doc. 155 at 3-4), Mr. Vahey also rejects that definition entirely, suggesting without any basis that the definition might not apply in illiquid markets.  For reasons outlined in First Tennessee's summary judgment briefing, that conclusion is incorrect as

[1] Unless otherwise noted, capitalized terms herein have the same meaning as in the Motion To Exclude the Expert Testimony of Brian P. Vahey, Jr., submitted herewith.  Citations to "Ex." are to the Odom Declaration submitted herewith.

a matter of law.  (Doc. 155 at 6-10.)  But even if the Court disagrees, two fundamental problems render Mr. Vahey's opinion inadmissible under Rule 702 and *Daubert*.

*First*, Mr. Vahey is not a broker-dealer and has never traded PreTSLs.  Thus, he lacks the relevant expertise to offer opinions about whether market makers exist in the PreTSL market.  In fact, for the last six years, Mr. Vahey has functioned as a professional expert witness at Berkeley Research Group and Mesirow Financial Consulting.  Before that, he never bought or sold the PreTSL securities on which he is opining.  In fact, Mr. Vahey has no experience whatsoever as a broker or dealer buying and selling securities in the secondary markets, which is where market makers exist.  Thus, he lacks any basis to provide testimony as an "expert."

*Second*, Mr. Vahey's opinion is inherently unreliable.  In addition to his complete lack of expertise, he failed to examine any of the underlying transactions at issue that the Insurers have pointed to in support of their conclusion that FTN functioned as a market maker in PreTSLs.  Instead, he points to bits and pieces of evidence that the Insurers attached to their summary judgment motion, while ignoring the conclusion of the Trustee's expert from the underlying litigation—whose research Mr. Vahey purportedly relied upon in forming his opinions—who concluded that FTN was not a market maker in PreTSLs.  Because Mr. Vahey lacks the relevant experience to offer an expert opinion on market makers in PreTSLs, and because he did not conduct the type of rigorous analysis that is required to survive *Daubert* scrutiny, Mr. Vahey's testimony should be deemed inadmissible.

## FACTUAL BACKGROUND

### I.    Mr. Vahey's Opinions

The Insurers retained Mr. Vahey to opine on three issues: whether FTN was a "market maker" for PreTSLs; whether Sentinel was an "investment company"; and whether Sentinel was a commodities broker-dealer; as those terms are "commonly understood" in "common parlance"

in the "investment industry" and "financial services industry."[2]  (Ex. 1 ("Vahey Rpt.") ¶¶ 1, 14-16; Ex. 2 ("Vahey Dep.") at 45:7-16; 127:18-128:6, 137:21-139:3, 142:13-143:2.)  As Mr. Vahey described his assignment, "I was asked sort of what the broad industry sort of understanding is[.]" (Vahey Dep. at 123:14-21; *id.* at 142:8-10.)

Mr. Vahey summarized his market making opinion as follows:

> **Opinion 1**: "Making a market" is a common and widely used term in the financial services industry.  The activities of a market maker depend on the market, security characteristics, and a dealer's capabilities.  FTN was a market maker, as the term is commonly understood, for PreTSL securities.

(Vahey Rpt. ¶ 14.)  Mr. Vahey never actually defines what a "market maker" is anywhere in his report.  Instead, without any citation or other apparent basis, Mr. Vahey opines that "the fundamental activities of market making are: [1] Willingness to hold inventory; [2] Regular contact with customers to both buy and sell securities; [3] Supporting and facilitating a market; and [4] Earning a profit from the bid-ask spread or other fees in the transactions instead of earning a profit from capital appreciation or income generated by the securities.  (*Id.* ¶ 31.)  Mr. Vahey opines that these functions "vary based upon the characteristics of the security, the security's market, and the market maker's capabilities."  (*Id.* ¶ 32; *id.* ¶ 33 (stating "[m]arket makers in liquid markets perform their activities differently from market makers in illiquid markets" without any citation).)  He then concludes, based on a handful of random statements by "industry associations, industry newsletters, and regulators," that FTN performed functions that are characteristic of market makers for PreTSLs.  (*Id.* ¶¶ 62-63.)

---

[2] Mr. Vahey's opinions that Sentinel was an investment company and a commodities broker, though incorrect, are not discussed further herein given the Court's ruling that the Insolvency Exclusion does not apply.  (Doc. 201.)  Because expert opinions on those issues are now moot, Mr. Vahey should not be permitted to offer rebuttal opinions on those subjects.  *See* Fed. R. Evid. 401, 402.

3

## II.  Mr. Vahey's Lack of Relevant Experience

Mr. Vahey's opinion concerning the activities of market makers is based solely on his experience in what he calls the "financial services industry."  (*Id.* ¶¶ 14-16, 18.)  In his deposition, Mr. Vahey defined the "financial services industry" broadly to include everyone from a pension fund manager to a payday lender.  (Vahey Dep. at 134:7-137:20.)

Mr. Vahey currently is a consultant at Berkeley Research Group ("BRG"), which describes itself as "a leading global expert services and consulting firm."  (BRG website, http://www.brg-expert.com/about.html.)   Mr. Vahey's work at BRG includes providing "financial services matter expertise in litigation, restructuring, and valuation matters."  (Vahey Rpt., App. A ("CV") at 2; Vahey Dep. at 55:21-56:19 (testifying that he spends more than two-thirds of his time as an expert for litigation).)  Before joining BRG, Mr. Vahey "worked in a similar capacity" at Mesirow Financial Consulting, another consulting firm, where as he describes it, he was "the expert in all financial instruments."  (Vahey Rpt. ¶ 6; Vahey Dep. at 90:7-18.)[3]

Before joining Mesirow, Mr. Vahey worked at King Street Capital Management, LLC, a New York hedge fund.  (CV at 1.)  At King Street, Mr. Vahey managed a portfolio of structured finance products (but not PreTSLs), but only as a buy and hold investor on the buy-side of the market, and never as a broker-dealer, market maker, or other sell-side market participant.[4]  (*Id.* at

---

[3] While at Mesirow, Mr. Vahey worked on issues relating to Sentinel's Bankruptcy with one of the Trustee's expert witnesses, James Feltman.  In reaching the conclusions he offers in this case, Mr. Vahey is not relying in any way on information he obtained in connection with the work he performed for Mr. Feltman or the Sentinel Trustee.  (Vahey Dep. at 94:6-10.)

[4] Mr. Vahey explained the distinction between buy-side firms and sell-side firms as follows: "generally the buy-side are the folks that are investing, and sell-side the folks that are, you know, providing the -- selling the securities to be invested."  (Vahey Dep. at 62:6-11; *see also* Doc. 141-35 ("Pak Rpt.") ¶ 50 (explaining that the buy-side of the market involves "portfolio management" while the sell-side includes "[broker-dealer] banking, structuring, and sales and trading").)

2-3; Vahey Dep. at  60:14-62:14 ("Q. When you worked at King Street, was it considered a sell-side firm?  A. No. They've always -- they're a buy-side firm. . . . Q. When you were at King Street Capital, was King Street Capital considered to be a broker? A. No, they're not a broker."); *id.* at 74:10-13 ("Q. When you were at King Street Capital, did King Street Capital invest in PreTSLs?  A. No, not -- I didn't[.]").)

Prior to joining King Street Capital, Mr. Vahey was a portfolio manager for General Electric Asset Management/GE Capital.  (CV at 1.)  While at GE, Mr. Vahey also managed a portfolio of fixed-income securities (which again did not include PreTSLs), but he did so only as an investor on the buy-side of the market, and never as a broker-dealer, market maker, or other sell-side market participant.  (CV at 3-4; Vahey Dep. at 83:8-20 ("Q. Well, did you ever actually invest in any trust preferred products or PreTSL products yourself when you were at GE?  [Objection] . . . A. No, I did not."); *id.* at 86:2-10 ("We -- where GE Asset Management and before that at GE Capital, it was always the buy-side operation.").)

In sum, PreTSLs are a debt security, and Mr. Vahey confirmed that his only experience with debt securities is exclusively on the "buy-side" of the market, as a purchaser or investor, and he has never worked at a "sell-side" firm, such as a broker-dealer in securities.  (CV at 1; Vahey Dep. at 62:19-63:5 ("Q. Have you ever worked at a sell-side firm? A. I -- not directly. . . . Q. Have you ever worked for a firm that was considered a broker?  A. . . . no."); *id.* at 225:3-4 ("Q. Have you ever taken down a bond?  A. No, I've never been a dealer.").)

## III.   Mr. Vahey's Analysis

In rendering his opinion, Mr. Vahey testified that he did not actually review any records of the underlying secondary market PreTSL transactions on which he opined.  (Vahey Dep. at 192:19-193:5 ("Q. Did you, in the course of your preparing your report, do an independent [e]valuation of the transaction history in PreTSLs between FTN and Sentinel?  A. I did not view

that to be -- given my experience in the space and the previous work done by Olvany and others, I figured that would be excessive. I certainly could, if you would like me to. Q. So you relied on the experts in the other matter? A. And my experience in the space, yeah, as far as their behavior in that -- in their sector.").) Specifically, Mr. Vahey relied on data summarized in the expert report of John J. Olvany, who was the Trustee's expert in the underlying Sentinel Litigation. (Vahey Rpt. ¶¶ 20 n.3, 22 n.7, 49 n.21 (citing Olvany Report for PreTSL data).)[5] Mr. Vahey fails to acknowledge that Mr. Olvany concluded based on this same dataset that "FTN did not make a market in PreTSLs." (Doc. 150-41 ("Olvany Rpt.") ¶ 130; Vahey Dep. at 237:19-238:8 (admitting he did not review the documents that Mr. Olvany considered in preparing his report).)

## ARGUMENT

"Rule 702 of the Federal Rules of Evidence, as discussed and interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), controls the admissibility of expert testimony." *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 757 (W.D. Tenn. 2006). Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Thus, expert testimony may only be admitted into evidence if: (1) the witness qualifies as an expert; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact to

---

[5] *See also* Vahey Dep. at 186:17-24 (stating that the Olvany Report was the basis for his opinions regarding FTN's purchase and sale of PreTSLs); *id.* at 191:2-11 (same); *id.* at 232:19-22 ("Q. And this [the Olvany Report] is the report you relied upon to learn more about the transaction history of PreTSLs? A. Excuse me. Yes.").

understand the evidence or determine a fact in issue." *Ellipsis*, 428 F. Supp. 2d at 757.  It is the Court's role to serve as "gatekeeper" to exclude improper expert testimony. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).  Finally, the party proffering the expert testimony must demonstrate by a "preponderance of proof" that its purported expert qualifies to give expert testimony under Rule 702, *Daubert*, and its progeny. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).  The Insurers cannot make that showing.

I. **Mr. Vahey's Opinions Should Be Excluded As Irrelevant Unless the Court Determines that the Market Maker Exclusion Is Ambiguous.**

As a threshold matter, unless and until the Court rules that the Market Maker Exclusion is ambiguous, Mr. Vahey's opinion should be excluded as irrelevant because it will not "'help the trier of fact to understand the evidence or to determine a fact in issue.'" *See United States v. Cunningham*, 679 F.3d 355, 379-80 (6th Cir. 2012) (quoting Fed. R. Evid. 702).  The proper interpretation of disputed language in the Policy is a matter of law to be determined by the Court "according to [the contract's] plain terms, considering the entire contract when determining the meaning of any or all of its parts." *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001).  "Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (quotation omitted).

Here, as outlined in its Motion for Partial Summary Judgment (Doc. 147), First Tennessee has offered the only reasonable interpretation of the Market Maker Exclusion.  (Docs. 148 at 14-15, 155 at 3-17, 165 at 8-9.)  Accordingly, as with his investment company and broker or dealer in commodities opinions which are now moot, Mr. Vahey's opinion regarding the activities of market makers is irrelevant and should be excluded after the Court grants First Tennessee's Motion for Summary Judgment. *See N. Am. Specialty Ins. Co.*, 111 F.3d at 1280-81

7

(affirming exclusion of expert testimony on interpretation of insurance contract because the Court did not need "to interpret any ambiguous provisions or confusing technical terms").

## II.   Mr. Vahey Is Not Qualified to Opine on the Functions of Market Makers in PreTSLs.

Even if the Court finds that the Market Maker Exclusion is ambiguous, and that evidence regarding industry understandings of that term is relevant, unlike Mr. Atkins and Mr. Pak, Mr. Vahey is simply not qualified to opine on the functions of market makers in PreTSLs.

### A.   A "Financial Services" Generalist Is Not Qualified to Opine on the Functions of Market Makers in PreTSLs.

Mr. Vahey claims to provide "financial services matter expertise in litigation, restructuring, and valuation matters." (CV at 2.) But "[a] witness is not an expert simply because he claims to be." *Brown v. Raymond Corp.*, 318 F. Supp. 2d 591, 598 (W.D. Tenn. 2004) (Mays, J.), *aff'd*, 432 F.3d 640 (6th Cir. 2005). "Pursuant to Rule 702, a witness may offer expert testimony only if he or she is 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Ellipsis*, 428 F. Supp. 2d at 758 (quoting Fed. R. Evid. 702). "To qualify as an expert, the witness' knowledge, skill, experience, training or education must be ***closely*** related to the subject matter of his testimony." *Id.* (emphasis added).

Here, the Insurers seek to qualify Mr. Vahey based solely on his general experience in the "financial services industry." (Vahey Rpt. ¶¶ 14-16, 18, 63; Vahey Dep. at 177:16-178:16, 192:19-193:5 (testifying that his market maker opinion is based on "industry experience" and "experience in the space"). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a ***particular subject*** depends on the nature and extent of ***that experience***." *Cunningham*, 679 F.3d at 379 (emphasis added). Further, where a purported expert's qualification is based on experience alone, the expert must have "extensive and specialized experience" regarding the topic on which he seeks to opine. *Kumho*, 526 U.S. at 156;

*see also Certain Underwriters at Lloyd's, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1154 (D. Ala. 2005) (excluding purported expert because he lacked "particularized experience" with respect to specific subject of his testimony).

Moreover, as other courts have recently held in litigation specifically relating to the structured finance market, "[b]eing a professional testifying expert in the financial area does not give an individual the qualification to opine in every financial area as to every type of analysis." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-79 (S.D.N.Y. 2013) (excluding putative expert witness's opinions based on lack of qualification where proposed expert "acknowledged that, aside from talking about CDOs in his class, his exposure to the CDO industry is entirely in the context of providing expert services subsequent to the financial crisis in 2007"). "[E]xpertise" in a general area of financial markets that is merely "proximate" to the subject of the proposed testimony is insufficient. *Id.* at 677-78 (considering and rejecting "the possibility that [the putative expert's] area of expertise is sufficiently proximate to the subject of his proposed testimony to overcome his lack of experience with the structuring or marketing of CDOs"). Accordingly, even if a putative expert has "expertise in the general area of structured finance," he is *not* qualified to testify regarding a specific structured finance product with which he lacks experience. *Id.* ("He [the putative expert] does appear to have expertise in the general area of structured finance, but that is so broad a category as to become meaningless when particularized here to synthetic CDOs, a very specific type of security").

### B. Mr. Vahey Has No Experience As a Broker-Dealer in Securities, And Therefore Is Not Qualified to Opine On the Manner in Which Broker-Dealers Trade.

Mr. Vahey is not qualified to opine on the functions of market makers in PreTSLs because he has never been a broker-dealer in securities, or any other sell-side market participant. Mr. Vahey concedes that "[s]ecurities dealers ('Dealers') are primarily the market participants

9

who function as a market maker." (Vahey Rpt. ¶ 30.)[6]  But Mr. Vahey has never been a broker-dealer in securities of any kind.  (Vahey Dep. at 62:24-63:5, 105:11-17.)  As he put it, "I've never been a dealer."  (*Id.* at 225:3-4.)  Nor has Mr. Vahey ever worked on the sell-side of the market.[7]  (*Id.* at 62:19-23 ("[M]e personally it's always been buy-side.").)  Thus, of course, Mr. Vahey has never been a market maker in PreTSLs or any other fixed-income security.  (*Id.* at 143:3-144:5.)

Indeed, when he was a market participant, Mr. Vahey lacked even the most fundamental qualifications to participate as a broker-dealer on the sell-side of the securities market, including registration with the Securities and Exchange Commission ("SEC") and passing the Series 7 examination.[8]  Section 15 of the Securities Exchange Act of 1934 requires that a broker or dealer in securities and any person associated with a broker or dealer register with the SEC.  15 U.S.C. § 78o(a)-(b).  "Individuals who want to enter the securities industry to sell any type of securities must take the Series 7 examination—formally known as the General Securities Representative Examination."  (SEC Website, Series 7 Examination, https://www.sec.gov/answers/series7.htm.)

---

[6] *See also* Vahey Dep. at 168:25-169:12 ("Q. In your view, where do market makers typically exist? . . . A. . . . I'm -- my experience certainly sort of for writing this report and my experience is dealers are a pretty good source. . . . so that's where I would say I found most of them.")

[7] Mr. Vahey acknowledges that other individuals closer to actual trading operations, like Mr. Pak, have a better understanding of what making a market means.  (Vahey Dep. at 134:24-135:6 ("Q. Would someone who is closer to actual trading operations as you use that -- that phrase, have a better understanding as to what making a market means than someone who is farther away from actual trading operations?  [Objection.]  A. I mean, generally one would hope.").)

[8] Perhaps recognizing this gap in his experience, Mr. Vahey obtained his Series 7 license only after he became a consultant at Mesirow Financial, not while he was a market participant.  (Dep. at 104:12-16.)  Mr. Vahey admits that he has never used his Series 7 license to buy or sell securities, never managed a trading book at a broker-dealer, and does not consider himself a securities broker-dealer.  (*Id.* at 104:12-105:21.)  Mr. Vahey does not even know what his Series 7 licenses him to do.  (*Id.* at 103:8-24 ("Q. Now, you mentioned earlier the Series 7.  What's the -- what's a Series 7? . . . Q. So it's a license to trade as a securities broker-dealer?  What's it a license to do?  A. I don't know.").)  Mr. Vahey explained: "I just know that most broker-dealer folks who work for broker-dealers are going to have that . . . ."  (Vahey Dep. at 104:1-3.)

The Series 7 examination is "a comprehensive test of the securities and brokerage field" that covers, among other topics, "federal and state securities regulations." *Exch. Servs., Inc. v. S.E.C.*, 797 F.2d 188, 189 & n.2 (4th Cir. 1986).

A broker-dealer who has passed the Series 7 test and registered with the SEC should know that the Exchange Act is central to how securities trade in the secondary market, including whether an entity is a market maker. *See Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2885 (2010) (noting that the Exchange Act is the foundation of the "comprehensive regulation of securities trading" in the United States); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994) ("[T]he 1934 [Exchange] Act for the most part regulates post-distribution trading."). Yet in rendering his opinions, Mr. Vahey ignores the fact that the Exchange Act supplies a very specific definition of the term "market maker" that is inconsistent with the market making activities he has identified. *See* 15 U.S.C. § 78c(a)(38) ("The term 'market maker' means . . . any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.").

Mr. Vahey never attempts to reconcile the Exchange Act definition with his description of the activities of market makers, asserting without any basis for saying so that market makers perform different activities in liquid and illiquid markets. (Vahey Rpt. ¶ 33.) His opinion ignores SEC guidance that the Exchange Act definition applies to market makers in all debt securities markets in the United States—regardless of liquidity. (Doc. 158-17, SEC Order Granting Approval to Proposed Rule Change, Release No. 34-55638 at 18 n.60 (Apr. 16, 2007) (also available at 2007 WL 1342088) ("2007 SEC Order") ("[T]o be considered a market maker, a dealer must meet the legal requirements set forth in the [Exchange] Act[.]")). In other words, in

11

debt securities markets, "a dealer is not and should not be considered a market maker merely
because the dealer takes risk positions or devotes substantial capital to provide liquidity." (*Id.*)

In his report, Mr. Vahey offers no support for his sweeping statement that the "SEC rules
are clearly established for market makers in only the most liquid of markets."  (Vahey Rpt. ¶ 65.)
During his deposition, Mr. Vahey likewise failed to provide any support for this statement.
(Vahey Dep. at 214:12-24 ("Q. Is it your opinion that [the Exchange Act] definition [of market
maker] does not apply or did not apply to illiquid markets during the time period 2004 to 2007?
A. Well, that -- it would be helpful if we could refer to that and I could point out how it does or
doesn't apply.  ***Because I'm kind of guessing***.") (emphasis added).)

Mr. Vahey's lack of experience also leads him to provide unreliable opinions that
experienced market participants do not hold.  For example, Mr. Vahey agrees with First
Tennessee's expert Robert Pak that there are three ways to transact in the illiquid secondary
market for PreTSLs: (1) matching up buyers and sellers; (2) transacting via offer wanted in
competition ("OWIC") or bid wanted in competition ("BWIC") lists, in order to buy or sell a
certain list of bonds respectively; or (3) a broker-dealer can buy or "principal" the PreTSLs
("Taking Down Bonds").  (Vahey Dep. at 224:9-225:2; Vahey Rpt. ¶¶ 42-25; Doc. 141-35 ("Pak
Rpt.") ¶¶ 57-76.)   But Mr. Pak, who bases his opinions on his over 17 years of trading
experience as a broker-dealer in the structured finance industry, including as an active trader in
PreTSLs, merely opines that these are ways that broker-dealers trade in illiquid markets, and not
defining characteristics of market makers.  Mr. Pak concludes that FTN was acting as a non-
market maker, broker-dealer when it transacted with clients, including Sentinel, in each of these
three ways.  (Pak Rpt. ¶¶ 6, 50, 76-78, 88.)

Mr. Vahey, on the other hand, who bases his opinion on *no* experience trading PreTSLs
and *zero* experience as a broker-dealer, says the exact opposite, opining that FTN's same

transactions in these three ways, makes it a market maker.  (Vahey Rpt. ¶¶ 51-54.)  But Mr. Vahey admits he has no experience taking down PreTSLs or any other bonds.  (Vahey Dep. at 225:3-4; *id.* at 225:19-22 ("Q. But you haven't been part of that process [of taking down bonds] before, have you?  A. No.  I've just analyzed companies in the space and that's sort of my perspective.")  Nor does he have any experience working an OWIC or BWIC list as a dealer. (*Id.* at 225:23-226:25.)  Finally, Mr. Vahey admits he has never been involved in matching up buyers and sellers, as a broker-dealer does.  (*Id.* at 230:25-231:6 ("Q. So you personally were involved in the matching up or someone else --  A. No, it's [salesmen].  I'm a buy-side guy, so the broker-dealers are the ones who facilitate the -- that's what they do[.]").)

At bottom, the fundamental disagreement between Mr. Vahey and First Tennessee's experts is whether FTN was a market maker in PreTSLs (as Mr. Vahey contends) or a broker-dealer in PreTSLs (as Messrs. Pak and Atkins contend).  (Doc. 155 at 6-8.)  Mr. Vahey is fundamentally unqualified to opine on this issue because, although he bases his opinions on his experience alone, he has never participated in the market as a broker-dealer in securities or any other type of sell-side market participant, and he ignores the regulatory framework that governs the manner in which market makers operate.  Therefore, his opinion should be excluded.

### C.      Mr. Vahey Has No Experience Trading PreTSLs.

Besides his utter lack of experience as a broker-dealer, Mr. Vahey also has no experience trading PreTSLs.  In his report, Mr. Vahey claims that he has "analyzed, invested, and traded many different varieties of CDOs including Trust Preferred CDOs and in particular, PreTSLs." (Vahey Rpt. ¶ 8.)  But under cross-examination, Mr. Vahey admitted that he has ***absolutely no experience trading PreTSLs***.  (Vahey Dep. at 74:10-75:3 (Q. When you were at King Street Capital, did King Street Capital invest in PreTSLs?  A. No, not -- I didn't[.]"); *id.* at 82:6-84:1 ("Q. Well, did you ever actually invest in any trust preferred products or PreTSL products

13

yourself when you were at GE? . . . A. No, I did not.")  Mr. Vahey testified that while he was at

GE, he "inherited" a portfolio that contained other trust preferred CDOs, but Mr. Vahey admitted

that he never invested in PreTSLs.  (*Id.* at 83:21-84:1.)  Mr. Vahey's complete lack of experience

trading PreTSLs renders him unqualified to opine regarding the secondary market trading of

PreTSLs, including whether FTN was a market maker or broker-dealer in that market.

## III.    Mr. Vahey's Opinion Is Inherently Unreliable.

Rather than supplying any objective definition of market maker, the foundation of Mr.

Vahey's opinion is his own unsupported assertion that "the fundamental activities of market

making are: [1] Willingness to hold inventory; [2] Regular contact with customers to both buy

and sell securities; [3] Supporting and facilitating a market; and [4] Earning a profit from the bid-

ask spread or other fees in the transactions instead of earning a profit from capital appreciation or

income generated by the securities."  (Vahey Rpt. ¶¶ 31, 46.)  Mr. Vahey does not bother to cite

any evidence or other support for his view.  (*Id.*)  Instead, Mr. Vahey's opinion is based solely on

his "experience as a participant in the securities marketplace."  (*Id.* ¶ 31.)  In other words, Mr.

Vahey asks the Court to "take his word for it."   But given Mr. Vahey's lack of experience,

failure to consider relevant evidence, dependence on unreliable evidence, and admission that his

own criteria may not hold water, the Court should exclude his opinion as unreliable.

### A.    Mr. Vahey's Lack of Experience Makes His Opinion Unreliable.

First, Mr. Vahey's lack of experience as a broker-dealer in securities, along with his

complete lack of experience trading PreTSLs, make his opinion—which is supposedly based

solely on that phantom experience—unreliable.  "If the witness is relying solely or primarily on

experience, then the witness must explain how that experience leads to the conclusion reached,

why that experience is a sufficient basis for the opinion, and how that experience is reliably

applied to the facts."  Fed. R. Evid. 702 advisory committee notes, 2000.  "The trial court's

gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* "Under *Daubert*, that's not enough." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).

Here, Mr. Vahey has not explained how his limited experience, solely on the buy-side of the market, coupled with his total lack of experience trading PreTSLs, provides any basis for him to opine that FTN was a market maker in PreTSLs. Therefore, his unreliable opinion should be excluded. *See E.E.O.C. v. AutoZone, Inc.*, No. 00-2923, 2005 WL 3591641, at *2 (W.D. Tenn. Dec. 29, 2005) (Mays, J.) ("The data and the expert's opinion should have a logical connection beyond the *ipse dixit* of the expert."); *Daubert*, 509 U.S. at 592-94 (same).

### B.    Mr. Vahey's Failure to Consider Relevant Evidence Inconsistent With His Conclusions Renders His Opinion Unreliable.

Mr. Vahey's failure to consider numerous pieces of relevant evidence also renders his opinion unreliable. *See Ellipsis*, 428 F. Supp. 2d at 759 ("When determining whether an expert's testimony is reliable, the court may consider the factual basis for the expert's opinion.").

*First*, Mr. Vahey attributes his conclusory statement that "FTN and KBW were the premier market makers for PreTSL securities" (Vahey Rpt. ¶ 27) to the summary of PreTSL trading data in the Olvany expert report, submitted by the Trustee in the underlying Sentinel Litigation (Vahey Dep. at 191:2-192:18). Mr. Vahey admitted that he conducted no independent review of the transaction history (as First Tennessee expert Robert Pak did), instead solely relying on Mr. Olvany's report (*id.* at 192:19-193:5[9]), all the while ignoring Mr. Olvany's ultimate conclusion that "FTN did not make a market in PreTSLs" (Olvany Rpt. ¶ 130). Mr. Vahey acknowledged that regulators would look at trading activity to assess whether someone

---

[9] *See also* Vahey Dep. at 186:17-24 (testifying that the Olvany Report was the basis for his opinions regarding FTN's purchase and sale of PreTSLs); *id.* at 232:19-22 ("Q. And this [the Olvany Report] is the report you relied upon to learn more about the transaction history of PreTSLs? A. Excuse me. Yes.").

was a market maker, but he did not bother to do so.  (Vahey Dep. at 198:14-199:6 (noting that regulators would "look at trading records over time" to determine if broker-dealer is a market maker); *see also id.* at 177:16-178:16.)

*Second*, Mr. Vahey did not consider whether FTN made any revenues as a market maker. (Vahey Dep. at 159:21-160:10.)  It is undisputed that FTN did not earn any revenue as a market maker in PreTSLs, or any other security.   (Ex. 3, July 24, 2008 Policy Appl. at FH_INS00039828; Doc. 156, Duckло Dec. ¶ 4; Doc. 171-1, Resp. to ¶ 8.)  Yet Mr. Vahey discounts this fact because, according to him, "that's not part of the definition of market making."  (Vahey Dep. at 160:11-18.)

*Third*, Mr. Vahey admitted that a security's prospectus is "important . . . to an investor," that he reviewed the written prospectus for a particular product "every time" before deciding whether to make an investment, and that he never made an investment in the fixed income market without first reviewing the prospectus or other offering documents.  (Vahey Dep. at 24:13-30:11; *id.* at 24:13-26:7 (discussing his prior testimony in another matter regarding "what the prospectus [for a structured finance product] detailed ***and how important it is to an investor***") (emphasis added).)  And the offering documents for PreTSLs were explicit:

> There is no market for any of the Notes being offered hereby and, as a result, a purchaser must be prepared to hold the Notes for an indefinite period of time or until the maturity thereof.  The Notes will be owned by a relatively small number of investors and it is highly unlikely that an active secondary market for the Notes will develop.  Purchasers of the Notes may find it difficult or uneconomic to liquidate their investment at any particular time.

(*E.g.*, Doc. 159-6, PreTSL XIX Offering Circular, Sept. 9, 2005, at FH_INS00013129 (setting forth "Limited Liquidity" provision that appears in PreTSL offering documents)).  Nevertheless, Mr. Vahey completely discounts the disclaimers of liquidity in the PreTSL offering circulars and offering memoranda without any explanation (Vahey Rpt. ¶ 72), even though the disclaimers, as

a matter of law, should control, *see, e.g.*, *S.E.C. v. Smith*, No. C2-CV-04-739, 2005 WL 2373849, at *7 (S.D. Ohio Sept. 27, 2005) ("[T]he written statement controls the oral one and the law presumes reasonable investors rely on written materials, not on oral representations.").

*Finally*, Mr. Vahey admitted that he is unaware of any instance where FTN held itself out as a market maker.  (Vahey Dep. at 241:23-242:2.)  But the Exchange Act definition of market maker provides that a broker-dealer is not a market maker unless it ***holds itself out*** as (1) standing ready to buy and sell securities, (2) for its own account, (3) on a regular or continuous basis.  15 U.S.C. § 78c(a)(38).  And even Mr. Vahey admitted that "how you hold yourself out matter[s] with respect to whether you're a market maker" because "there are laws involved" and "many" of the laws "have consequences when you use certain terms in the industry."  (Vahey Dep. at 143:19-144:20.)

**C.     The Evidence Mr. Vahey Relied On to Form His Opinions Is Unreliable.**

Mr. Vahey's opinion is also unreliable because it depends on unreliable evidence.  *See Ellipsis*, 428 F. Supp. 2d at 760.  As an initial matter, the totality of the material considered by Mr. Vahey in forming his opinions is found in the three-page Appendix B to his report.  (Vahey Rpt., App. B.)  Virtually all of those materials were also cited by the Insurers' counsel in support of their numerous summary judgment motions.  (Docs. 143, 143-1, 152, 152-1, 171, 171-1.)  As explained in First Tennessee's own summary judgment briefing, none of this evidence creates a genuine issue of material fact regarding whether FTN was a market maker in PreTSLs.  (Docs. 147, 155, 165.)  And, even if the Court disagrees, Mr. Vahey should not be permitted to usurp the role of the jury in weighing this evidence:

> [E]xpert testimony may not usurp the province of . . . the jury to make factual determinations. . . . It is also inappropriate for experts to become a vehicle for a factual narrative that simply accumulates and puts together pieces of a factual story.  Acting simply as a narrator of the facts does not convey opinions that are

based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.

*See Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 Civ. 3040(KBF), 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014) (internal citation omitted)).  Mr. Vahey's opinion also should be excluded for the additional reason that it is based on the following unreliable evidence:

- The testimony of Micah S. Green, a lobbyist for the Bond Market Association (Vahey Rpt. ¶¶ 35, 37, 40), who subsequently "did something very wrong" and "got in trouble" for "something unethical" that "messed up a good career" (Vahey Dep. at 165:6-166:8, 166:16-167:9).  Mr. Vahey acknowledged that Mr. Green's testimony was "kowtowing to his audience" to "get something that [the Bond Market Association] want[ed] from somebody who has power."  (*Id.* at 222:7-223:10.)  As First Tennessee previously explained, this was part of an industry initiative to *broaden* the definition of market maker.  (Doc. 155 at 9-10.)  That effort was unsuccessful and the SEC subsequently affirmed that "to be considered a market maker, a dealer must meet the legal requirements set forth in the [Exchange] Act[.]"  (2007 SEC Order at 18 n.60.)

- A document from an internet publication named "Asset-Backed Alert" (Vahey Rpt. ¶¶ 24, 59), which Mr. Vahey admits does not list an author (Vahey Dep. at 175:17-23).  While titled "World's Leading CDO Market Makers," the document is merely a "listing [of] contact information for the top-ranking professionals in the CDO-banking world[.]" (Doc. 141-49 at 1.)  Mr. Vahey admits that nowhere does the document state that FTN was a market maker in PreTSLs.  (*Id.*; Vahey Dep. at 173:3-5 ("Q. Do you agree that this document doesn't refer to PreTSLs at all?  A. That's correct.").)

- Mr. Vahey's interpretation of two phone calls in which he did not participate.  (Vahey Dep. at 182:16-184:5.)

- A Bank of America residential mortgage backed securities disclosure document (Vahey Rpt. ¶ 72; Vahey Dep. at 251:1-15), which is irrelevant because it discusses a different broker and a different product, and which actually undermines Mr. Vahey's conclusions because there, Bank of America held itself out as a market maker in its disclosure documents, which FTN never did (Ex. 4, BOA Prospectus at S-36 ("The underwriter [Bank of America] intends to make a market for purchase and sale of the offered certificates after their initial issuance, but the underwriter has no obligation to do so.").)

- An unexecuted, draft letter for a proposed $20 million loan transaction that was never completed.  (Vahey Rpt. ¶ 54; Doc. 155-1, Resp. to ¶ 24 (explaining lack of relevance and evidentiary problems with same letter, which the Insurers cited in their summary judgment briefing).)  Mr. Vahey inexplicably characterizes the letter as standing for the proposition that "FTN and some of their key employees considered themselves a market maker in PreTSLs."  (Vahey Rpt. ¶ 54)  But Mr. Vahey admitted that he is unaware of any instance where FTN held itself out as a market maker.  (Vahey Dep. at 241:23-242:2.)  And Mr. Vahey failed to consider the testimony of First Horizon Senior Vice

President & Counsel Robert Ducklo (*id.* at 243:5-7), who explained that the draft letter was written by Wade Rhea, a "junior [member] . . . of the correspondent lending group," who was not involved with the PreTSL market ("He's not a bond guy"), and who was not authorized to send out the letter because the transaction was never approved.  (Ex. 5, Ducklo Dep. at 131:24-132:1, 134:6-14, 135:1-4.)  Ignorant of these facts, Mr. Vahey nevertheless relied on the letter even though he acknowledged it was ineffective.  (Vahey Dep. at 243:8-13 ("Q. Have you ever tried to enforce an unsigned $20 million loan agreement?  [Objection] . . . A. No[.]").)

### D. Mr. Vahey's Testimony Undermines His Conclusion that the Activities He Has Identified Count As Market Making Activities.

Finally, Mr. Vahey's opinion is not reliable because even he admits that "the [four] fundamental activities of market making" he identifies do not necessarily indicate a broker-dealer is a market maker.  (Vahey Rpt. ¶ 31.)

First, Mr. Vahey acknowledged that a broker-dealer may hold inventory and not be a market maker, such as when it holds inventory for proprietary trading.[10]  (Vahey Dep. at 196:19-197:18 ("Q. So it's possible that those who hold inventory for purposes of proprietary trading may not be market makers. Correct?  . . . [Objection] . . . A.  Yes.").)  When a broker-dealer holds inventory, however, Mr. Vahey re-labels "inventory" as "investments."  (*Id.* at 200:3-202:10.)

Mr. Vahey also admitted that the second activity—regular contact with customers to both buy and sell securities—is really no indication at all that a broker-dealer is a market maker, since most broker-dealers meet that criteria too in their regular contact with their customers to both buy and sell securities.  (*Id.* at 202:11-203:14 ("A.  I would -- I would say based on my experience, yes, most of them, to be effective broker-dealers, should contact customers to buy and sell securities or they would probably go out of business.").)

---

[10] Mr. Vahey could not specify how much inventory someone engaged in market making must hold.  (Vahey Dep. at 197:19-198:13 ("Once again, this is, you know, facts and circumstances and relative[.]").)  Nor could Mr. Vahey say how long someone must hold a security in inventory to be considered a market maker.  (*Id.* at 199:7-200:2.)

Mr. Vahey further acknowledged that the third activity—supporting and facilitating a market—is so expansive and ambiguous that a handbag sales clerk at Nordstrom's satisfies it:

> Q. Now, I'm kind of late with the Christmas shopping this year.  If I go down to Nordstrom's and ask a sales clerk to help me pick out a gift for my wife, would that sales clerk be supporting the market the way you define it?
>
> A. Uniquely at Nordstrom's, I bet you, depending on what department you're in -- did you say a purse or something?  Yes, I believe that you would be supporting the Nordstrom purse market for -- for sure and trying to make you a repeat customer so you'll come by and buy more.

(*Id.* at 203:15-204:23.)

Finally, Mr. Vahey acknowledges that the fourth activity—earning a profit from the bid-ask spread or other fees in the transactions instead of earning a profit from capital appreciation or income generated by the securities—is really no indication that FTN was a market maker for two reasons.  First, Mr. Vahey testified that all broker-dealers—not just market makers—profit from the bid-ask spread.  (*Id.* at 128:23-129:18.)  Second, Mr. Vahey testified that he is not aware of FTN earning any "other fees" from anyone that it transacted with in the secondary market for PreTSLs.  (*Id.* at 205:16-20.)

In short, Mr. Vahey's unique and unsupported theory that market makers can be identified by the "fundamental activities of market making," unmoored from the Exchange Act definition of market maker, would turn any broker-dealer who provides liquidity or engages in a single transaction in the securities market into a market maker.  That view is simply incorrect as a matter of law, and Mr. Vahey is not qualified to offer such an opinion.

## **CONCLUSION**

Wherefore, Mr. Vahey's testimony should be excluded for each of the foregoing reasons.

Respectfully submitted this 4th day of April, 2014.

*/s/ Anthony P. Tatum*
Meghan Magruder
Georgia Bar No. 372678
Anthony P. Tatum
Georgia Bar No. 306287
Shelby S. Guilbert
Georgia Bar No. 315101
Sarah E. Statz
Georgia Bar No. 568068
Michael B. Wakefield
Georgia Bar No. 950517
J. Bradford Odom
Georgia Bar No. 940634
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA  30309
404-572-4600 (Phone)
404-572-5138 (Fax)
mmagruder@kslaw.com
ttatum@kslaw.com
sguilbert@kslaw.com
sstatz@kslaw.com
mwakefield@kslaw.com
bodom@kslaw.com

Thomas Lang Wiseman
Tennessee Bar No. 18293
Christopher Lynn Patterson
Tennessee Bar No. 23823
WISEMAN BRAY PLLC
1665 Bonnie Lane, Suite 106
Memphis, TN 38016

*Attorneys for Plaintiffs*

21

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 4, 2014, I electronically filed the foregoing document with the

Clerk of Court, which will automatically send notice of such filing to the following attorneys:

WILFORD CONRAD LLP
David A. Wilford
Christopher T. Conrad
18 East Dundee Road
Building 6, Suite 150
Barrington, Illinois 60010
dwilford@wilfordconrad.com
cconrad@wilfordconrad.com

LEITNER, WILLIAMS, DOOLEY &
NAPOLITAN, PLLC
Ronald L. Harper
Brinkley Plaza
80 Monroe Avenue, Suite 800
Memphis, Tennessee  38103
ron.harper@leitnerfirm.com

*Counsel for Certain Underwriters at Lloyd's and Aspen Insurance UK Limited*

WILEY REIN LLP
William E. Smith
Charles C. Lemley
Mary Catherine Martin
1776 K Street NW
Washington, DC  20006
wsmith@wileyrein.com
clemley@wileyrein.com
mmartin@wileyrein.com

FARRIS BOBANGO PLC
Robert F. Miller
999 S. Shady Grove Road, Suite 500
Memphis, Tennessee  38120
rfmiller@farris-law.com

*Counsel for U.S. Specialty Insurance Company*

TROUTMAN SANDERS, LLP
Merril Hirsh
Clarence Y. Lee
Richard C. Ambrow
401 9th St., N.W., Suite 1000
Washington, D.C. 20004
merril.hirsh@troutmansanders.com
clarence.lee@troutmansanders.com
richard.ambrow@troutmansanders.com

THOMASON, HENDRIX, HARVEY,
JOHNSON & MITCHELL, PLLC
William H. Haltom, Jr.
Justin Joy
2900 Once Commerce Square
40 South Main Street
Memphis, Tennessee  38103
haltomw@thomasonlaw.com
joyj@thomasonlaw.com

*Counsel for Federal Insurance Company*

This 4th day of April, 2014.

/s/ Anthony P. Tatum
Anthony P. Tatum