# Exhibit 1

Confidential Pursuant to Stipulated Protective Order

**First Horizon National Corporation, et al.**

**v.**

**Certain Underwriters at Lloyd's, et al.**

**Expert Report of Brian P. Vahey, Jr. CFA**

November 4, 2013

**Confidential Pursuant to Stipulated Protective Order**

## Table of Contents

I.      **Introduction** ........................................................................................................................ **3**

II.    **Professional Qualifications** ............................................................................................ **3**

III.   **Material Reviewed in Formulating Opinions** ............................................................ **4**

IV.   **Summary of Primary Opinions** .................................................................................... **4**

V.    **Case Background** ............................................................................................................ **5**

    A.   Insurance Policies ............................................................................................................ 5

    B.   PreTSLs and the Market in Which they Operate .......................................................... 5

    C.   Sentinel Management Group's ("Sentinel") business and demise .................................. 7

VI.   **Opinion 1:** ...................................................................................................................... **8**

    A.   What is a Market Maker? .................................................................................................. 8

    B.   FTN Made a Market in PreTSLs. .................................................................................... 11

    C.   Mr. Pak and Mr. Atkins Mischaracterize FTN's Function in the PreTSL Market ........ 15

VII. **Opinion 2:** .................................................................................................................... **18**

    A.   What is an investment company? .................................................................................... 18

    B.   Sentinel was an investment company. ............................................................................ 19

    C.   Mr. Atkins overlooks the common use of the term "investment company" and instead focuses on a narrow, technical definition of the term from SEC regulations. .................................. 21

VIII.       **Opinion 3:** .......................................................................................................... **21**

    A.   What is an FCM or a commodities broker-dealer? ........................................................ 21

    B.   Sentinel was registered as an FCM and therefore was a commodities-broker-dealer ............. 23

Confidential Pursuant to Stipulated Protective Order

## I.   Introduction

1.  I have been retained by counsel, on behalf of Certain Underwriters at Lloyd's, Aspen Insurance UK Limited, U.S. Specialty Insurance Company, and Federal Insurance Company ("Insurers").  The Insurers asked me to review the expert reports of Mr. Paul S. Atkins, Mr. Robert Pak, and Mr. Nicholas J. Weir, submitted in the above captioned matter, and provide my expert opinions regarding (1) FTN Financial Securities Corp. ("FTN") market activities for certain Collateralized Debt Obligations ("CDOs") referred to as Preferred Term Securities Limited ("PreTSLs"), (2) the nature of Sentinel Management Group, Inc.'s ("Sentinel") business and whether it was an investment company and (3) the significance of Sentinel's registration as a Futures Commission Merchant ("FCM").

2.  This expert report is intended for use in the above-captioned matter.  I have prepared this expert report based on the information available and reviewed by me as of today.  I may expand or modify my opinions based on additional information or other developments.

3.  My employer, Berkeley Research Group ("BRG"), is being compensated for my time on this engagement at $600/hour.  Other BRG professionals, working under my direction, assisted with the analysis and BRG is being compensated for their work at their customary hourly rates.  None of this compensation is contingent upon my opinions.

## II.   Professional Qualifications

4.  I am a Principal at BRG with the Financial Institutions Practice, which specializes in consulting and testifying on the practices of broker-dealers, investment firms, investment advisers, hedge funds, insurance companies, and banks.

5.  I specialize in consulting in the areas of asset management, fiduciary duties, regulatory compliance, trading, risk, proper due diligence, fraud, restructurings, bankruptcies, and securities valuations and models.  I have analyzed and traded a broad range of investments, particularly within fixed income and asset-backed products, including commercial and residential real estate loans and securities.

6.  Prior to joining BRG I worked in a similar capacity at Mesirow Financial Consulting ("MFC").  While at MFC I worked on the Sentinel bankruptcy with Mr. James Feltman.  Mr. Feltman and MFC had been retained by the Sentinel Liquidation Trustee Mr. Frederick J. Grede.  Our work involved analysis and reporting[1] on issues

---

[1] Frederick J. Grede v. FTN Financial Securities Corporation, et al., Expert Report of James S. Feltman, CPA, CFE, dated May 18, 2011.

**Confidential Pursuant to Stipulated Protective Order**

surrounding Sentinel's holdings, in particular PreTSLs, Sentinel's operations, and its eventual bankruptcy.

7.      I have nearly 15 years of experience in the investment sector, predominantly as a portfolio manager and trader for a variety of institutional and accredited investors. I have invested and managed portfolios of up to $30 billion in assets for pensions, mutual funds, insurance companies, CDOs, segregated accounts, and a hedge fund.

8.      While a portfolio manager for GE Capital and GE Asset Management, I analyzed, invested, and traded many different varieties of CDOs including Trust Preferred CDOs and in particular, PreTSLs.

9.      I am a CFA charter holder and have held a FINRA Series 7 (General Securities Registered Representative) license.

10.     Prior to my investment and consulting career I served as a submarine officer in the U.S. Navy and am currently a retired Lieutenant Commander from the U.S. Navy Reserves.

11.     A complete list of my qualifications can be found in my curriculum vitae, attached as Appendix 1.

### III.    Material Reviewed in Formulating Opinions

12.     In forming my opinions below, I, and others under my direction, have reviewed numerous materials, including various complaints, depositions, expert reports and expert rebuttal reports.  A complete listing of documents I relied upon can be found attached as Appendix 2.

### IV.    Summary of Primary Opinions

13.     Based on a review of the materials, analysis and nearly 15 years of prior experience as a fixed income trader and investor, my opinions are that:

14.     **Opinion 1:**  "Making a market" is a common and widely used term in the financial services industry.  The activities of a market maker depend on the market, security characteristics, and a dealer's capabilities.  FTN was a market maker, as the term is commonly understood, for PreTSL securities.

15.     **Opinion 2:**  Mr. Atkins contends that Sentinel was not an investment company only because it was not registered with the SEC.  Many companies operate as investment companies but are not registered with the SEC.  Sentinel was a company engaged in investing in securities on behalf of others for a fee and therefore it is an investment company, as the term is commonly understood.

**Confidential Pursuant to Stipulated Protective Order**

16.     **Opinion 3:**  Sentinel was registered as an FCM and allowed to operate as a broker or dealer in commodities.  They performed some functions of a commodities broker by investing the margin assets of other FCMs and they were regulated as a commodities broker.  For these reasons, Sentinel was a commodities broker-dealer.

### V.   Case Background

#### A.   Insurance Policies

17.     It is my understanding that the insurance policies at issue in this litigation contain the following exclusions: [2]

> (v) arising out of any function of any Insured as a specialist or market maker for any securities or arising out of failing to make a market for any securities;

> (m) alleging, arising out of, based upon or attributable to the bankruptcy, insolvency, conservatorship, receivership or liquidation of, or suspension of payment by, any broker or dealer in securities or commodities, or any bank of banking firm, or any insurance or reinsurance entity, investment company or investment banker or any Insured; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with an Insured's investment on the behalf of the claimant in the stock of any of the foregoing entities;

18.     It is my understanding that common industry terms such as "market maker", "broker or dealer in securities or commodities", and "investment company", were not defined elsewhere in the insurance policies.  Therefore, I have considered whether FTN, based upon my industry experience and the materials reviewed, acted as a market maker, and whether Sentinel operated as an investment company and a broker or dealer in securities or commodities.  As explained elsewhere in this expert report, it is my opinion that FTN functioned as a market maker for PreTSL securities, and Sentinel was both an investment company and a broker dealer in commodities as the respective terms are generally understood.

#### B.   PreTSLs and the Market in Which they Operate

19.     PreTSLs are a type of CDO first created by FTN and Keefe Bruyette & Woods, Inc. ("KBW") in 2000.  CDOs are created by pooling together financial assets.  The CDOs then issue bonds from these pools that vary in seniority.  Senior bonds have first

---

[2] First Horizon National Corporation, et al. v. Certain Underwriters at Lloyds Complaint dated July 18, 2011, Exhibit A (primary policy) and Exhibit B (excess policy).  Exhibit A, at pg. 73-74. I have not been asked to analyze the insurance policies to interpret coverage,

**Confidential Pursuant to Stipulated Protective Order**

priority on payback, mezzanine or junior bonds have second priority, and residuals, called income notes by FTN, have the lowest priority.

20.     More specifically, PreTSL is an acronym for CDO securities issued by a series of special purpose vehicles ("SPV") called "Preferred Term Securities I - XXVIII, Ltd".[3] FTN and KBW established SPVs to accumulate securities – primarily trust preferred securities ("TruPS") of regional banks. FTN and KBW then issued PreTSLs, which were backed by the trust securities held in the SPV. Thus, PreTSLs are Trust Preferred Securities Collateralized Debt Obligations ("TruPS CDOs").

21.     TruPS are preferred shares in banks that are treated as equity by bank regulators and as debt for tax purposes. Thus, they provide significant advantages to the issuing banks. According to the Philadelphia Federal Reserve Bank ("FED"), almost 1,400 bank holding companies had approximately $148.8 billion in outstanding TruPS at the end of 2008.[4] TruPS CDOs are significant buyers of TruPS. According to the FED, $58.9 billion dollars of TruPS CDOs were issued between 2000 and 2007.[5]

22.     According to the FED research, FTN was the largest dealer in TruPS CDOs ($20.793 billion original deal balance) ahead of Merrill Lynch ($12.443 billion original deal balance), Bear Stearns ($7.568 billion deal balance) and various entities with lower amounts (i.e., Credit Suisse, JP Morgan, Citibank, and Deutsche Bank). KBW had a $311 million dollar original deal balance.[6] Between September 7, 2000, and November 8, 2007, over $19 billion in PreTSLs were issued in 28 separate issues.[7]

23.     TruPS CDOs such as PreTSLs are complex securities that required significant expertise and upfront investments from the dealers that developed them. The dealers purchased many preferred securities, put the securities into SPVs that the dealers themselves set up, and issued the securities backed by the trust held in the SPV to investors.

24.     To provide liquidity and attempt to maintain a profitable business, dealers make markets in the securities that they issue. Profits are achievable because investors typically pay premium prices if they think that the securities they are purchasing can be later sold in a market. In addition, dealers who create a security are

---

[3] Frederick J. Grede v. FTN Financial Securities Corporation, et al., Expert Report of John J. Olvany Report dated May 18, 2011 ("Olvany Report"), Table D, pg. 22 and Offering Circular dated September 22, 2006 for securities to be issued by Preferred Term Securities XXIII, Ltd.

[4] SRC Insights, Federal Reserve Bank of Philadelphia, First Quarter 2009 / Volume 13 Issue 3, pg. 8.

[5] The Trust Preferred CDO Market: From Start to (Expected) Finish, Research Department, Federal Reserve Bank of Philadelphia, June 2011, pg. 5.

[6] Id., Table 2, pg. 36.

[7] Olvany Report, Table D pg. 22.

**Confidential Pursuant to Stipulated Protective Order**

intimately knowledgeable about both the securities and the investors who initially bought them.  Clearly, FTN had both the means and the incentive to make markets in the PreTSLs.  According to Asset Backed Alert, a leading trade magazine, FTN, its banker Mike Heflin, and its head trader Alan Jankowski were among the "world's leading CDO market makers".[8]

25.     For original investors of PreTSLs, an effective way to exit their investments was to directly contact FTN or KBW.  FTN promised to stand by their securities[9] and the record shows that they stood ready to purchase the securities and made an effort to satisfy their customers' wishes.  For example, approximately $11.491 billion to $21.104 billion of PreTSLs representing 4.9% to 14.3% of the outstanding securities were traded by FTN and KBW in the secondary market each quarter between 1Q 2005 and 4Q 2007.[10]

26.     FTN bought the securities from sellers and then sold them back to other investors.  FTN did not buy these securities as an investment with the intent to make profits from price increases or income yield, but instead, purchased such securities to hold in inventory and sell as needed pursuant to its market making activities.  These actions allowed FTN to support the market that FTN had created and in addition, earn significant profits, as cited by their head of capital markets, Frank Gusmus, who stated PreTSLs were responsible for nearly all FTN's profits.[11]

27.     FTN and KBW were the premier market makers for PreTSL securities; they conducted most of the secondary trading and held the dominant source of inventory.

### C.   Sentinel Management Group's ("Sentinel") business and demise

28.     Sentinel was an Illinois corporation that invested client funds.  The company was registered with the SEC as an investment adviser and with the Commodity Futures Trading Commission ("CFTC") as an FCM.  The company filed for Chapter 11 bankruptcy on August 17, 2007.  At around the time of its bankruptcy, the company managed accounts for around 70 clients and purported to invest approximately $1.4 billion in assets for these clients.[12]

---

[8] Asset-Backed Alert, www.ABAlert.com,October 31, 2008, p. 2.

[9] Frederick J. Grede v. FTN Financial Securities Corporation, et al., Stephen M. Folan phone call transcript dated October 14, 2006, Exhibit 127, pgs. 7:10-8:8.

[10] Frederick J. Grede v. Stephen M. Folan, et al., Christopher M. James Expert Report dated May 18, 2011, Exhibit 13.

[11] Frederick J. Grede v. Stephen M. Folan, et al., Frank Gusmus deposition transcript, January 20, 2011, pgs. 41:4 - 42:15.

[12] SEC v. Stephen M. Folan, Complaint dated December 15, 2011, Case No. 1:11-cv-8905, pg. 4.

**Confidential Pursuant to Stipulated Protective Order**

29.　PreTSLs were one of the types of securities that Sentinel used in the accounts that it managed .  Sentinel purchased PreTSLs from FTN and sold them back to FTN numerous times from 2004 until August 2007, when Sentinel declared bankruptcy.

**VI.　Opinion 1:**

**"Making a market" is a common and widely used term in the financial services industry.  The activities of a market maker depend on the market, security characteristics, and a dealer's capabilities.  FTN was a market maker, as the term is commonly understood, for PreTSL securities.**

**A.　What is a Market Maker?**

30.　"Market making" in the securities markets consists of facilitating the buying and selling of securities between participants.  Securities dealers ("Dealers") are primarily the market participants who function as a market maker.  They position the securities to buy and sell to and from investors or other dealers.[13]  Dealers' intent in this role is to profit from differences between buying and selling at the bid and ask prices respectively, known as the bid-ask spread, rather than profit from the income and capital appreciation from buying and holding the securities long term.

31.　Based on my experience as a participant in the securities marketplace, the fundamental activities of market making are:

- Willingness to hold inventory;

- Regular contact with customers to both buy and sell securities;

- Supporting and facilitating a market; and

- Earning a profit from the bid-ask spread or other fees in the transactions instead of earning a profit from capital appreciation or income generated by the securities.

32.　However, some attributes of a market maker's activities vary based upon the characteristics of the security, the security's market, and the market maker's capabilities.

---

[13] Weiss, David M. (2006-08-17).  After the Trade Is Made, Revised Ed.: Processing Securities Transactions (Kindle Locations 7853-7854). Penguin Group US. Kindle Edition.

**Confidential Pursuant to Stipulated Protective Order**

33.   Market liquidity is one of the characteristics that determine how market makers perform their activities.[14]  Market makers in liquid markets perform their activities differently from market makers in illiquid markets.

34.   Trading in liquid markets is supported by real time quote systems which allow almost instantaneous execution in these markets.  Because of the volume of transactions and number of participants involved, the SEC and FINRA have created technical guidelines and rules suitable for market makers *in these markets*.  These regulators created such guidelines and rules consistent with their respective stated missions to "protect investors, maintain fair, orderly, and efficient markets[15] and "to provide investor protection and promote market integrity".[16]

35.   U.S. securities exchanges are based on the concept that market makers will continuously offer to buy and sell securities by quoting a bid (buy) and offer (sell), because there is a steady stream of other customers who are willing to buy and sell the same securities.[17]

36.   However, the vast majority of bond trades outside of the Treasury market do not occur on a centralized, organized exchange or trading system as stock trades do.  Instead, the secondary market for bonds is a decentralized, over-the-counter (OTC) market.

37.   The OTC bond market, with a few exceptions, is much less liquid than the stock market.  Even within the Treasury market, many bonds have limited liquidity once they become "off the run", *i.e.* not the most current issue.  As a result, it is practically impossible for dealers to quote continuous two-way prices in debt markets.[18]

38.   Certain securities trade over-the-counter because of the characteristics of these securities and their customer base.  In contrast to equity markets where there are thousands of equity issues, the bond market consists of millions of outstanding securities.  These bond securities can differ in a multitude of characteristics, such as their issuers, amounts outstanding, coupons, maturities, and credit risk.

39.   For example, General Electric has one class of common equity with the ticker "GE", but has well over a hundred different bond issues outstanding.  Furthermore, the customer base for much of the bond market consists of institutional investors who

---

[14] A "liquid market" is a market with many participants – buyers and sellers – and a corresponding high trading volume.

[15] SEC website http://www.sec.gov/about/whatwedo.shtml.

[16] FINRA website http://www.finra.org/AboutFINRA/Careers/.

[17] Statement of Micah S. Green, President of the Bond Market Association, in Testimony before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, June 17, 2004, p. 3.

[18] Id, pg. 4.

**Confidential Pursuant to Stipulated Protective Order**

primarily buy and hold their investments. Therefore, the GE bond securities are not as actively traded and are less liquid than the GE equity securities. Because of these features of the bond market it is impractical for Dealers that make a market in GE bonds to provide continuous bid-ask quotes. There is not enough capacity at any firm to hold all available bonds, and for certain issues there may be no available bonds to hold in inventory.

40.     Since there is no centralized exchange for debt securities like the PreTSLs, the primary sources of liquidity to the market are the Dealers who function as market makers. This unique characteristic of the bond market is widely understood by participants, as is captured in the comments in 2004 by Mr. Micah S. Green, the former President of the Bond Markets Association[19] on bond Dealers and capital at risk:[20]

> "When an investor wants to sell a bond in the secondary market, he or she usually sells the bond to a dealer. The dealer then attempts to resell the bond to another investor. This function is known as "market-making." The period between a dealer's purchase of a bond and when the dealer sells the bond is described as the time the bond is in the dealer's "inventory"."

41.     Dealers in debt markets adjust their practices, as needed, when they make markets. The lower liquidity in most bonds' markets makes it riskier to hold inventory. The vast number of debt securities would require large inventories but capital constraints at a given firm limit the size of inventory.

42.     In the relatively illiquid market that exists for many bonds, including PreTSLs, there are basically three ways to transact in the secondary market, as Mr. Pak also described in his report.

43.     In the first method, the Dealer buys and sells to or from their inventory. Mr. Pak refers to this method as "Taking Down Bonds." Holding inventories of a large number of bonds is a strain on the Dealer's balance sheet from a capital as well as risk perspective. The Dealer's capacity as a market maker therefore involves putting capital at risk as it is subject to price declines while the securities are in its inventory. The risk in illiquid markets is higher than that of liquid markets because it takes longer to identify a buyer for the securities in inventory and prices may drop

---

[19] The Bond Markets Association is now known as Securities Industry and Financial Markets Association (SIFMA).
[20] Statement of Micah S. Green, President of the Bond Market Association, in Testimony before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, June 17, 2004, p. 45.

Confidential Pursuant to Stipulated Protective Order

in the meantime.  It is because of this risk that a Dealer will attempt to earn a higher spread between prices paid and sold.

44.    In the second method, the Dealer receives an offer wanted in competition ("OWIC") or a bid wanted in competition ("BWIC"), in order to buy or sell a certain list of bonds respectively.  Mr. Pak refers to OWICs and BWICs as "lists".  Customers send the list of the bond(s) to multiple Dealers for their best price by a certain deadline. This method is often used to obtain better price execution.  A dealer that wins a BWIC holds the securities in inventory until they are sold to other customers. OWICs are filled from a dealer's existing inventory or the Dealer may accumulate inventory to facilitate future trades.

45.    The third method of transacting by "matching up Buyers and Sellers" is perhaps the earliest known form of exchange.  This can be done either informally, and sometimes referred to as "by appointment", where a seller or buyer states their interest and the Dealer then seeks a counterparty to begin negotiations, or more formally, and referred to as "working an order", where an actual size, amount and timeframe is agreed upon and the Dealer attempts to fill the order.

46.    The common functions that are characteristic of market making in all three methods of trading are:

- Willingness to hold an inventory;

- Regular customer contact to both buy and sell securities;

- Supporting and facilitating a market; and

- Earning a profit from the bid-ask spread or other fees in the transactions rather than to earn a profit from capital appreciation or income generated by the securities.

### B.  FTN Made a Market in PreTSLs.

47.    What differentiates a broker who only is a match-maker from a dealer who truly supports the market, such as FTN, is their willingness to purchase the bond for inventory, without necessarily having a counterparty to whom they would sell the bond.  FTN's trading in PreTSLs was unparalleled because of their in-depth knowledge of the market; they also fully understood their customers' PreTSL holdings and their appetite for trading in those holdings.

48.    Participants in this market use the term market maker for Dealers that facilitate a market in a security or sector of fixed income to the best of their abilities.  FTN

**Confidential Pursuant to Stipulated Protective Order**

performed many activities that supported and facilitated a market for PreTSL securities including:

- They were one of two issuers that created and sold PreTSLs;

- They educated new and existing investors to deepen the market;

- They restructured PreTSL bonds to create a broader customer base;

- They assisted in, or provided outright financing for PreTSLs to support the customer market; and

- Most importantly, they performed the bulk of secondary trading in PreTSLs and bought and held inventory within their capital constraints to support that function.

49.     FTN's position as a market leader in the issuance of PreTSL securities was well established.  By July 2007 FTN had led or co-led the issuance of over $19 billion in PreTSL notes, spread across 28 deals and over 100 bonds.[21]

50.     FTN's efforts to cultivate a wider investor base and thus support primary[22] and secondary[23] markets is captured in the testimony of Mr. de Saint Phalle who was the lead member of the structured finance team for PreTSLs. When answering questions about selling PreTSL notes at year-end 2006 he states:[24]

> "The process of selling income notes and marketing PreTSLs never stopped at FTN at that point in time because we were doing transactions quarterly.  So we were always in the market educating, meeting new investors, increasing the breadth of the firm's distribution.  So it was a constant process; constant marketing and education..."

> "Not to mention the fact [FTN], to the best of my recollection, has about 200 institutional sales force that we supported on the product, a number of which sold the PreTSL product."

51.     As previously described, it is common practice for market makers in the less liquid OTC bond market to utilize three basic methods to transact in the secondary market.

---

[21] Olvaney Report, Table D, pg. 22.

[22] A primary market is a market where new securities are issued and sold directly by the issuer to investors.

[23] A secondary market is a market trading in securities that takes place after the initial offering.

[24] Frederick J. Grede v. Stephen M. Folan, et al., Jacques de Saint Phalle deposition transcript, May 11, 2011, pgs. 350:7-14 and 347:17-348:3.

**Confidential Pursuant to Stipulated Protective Order**

FTN was the dominant facilitator in all three methods for PreTSL products, making FTN the premiere market maker.

52.   First, FTN bought and sold to or from its own inventory or "took bonds down" as Mr. Pak refers to the activity.  FTN's trading desk had balance sheet capacity of up to $125 million to hold PreTSLs and had the ability to purchase more with approval, according to the SEC testimony of their head trader, Alan Jankowski.[25]  His testimony also indicated that they utilized this capacity to purchase the $19 million in bonds from Sentinel in 2006[26] and more in 2007.[27]

53.   Second, FTN used OWICs and BWICs to buy and sell as Mr. Pak mentions in his discussion of lists.  Any current or potential investor in PreTSLs between 2000-2007 utilizing this method would have included FTN and KBW because both firms were known as the market makers in the product and thus would be highly likely to provide the best execution.  There is evidence from head trader Jankowski's SEC testimony that FTN bid PreTSLs from lists, for inventory, and in amounts greater than their pre-approved limit:[28]

> "I recall a large graded note purchase that I had to get approval before I bid the bonds.  But if I bought them, I would be over our rated note inventory limit."

54.   Third, FTN matched buyers and sellers as Mr. Pak[29] and Mr. Atkins[30] both point out.  Given FTN's knowledge of the PreTSL market and its customer base and their trading activity, FTN was the logical Dealer to engage in this type of trading.  FTN and some of their key employees considered themselves a market maker in PreTSLs.  This is evidenced in FTN's own documentation for the collateral description in a 2006 PreTSL finance agreement with Sentinel:[31]

> "Preferred Term Security Income Notes that FTN Financial makes a market in."

---

[25] In the Matter of Sentinel Management Group, Inc., File No. C-07337-A, Alan Jankowski deposition transcript (SEC testimony), October 21, 2009, pgs. 60:8-61:5.

[26] Id. pg. 50: 5-6.

[27] Id. pg. 163:7-10.

[28] id. pg. 119: 8-10.

[29] First Horizon National Corporation, et al. v. Certain Underwriters at Lloyds, Expert Report of Robert Pak dated September 25, 2013 ("Pak Report"), pg. 17.

[30] First Horizon National Corporation, et al. v. Certain Underwriters at Lloyds, Expert Report of Paul S. Atkins dated September 25, 2013 ("Atkins Report"), pg. 14.

[31] Frederick J. Grede v. Stephen M. Folan, et al., Ducklo Exhibit 54, October 18, 2006 letter from FTN to Charles Mosely for $20 million loan, pg. 1.

**Confidential Pursuant to Stipulated Protective Order**

55. FTN's salesman, Stephen Folan, who covered the Sentinel account, stated twice in his May 4, 2011 deposition that he believed FTN to be a market maker.  In his responses to questions regarding PreTSL product liquidity, he stated: "To the best of my recollection, I think I actually thought they [PreTSL products] were more liquid than he [Sentinel's trader] did because we were making markets in them and we were trading them"[32] and also stated ". . . we were making—making active markets in them.  We were trading them.  There was bids and offers out there both at FTN, KBW."[33]

56. Similar comments were made by de Saint Phalle[34]  and FTN's head trader, Jankowski, who stated his concerns about PreTSLs in 2007 during his SEC testimony, "Because at that particular time in the marketplace, bonds were becoming more and more illiquid as the environment changed.  And I was trying to assist him [Sentinel's trader] with everything we could, and *trying to keep an orderly market* (emphasis added)."[35]

57. Accordingly, de Saint Phalle, Jankowski and Folan explicitly stated that they were making markets in PreTSLs and described how they tried to keep an orderly market.  Mr. Atkins agrees that the function of maintaining an orderly market is an activity of market makers.[36]

58. KBW – the co-creator of PreTSLs together with FTN and a smaller primary Dealer for PreTSLs  – clearly stated in its annual reports that:[37]

> "The Company's primary role as it relates to its PreTSL™ product is to act as structuring and placement agent broker and market maker."

59. In addition, according to Asset Backed Alert, a leading trade magazine, FTN, its banker Mike Heflin, and its head trader Alan Jankowski were among the world's leading market makers in CDOs.[38]  PreTSLs were the primary CDO securities that FTN created and traded.

60. Indeed, in its complaint against Folan, the SEC itself stated that:

---

[32] Frederick J. Grede v. Stephen M. Folan, et al., Stephen M. Folan deposition transcript, May 4, 2011, pg. 54:1-4.
[33] Id., pgs. 49:24-50:3.
[34] Frederick J. Grede v. Stephen M. Folan, et al., Jacques de Saint Phalle deposition transcript, December 17, 2010, pg. 91:17-20.
[35] In the Matter of Sentinel Management Group, Inc., File No. C-07337-A, Alan Jankowski deposition transcript (SEC testimony), October 21, 2009, pg. 143:14-17.
[36] Atkins Report, pg. 17.
[37] KBW form 10-K as Dec. 31, 2007, pg. 69.
[38] Asset-Backed Alert, www.ABalert.com, October 31, 2008, p. 2.

**Confidential Pursuant to Stipulated Protective Order**

"FTN helped create a new PreTSL every quarter and was one of only a few brokers who made a market in them."[39]

61.   These aforementioned examples demonstrate how the term "market maker" is broadly used in the industry.

62.   The characterizations by FTN, its employees, KBW, the SEC, and Asset Backed Alert all support that it was broadly understood FTN performed functions that are characteristic of market makers for PreTSLs:

- FTN held an inventory of PreTSLs and was regularly willing to buy or sell PreTSLs;

- FTN bought or sold PreTSLs to customers regularly and FTN found counterparties for these trades when it did not have the securities in inventory;

- FTN Supported and facilitated a market for PreTSLs; and

- FTN met the customer demand to buy and sell PreTSLs in order to earn a profit from the bid-ask spread in the transactions rather than to earn a profit from capital appreciation or income generated by holding the securities for the long term.

63.   Based on my experience as a participant in the fixed income market during this period and my analysis of FTN's actions in the PreTSL market, it is clear that FTN was making markets in PreTSLs.  As I have cited above, this is further supported by other constituents in the market during the applicable time period such as industry associations, industry newsletters, and regulators.

   **C.  Mr. Pak and Mr. Atkins Mischaracterize FTN's Function in the PreTSL Market**

64.   Mr. Atkins emphasizes the key criteria of a market maker to be "(1) holding itself out as and (2) being willing to buy and sell PreTSLs for its own account on a regular or continuous basis."[40]  I believe that FTN did fulfill Mr. Atkins' two criteria to the extent their capital allowed and thus functioned as a market maker, considering the nature of the PreTSL securities and the PreTSL market.

65.   In his report, Mr. Atkins narrowly focuses on a technical definition of a market maker as contained in SEC and FINRA regulations in making his determination of

---

[39] SEC v. Stephen M. Folan Complaint dated December 15, 2011, Case No. 1:11-cv-8905, pg. 5.
[40] Atkins Report, p. 11.

**Confidential Pursuant to Stipulated Protective Order**

whether FTN's activities constituted market making.[41]  SEC rules are clearly established for market makers in only the most liquid of markets, because, in the words of Mr. Atkins, "they are fundamental to the smooth operation of U.S. capital markets – a market maker provides liquidity when there are imbalances in demand and supply for a particular security by stepping in to buy or sell from its own inventory."[42]  However, as previously described, industry participants understand the term and actions of market makers more broadly in application across markets, including those less liquid such as PreTSLs.

66.   Mr. Pak and Mr. Atkins point to various activities by FTN to support their argument that FTN was not a market-maker.  For example, they point to FTN's trading, buying bonds, "accommodating customers", making promises, matching up buyers and sellers.  Both Mr. Pak and Mr. Atkins view these as non-market making activities.  Yet, it is the summation of these activities that created the industry notion of FTN functioning as a market maker in the PreTSL market.

67.   Mr. Atkins makes several references to "concessions made to accommodate a customer" when referring to efforts made by FTN in order to provide liquidity for Sentinel with regards to PreTSL securities.  These efforts include the year-end 2006 repo transaction, and the construction of Combination Notes to create rated securities for Sentinel and other customers.  I view these activities, especially in conjunction with FTN's outright purchase of $19 million of income notes, as a Dealer providing support to the market to the best of their abilities.  Providing support to the market is a function of a market maker.

68.   Mr. Pak employs a similar, narrow definition of market maker, by making it contingent on the nature of a security's market.  He contends that market makers can only exist in liquid markets,[43] and thus groups the actions of most fixed income Dealers trading securities besides U.S. Treasury notes, as "non-market makers".

69.   Market making, as it is broadly viewed in common parlance by fixed income participants, does not necessarily require a market to be liquid as Mr. Pak suggests.  Similarly, illiquidity in a market does not preclude the possibility of market makers in that market.  Considering the limited liquidity in the PreTSL marketplace, the market making shortfalls identified by Mr. Pak were due to the market, and not FTN's efforts.  They did not change the fact that FTN was a market maker.

---

[41] Atkins Report, p. 10.
[42] Atkins Report, p. 9.
[43] Pak Report, p. 10.

**Confidential Pursuant to Stipulated Protective Order**

70.   FTN was a leader in secondary structured finance trading for PreTSLs using all the means available, described by Mr. Pak to include taking down bonds, lists, and matching buyers and sellers.[44]  FTN regularly provided bids and offers,[45] held and offered inventory,[46] and provided liquidity to the market.  The fact that there aren't publicly quoted bids, or tight bid/offers, did not preclude FTN from facilitating liquidity in PreTSLs, just as it does not preclude the corporate bond market from having many market makers.

71.   Mr. Pak and Mr. Atkins are using a definition of "market making" in PreTSL securities that is very narrow.  These are technical definitions that come from SEC regulations that are oriented towards specific purposes and often apply only in liquid markets.  Taken literally, Mr. Pak and Mr. Atkins' definition of "market making" implies that there are no market makers in the vast majority of debt markets.  Thus, their definition only applies to a narrow portion of the debt markets.  Broadly speaking, it is understood by market participants that market making activities occur across the entire spectrum of fixed income.

72.   Messrs. Pak[47] and Atkins[48] cite the risk disclosures in the PreTSL Offering Memorandums to indicate that FTN is not a market maker.  These risk factor disclosures on "Limited Liquidity of Notes" are a common disclosure for bonds issued into the private market.  For example, Bank of America's private label residential mortgage backed securities ("RMBS") series, Bank of America Funding Corporation ("BAFC") contain the same liquidity clause in their prospectus.[49]  Bank of America as a Dealer acted as a market maker in all the BAFC RMBS bonds, holding and offering inventory, participating in lists, and matching buyers and sellers.

73.   Dealers utilize this disclosure to ensure that the buyers understand that there is no guarantee of liquidity.  However, the disclosure does not preclude Dealers from supporting this segment of bond market, or this particular offering, with market making activities.  Investors make that determination by the actions of the Dealer in the market.

74.   Investors would look at, for example, how much FTN traded in other PreTSL issues, whether FTN had and offered PreTSL bonds in inventory, how much inventory FTN could hold, and if they took down bonds off of lists.  Proof of these activities, and the

---

[44] Pak Report, pp. 15-16.

[45] Frederick J. Grede v. Stephen M. Folan, et al., Stephen M. Folan deposition transcript, May 4, 2011, p. 50:1-4.

[46] Frederick J. Grede v. Stephen M. Folan, et al., Stephen M. Folan deposition transcript, May 4, 2011, p. 125:11-16.

[47] Pak Report p. 20.

[48] Atkins Report p. 12.

[49] BAFC 2006-D prospectus supplement dated April 26,2006, p. S-36.
http://www.sec.gov/Archives/edgar/data/934377/000095013606003285/0000950136-06-003285.txt

**Confidential Pursuant to Stipulated Protective Order**

assurances of the salesman and structuring leader that they would bid their bonds[50], or support their paper, would indicate the level of FTN's market making and the liquidity that exists for that type of security.

75.   Accordingly, FTN would be viewed as a market maker in our industry, just as FTN viewed itself as a market maker.

**VII.   Opinion 2:**

> **Mr. Atkins contends that Sentinel was not an investment company only because it was not registered with the SEC.  Many companies operate as investment companies but are not registered with the SEC.  Sentinel was a company engaged in investing in securities on behalf of others for a fee and therefore it is an investment company, as the term is commonly understood.**

### A.   What is an investment company?

76.   An "investment company" is a company that is primarily engaged in the business of investing securities.  An investment company invests the money it receives from investors on a collective basis and investors share the profits and losses from the collective investments.[51]

77.   Many "investment companies" are not required to be registered under the Investment Company Act of 1940 (the "ICA").  For instance, the ICA excludes from the registration requirements in its "Investment Company" definition, investment companies with too few investors.  Although Congress chose to limit which investment companies needed to register under the ICA, the ICA does not purport to define how the word "investment company" is used by the industry.  Indeed, many of the investment companies that do not have to register under the ICA, are still regulated under the Act and have to follow ICA requirements limiting their ownership.  Moreover, the SEC itself, as well as the other regulators of the financial industry, recognizes that the term "investment company" is not limited to those companies that are required to register under the ICA.   Hedge funds and private equity firms are examples of investment companies that are not required to register under the ICA.[52]

---

[50] Frederick J. Grede v. Stephen M. Folan, et al., Transcript of May 4, 2006 phone call Mosley, Folan, de Saint Phalle, and Jankowski, pgs. 10:13-12:21.

[51] http://www.sec.gov/answers/mfinvco.htm .

[52] http://www.sec.gov/divisions/investment/invcoreg121504.htm .

**Confidential Pursuant to Stipulated Protective Order**

78. For example, then SEC Commissioner Hugh F. Owens has stated that: "The term "hedge fund" has been used broadly to describe registered or unregistered investment companies which employ special speculative investment techniques."[53]

79. The Report of the President's Working Group on Financial Markets prepared jointly by the Department of Treasury, the Federal Reserve Board, the SEC and the CFTC, defined the term "hedge fund" as encompassing "any pooled investment vehicle that is privately organized, administered by professional investment managers, and not widely available to the public. The primary investors in hedge funds are wealthy individuals and institutional investors."[54]

80. Approximately two trillion dollars of assets were held by hedge funds at the beginning of this year.[55]  In other words, two trillion dollars are invested by this category of investment companies that are not required to be registered under the ICA.

81. In addition, thousands of investment companies outside the United States are, of course, investment companies, yet do not have to register under the ICA.  Certainly, those in the industry and, indeed, the financial regulators themselves recognize that the term "investment company" encompasses many companies that are not required to be registered under the ICA.

## B.  Sentinel was an investment company.

82. After analyzing Sentinel's *activities* in the marketplace, it is clear they were operating as an investment company as that term is commonly understood.  The activities indicating that Sentinel was operating as an investment company are: (1) they indicated their intent to invest on behalf of others, (2) they marketed themselves as an investment manager[56], (3) they invested with full discretion across multiple strategies for which they had created investment guidelines based on customer constraints, and (4) they were paid a fee for their investment services.

83. Sentinel was clear in its intentions to invest on behalf of others.  This is clearly exhibited in their 1981 request for a "no-action letter":[57]

---

[53] Hugh F. Owens, "A Regulator Looks at Some Unregulated Investment Companies, The Exotic Funds", October 21, 1969, p. 1
[54] Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management, Report of the President's Working Group of Financial Markets, April 1999, p. 1.
[55] http://www.barclayhedge.com/research/indices/ghs/mum/HF_Money_Under_Management.html .
[56] Archived jpeg of Sentinel website.
[57] 1981 CFTC No Action Letter, at 1.

**Confidential Pursuant to Stipulated Protective Order**

> "Sentinel is an FCM solely so that it may hold customers'
> funds deposited with it by other FCMs for the exclusive
> purpose of investing such funds in Section 1.25 (17CFR
> 1.25) approved obligations for the benefit of such other
> FCMs."

84.   Sentinel marketed itself to the outside world as "a pre-eminent investment manager of short-term corporate cash", according to their website.[58]  FTN knew Sentinel was a firm that was investing on behalf of others.[59]  Sentinel's relationship with its customers is documented in their Investment Management Agreements which clearly delineate discretionary investment authority, treatment of customers' funds, and fee arrangements.[60]

85.   FTN recognized Sentinel as an investment company.  Mr. de Saint Phalle made reference to Sentinel as a hedge fund, which is a type of investment company: "[Mr. Mosley] was a private money manager or hedge fund, as we understood it."[61]

86.   Additionally, FTN's credit analysis of Sentinel for their 2006 loan stated, "Overall, Sentinel is very similar to a money market mutual fund except Sentinel's clients know exactly what they own."[62]  This association with a fund again demonstrates FTN's belief that Sentinel was an investment company.

87.   Court documents prepared in support of FTN refer to Sentinel as a hedge fund, hence as an investment company.[63]  The Defendants' Motion for Summary Judgment reads: "Plaintiff, the Chapter 11 trustee of *hedge fund Sentinel Management Group, Inc.* ("Sentinel"), attempts to recover losses resulting from Sentinel's massive leveraged investment strategy..." while the Defendants' Motion to Dismiss reads: "By now this Court is familiar with the strategy of Frederick J. Grede, the Chapter 11 Trustee of *hedge fund Sentinel Management Group, Inc...*" [emphasis added].

88.   All these descriptions of Sentinel consistently refer to FTN as a "hedge fund" or fund, and hence an investment company.

---

[58] Archived jpeg of website.

[59] Frederick J. Grede v. Stephen M. Folan, et al., Jacques de Saint Phalle deposition transcript, December 17, 2010, pg. 42:15-17.

[60] Sentinel Management Group, Inc., Investment Advisory Agreement with BC Capital Fund A, LLC, dated March 24, 2005.

[61] Frederick J. Grede v. Stephen M. Folan, et al., Jacques de Saint Phalle deposition transcript, December 17, 2010, pg. 42:16-19.

[62] Frederick J. Grede v. Stephen M. Folan, et al., Ducklo Exhibit 56, FTN credit review of Sentinel for $20 million loan, pg. 1.

[63] Frederick J. Grede v. Stephen M. Folan, et al., Memorandum of Defendants Stephen M. Folan, Jacques de Saint Phalle, FTN Financial Securities Corporation, and First Tennessee Bank, N.A., in Support of Their Motion for Summary Judgment, pg. 1; Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, pg. 4.

Confidential Pursuant to Stipulated Protective Order

**C.   Mr. Atkins overlooks the common use of the term "investment company" and instead focuses on a narrow, technical definition of the term from SEC regulations.**

89.   Once again, Mr. Atkins presents a very technical, narrow definition for an investment company in lieu of what people in the industry regularly think of as an investment company.

90.   Two trillion dollars are invested by hedge funds – private investment companies that Mr. Atkins considers not to be investment companies.  Considering hedge funds alone, one would ignore investment companies holding two trillion dollars of investments using Mr. Atkins's definition.

91.   Sentinel was registered as an Investment Advisor under SEC regulations but did not give advice to its clients. It had discretion over the customers' funds and managed how they were invested.  These activities required them to register as an Investment Advisor.

92.   In contrast, Sentinel was not required to register as an Investment Company under SEC regulations.  The reason was not that Sentinel was not an investment company in common parlance, but that Sentinel did not have enough investors to require it to be registered.

93.   Based on my experience working for all three types of companies, namely a registered Investment Company, a registered Investment Advisor, and an unregistered investment company, the act of investing on behalf of others, and being paid to do so, was a constant at all three.  In fact, it is not always immediately apparent in the marketplace if an investment company is registered or how they are structured.

**VIII.   Opinion 3:**

**Sentinel was registered as an FCM and allowed to operate as a broker or dealer in commodities.  They performed some functions of a commodities broker by investing the margin assets of other FCMs and they were regulated as a commodities broker.  For these reasons, Sentinel was a commodities broker-dealer.**

**A.   What is an FCM or a commodities broker-dealer?**

94.   FCM is the term used in the Commodity Exchange Act ("CEA") to refer to registered firms that are in the business of soliciting or accepting orders, as broker, for the purchase or sale of any exchange traded futures – commodities, financial, and other

**Confidential Pursuant to Stipulated Protective Order**

– contracts and options on futures contracts.  In connection with these activities, institutions may hold customer funds, assets, or property and may be members of futures exchanges and their associated clearinghouses.[64]

95.  FCMs are often referred as commodity broker-dealers in common use.  This use comports with the fact that the Commodity Futures Trading Commission regulates all futures markets – commodity, financial, and other futures – and similarly the Commodity Exchange Act is the principal legislation that governs all futures markets.

96.  The CFTC currently defines an FCM broadly as an entity performing any of the following functions in connection with trading of commodities futures:[65]

> (A) An individual, association, partnership, corporation, or trust— (i)that— (I)is— (aa)engaged in soliciting or in accepting orders for— (AA)the purchase or sale of a commodity for future delivery; (BB)a security futures product; (CC)a swap; (DD)any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title; (EE)any commodity option authorized under section 6c of this title; or (FF)any leverage transaction authorized under section 23 of this title; or (bb)acting as a counterparty in any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title; and (II)in or in connection with the activities described in items (aa) or (bb) of subclause (I), accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or (ii)that is registered with the Commission as a futures commission merchant.
>
> (B) Further definition The Commission, by rule or regulation, may include within, or exclude from, the term "futures commission merchant" any person who engages in soliciting or accepting orders for, or acting as a counterparty in, any agreement, contract, or transaction subject to this chapter, and who accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts

---

[64] Trading and Capital-Markets Activities Manual, Section 3030.1, pg.1, available at http://www.federalreserve.gov/boarddocs/supmanual/.
[65] http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/index.htm#F .

Confidential Pursuant to Stipulated Protective Order

that result or may result therefrom, if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

97.  Before the Dodd-Frank Act of 2010, the CFTC definition for an FCM was:[66]

> an individual, association, partnership, corporation, or trust that—
> (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and
>
> (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

### B.  Sentinel was registered as an FCM and therefore was a commodities-broker-dealer

98.  The CFTC required Sentinel to register as an FCM, because it performed some of the activities that constitute the definition of an FCM for other FCMs. At the time of its bankruptcy, Sentinel was one of 159 FCMs that filed financial reports with the CFTC.[67]

99.  Just as Sentinel did not perform many of the activities that are listed in the definition of an FCM, other FCMs did not perform all the activities listed in the CFTC's definition, either.  For example, an FCM may be engaged in executing only interest rate futures trades or futures on options and no commodities.  However, they are all viewed as commodities brokers.  These are the only brokers that are authorized by the Commodity Futures Trading Commission under the Commodity Exchange Act to execute customer trades in futures on U.S. exchanges.

100.  As a result, investment professionals commonly view an entity that is registered as an FCM, to be a commodities broker-dealer without specific reference to their business activities (e.g., even if the entity may be only executing interest rate futures trades or only performs investment services  for other FCMs).

---

[66] 7 U.S.C. § 1a (20) (2009).
[67] For financial data for current FCMs, see http://www.cftc.gov/MarketReports/FinancialDataforFCMs/index.htm

**Confidential Pursuant to Stipulated Protective Order**

101.    Sentinel performed investment services for customer margin cash at other FCMs. The CFTC requires that whoever performs this function to be registered or regulated.[68]  In order to do what Sentinel wanted to do, Sentinel had to be a bank or banking firm (such as a trust company) or an FCM.  All of these organizations are discussed in the exclusion criteria in the insurance policy.

102.    Mr. Weir cites CFTC's no-action letters to Sentinel which give Sentinel certain relief from capital requirements as long as Sentinel did not trade futures.  Nevertheless, CFTC letter dated January 21, 2004 does not preclude Sentinel from trading commodities commensurate with its existing capital or further execute any amount of commodities transactions accompanied by capital infusions.[69]  Sentinel's adjusted net capital ranked 114th out of the 159 FCMs registered with the CFTC at the time of Sentinel's bankruptcy (i.e., 45 FCMs had less capital than Sentinel for executing commodities trades).[70]

103.    In summary, Sentinel was a broker-dealer in commodities based on the fact that it was registered and allowed to operate as one.


I may update the report if new information comes to my attention.


Brian P. Vahey, Jr. CFA                              Date:  November 4, 2013

---

[68] CFTC Rule 1.20.
[69] CFTC letter No. 04-06.
[70] http://www.cftc.gov/MarketReports/FinancialDataforFCMs/index.htm .

Appendix A



**Curriculum Vitae**

**Brian P. Vahey, Jr.**

BERKELEY RESEARCH GROUP, LLC
810 7th Avenue, Suite 600
Direct: (646) 862-0954 ext. 9954
[bvahey@brg-expert.com](mailto:bvahey@brg-expert.com)

**EDUCATION**

B.S. (Aerospace Engineering)                    University of Notre Dame
B.S. equivalent (Nuclear Engineering)      Naval Nuclear Power School

**PRESENT EMPLOYMENT**

Berkeley Research Group - Principal

**PREVIOUS POSITIONS**

Mesirow Financial Consulting
Managing Director, Restructuring and Litigation Consulting Practice, New York, NY
2008-2012

King Street Capital
Trader, New York, NY
2006-2008

GE Asset Management/GE Capital
Portfolio Manager and Trader, Stamford, CT
1999-2006

U.S. Navy
Lieutenant Commander, Submarine Force
1991-1998

**LICENSES AND CERTIFICATIONS**

<u>**Current**</u>

Chartered Financial Analyst and member of the CFA Institute
FINRA Series 7 License
Certified Six Sigma Black Belt

**PRESENTATIONS AND SPEAKING ENGAGEMENTS**

1



"Mezz/CMBS Workouts: What Makes them Different?" (Co-Panelist), IMN's 3rd Annual Bank & Financial Institutions Special Asset Executive Conference On Real Estate Workouts, Mar 2012

## PROFESSIONAL EXPERIENCE

Mr. Vahey provides financial services matter expertise in litigation, restructuring, and valuation matters.  He has over ten years of experience as an institutional investor in the analysis, management and trading of fixed income and derivatives.  He was a portfolio manager for pension, mutual fund, insurance, CDO and segregated account investors.  Mr. Vahey also managed and traded positions for a large hedge fund that specialized in distressed assets.  As a consultant he has been active in investigating and supporting litigation involving asset management, financial services and securities, including secured financial products of all types including RMBS, ABS, CDOs, and CMBS.

Mr. Vahey has:
- Collected and analyzed observable market data for high yield, illiquid, distressed and esoteric securities involved in litigation including bonds, CDS, and structured products.
- Testified to underwriting standards and FASB accounting treatment of hedge fund assets involving private asset backed loans, settlements and other assets.
- Led consulting expert efforts in several  multibillion dollar litigations involving disputes between institutional investors and the mortgage backed security originators, underwriters, and officers.
- Analyzed the pricing and modeling of various financial instruments for accounting or bankruptcy/solvency purposes including advising on an annual audit of a bank with a large mortgage operation.  Created modeling assumptions and verified accounting adjustments for mortgage portfolio assets consisting of Prime, Alt-A, and HELOC loans.
- Conducted forensic work in multiple sectors within financial services. Mr. Vahey has investigated officers and operations at different types of financial institutions including a major mortgage originator, a major residential mortgage servicer, a Futures Commission Merchant, a money management firm, a RMBS issuer, as well as multiple hedge funds.
- Consulted on counterparty risk and litigation issues, including loan and security analysis for both a large bond insurer facing mortgage originators and a RMBS/CDO investors in a matter involving major investment banks.
- Conducted collateral analysis and valued several CDO portfolios in connection with an indentured trustee to determine proper asset disposition strategies.
- Calculated damage estimates in multiple disputes including individual security losses, portfolio losses, Ponzi schemes, as well as losses due to inadequate servicing.
- Negotiated recoveries in restructuring efforts such as working on behalf of a group of unsecured creditors to a $4.0 billion Commercial Real Estate REIT.  Mr. Vahey led the analysis and investigation into the lending agreements, indentures, collateral values, and securities to facilitate a settlement that avoided bankruptcy.

Prior to working as a consultant, Mr. Vahey was a trader at King Street Capital Management, LLC, in New York, NY.  In this role, Mr. Vahey conducted all strategy, underwriting and trading for the structured product portfolio:
- Initiated the MBS, ABS, CMBS strategy for this $9.0 billion hedge fund.
- Developed loan level valuation models for subprime and Alt-A loans to evaluate investments.
- Utilized CDS in the creation of multiple synthetic custom credit portfolios to strategically maximize short exposure to CDOs and subprime assets.
- Conducted financial analysis, including in-depth business model and balance sheet strength, on several firms in the financial sector including REITs, thrifts, monolines and mortgage insurers.

2



- Traded and managed up to $1 billion in exposure in ABX, CMBX, single name CDS for subprime bonds and CDOs, residual/equity pieces of mortgage securities, CDO equity, aircraft bonds, and distressed home equity ABS.

Prior to King Street Capital, Mr. Vahey worked for the General Electric Company where he served as a portfolio manager for General Electric Asset Management ("GEAM") and General Electric Financial Assurance.  In his role at GEAM, Mr. Vahey:

- Co-managed a $30.0 billion structured product portfolio for investors.
- Traded fixed and floating ABS, CMBS, and MBS, for multiple insurance, total return, and CDO portfolios.
- Helped lead efforts to create GEAM's CDO platform including issuing its first CDO, the $400mm mezzanine *Summer Street I*.  Mr. Vahey:
    o Oversaw credit underwriting of both securities and the issuers/underwriters.
    o Worked with underwriters on CDO structure and economics.
    o Conducted the majority of trading of cash and synthetic securities and hedges.
    o Expanded the size of the CDO portfolio by issuing an additional $1.6 billion of both high grade and mezzanine CDOs under the Summer Street label.
- Collaborated with total return portfolio management team on strategic and tactical trading decisions to create alpha for portfolio.  Most funds managed were in 2nd quartile for peer group over three and one year horizons.
- Led the development of the structured product credit research team.  The development effort included:
    o Conducting originator, servicer, issuer and conduit due diligence for all securities including ABS, RMBS and CMBS.
    o Analysis included:
        ▪ Issuer, originator and servicer financial strength.
        ▪ Deal underwriting, including prospectus review.
        ▪ Developing pre-payment and default models.
        ▪ Monthly surveillance of the securities portfolio.
        ▪ Analysis of the entire securitization process including originator and servicer visits, examination of lending personnel and processes, loan pricing, securitization creation and valuation.

At GE Financial Assurance Mr. Vahey directed the composition and performance of $100 billion in fixed income insurance portfolios backing a variety of insurance liabilities as a portfolio manager.
In this role he:

- Coordinated and managed all variables impacting the portfolio and company including:
    o GAAP/STAT/TAX issues
    o Regulatory capital efficiency
    o ALM strategies
    o Risk strategies
    o New product development
    o Portfolio optimization
    o Asset allocation strategies
    o Cash flow management
    o New asset class introductions
- Directed investments in the following asset classes:
    o Treasuries
    o Agencies
    o Corporates
    o High yield

Appendix A



- o   Private placements
- o   Commercial real estate
- o   Structured products, including ABS, RMBS, CMBS
- o   Municipals
- o   Emerging markets debt
- o   Levered loans
- o   Interest rate and credit synthetics
- o   Private equity, Hedge funds, and equities
- Created a methodology for portfolio pricing versus a liability stream that resulted in a measurable increase in the company's net income.
- Expanded clients' investing options by introducing high yield CMBS and Levered Loans.
- Developed and executed an industry first by utilizing a forward starting swap strategy to create synthetic duration in an $8.0 billion long term care insurance portfolio.

Prior to working for GE Mr. Vahey served as a Lieutenant Commander in the United States Navy submarine force, where he ranked at the top of his peer group during his years of service and earned a number of leadership and performance awards.

**Confidential Pursuant to Stipulated Protective Order**

## Documents Considered

| Document | Date |
|---|---|
| **Parties' Filings in Underlying Litigation** | |
| *FC Stone LLC v Grede,* Case No. 07-14987 (N.D. Ill.), Complaint | 6/9/2008 |
| Expert Report of John J. Olvany | 5/18/2011 |
| Expert Report of James S. Feltman | 5/18/2011 |
| Expert Report of Professor Christopher M. James | 5/18/2011 |
| *SEC v Folan,* Case No. 1:11 CV 8905 (N.D. Ill.), Complaint | 12/15/2011 |
| *USA v Eric Bloom and Charles Mosley*, Indictment | 1/2012 |
| Expert Report of Nicholas J. Weir | 9/25/2013 |
| Expert Report of Paul S. Atkins | 9/25/2013 |
| Expert Report of Robert Pak | 9/25/2013 |
| | |
| **Parties' Filings in Instant Case** | |
| Complaint of Certain Underwriters at Lloyd's and Aspen Insurance UK Limited | 7/18/2011 |
| | |
| **Deposition Transcripts** | |
| Alan Jankowski, *Grede v. Folan* (SEC Testimony) | 10/21/2009 |
| Jacques de St. Phalle | 12/17/2010, 5/11/2011 |
| Stephen M. Folan | 5/4/2011 |
| Frank Gusmus | 1/20/2011 |
| | |
| **Memorandum and Statues** | |
| Investment Adviser Act and Investment Company Act Issues, Eric Bloom | 5/25/2005 |
| *Grede v Folan,* Case No. 08 CV 6587 (N.D.Ill.), Memorandum in Support of Defendants' Motion to Dismiss Complaint | 1/21/2009 |
| *Grede v. Bank of New York Mellon*, Case No. 08 CV 2582 (N.D. Ill.), Memorandum Opinion and Order | 11/3/2010 |
| *Grede v. Folan*, Case No. 08 CV 6587 (N.D. Ill.), Answer of First Tennessee Bank, N.A., In Support of Motion for Summary Judgment | 7/19/2011 |
| | |
| **SEC, CFTC, and FINRA Related Documents** | |
| Report of President's Working Group on Financial Markets: Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management | 4/28/1999 |
| 7 U.S.C. § 1a (20) (2009) – Customer funds to be segregated and separately accounted for. | 12/13/2000 |
| CFTC No-Action Letter No. 04-06, Interpretation Division of | 1/21/2004 |

**Confidential Pursuant to Stipulated Protective Order**                    Appendix B

| | |
|---|---|
| Clearing and Intermediary Oversight | |
| KBW Form 10-K | 12/31/2007 |
| SEC website: What We Do (*The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation*) | 6/10/2013 |
| SEC website: Investment Companies | 7/9/2013 |
| SEC website: Investment Company Registration and Regulation Package | 2/19/2013 |
| CFTC Glossary, www.cftc.gov | 11/2/2013 |
| CFTC Market Reports Financial Data for FCMs, www.cftc.gov | 2013 |
| FINRA Website: About FINRA | 2013 |

**PreTSL Documents**

| | |
|---|---|
| Preferred Term Securities XXIII Offering Circular | 9/22/2006 |

**FTN Documents**

| | |
|---|---|
| October 18, 2006 Letter from FTN to Charles Mosley for $20 million loan | 10/18/2006 |
| Sentinel Management Group: $20 Million Line of Credit | 2006 |
| Letter from Jim Vogel, FTN Financial Capital Markets, in response to proposed Volker Rule Regulations | 2/13/2012 |
| FTN Website: First National Horizon Corporation About Us | 11/1/2013 |

**Sentinel Documents**

| | |
|---|---|
| Phone Call Transcript between Charles Mosley and Steve Folan | 10/14/2006 |
| Phone Call Transcript between Charles Mosley, Steve Folan, Alan Jankowski, and Jacque de St. Phalle | 5/4/2006 |
| Organizational Chart – Hierarchy Report | 6/30/2007 |
| Futures Commission Merchant – Sentinel 2007 Data | 2007 |
| Sentinel Website: Homepage (Archived) | 8/14/2007 |
| *Glede v. Bank of New York Mellon,* Securities Clearing Agreement August 24, 1997 | 3/3/2008 |
| First National Horizon Corporate History | 2013 |

**Books, Articles and Analyst Reports**

| | |
|---|---|
| Huge F. Owens Address: A Regulator Looks at Some Unregulated Investment companies The Exotic Funds | 10/21/1969 |
| Trading and Capital-Markets Activities Manual, Section 3030.1 | 2/1998 |
| Congressional Research Service, Report RL30434, *Commodity Futures Modernization Act of 2000: Derivatives Regulation Reconsidered* | 1/29/2003 |

**Confidential Pursuant to Stipulated Protective Order**

| | |
|---|---|
| Bear Stearns & Merrill Primers | 5/2003, 11/11/2004 |
| Weiss, David M. Processing Securities Transactions, Revised Ed., *After the Trade is Made* | 2006 |
| Asset-Backed Alert, www.ABAlert.com | 10/31/2008 |
| SRC Insights, Federal Reserve Bank of Philadelphia, First Quarter 2009 / Volume 13 Issue 3 | 2009 |
| SIFMA Fact-Book 2009 | 2009 |
| The Trust Preferred CDO Market: From Start to (Expected Finish), Research Department, Federal Reserve Bank of Philadelphia, June 2011 | 6/2011 |

**Miscellaneous**

| | |
|---|---|
| Testimony before the Committee on Banking, Housing and Urban Affairs, Statement of Micah S. Green, President, Bond Market Association | 6/17/2004 |
| 2004 Customer Agreements (cited in Feltman Report) | 2004 |
| Banc of America BAFC 2006-D prospectus | 4/26/2006 |
| Broker Insurance Document: MARSH Insurance | 8/5/2008 |
| Investopedia.Com definition, "Investment Company" | 2013 |