# Exhibit 2

[Page 1]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

---------------------------------

FIRST HORIZON NATIONAL          : Civil Action No.

CORPORATION, et al.,            : 2:11-CV-02608

      Plaintiffs,  :

   vs.                      :

CERTAIN UNDERWRITERS AT         :

LLOYD'S, et al.,                :

      Defendants.  :

---------------------------------


    VIDEOTAPED DEPOSITION OF

     BRIAN P. VAHEY, JR.,



    TRANSCRIPT of testimony as taken by

and before MONIQUE VOUTHOURIS, a Certified Court

Reporter, RPR, CRR and Notary Public of the States

of New Jersey and New York, at the offices of

Troutman Sanders, LLP, 405 Lexington Avenue, New

York, New York, on Wednesday, December 11, 2013,

commencing at 10:09 a.m.

1        A.      No.  In both cases, the investing -- the

2   investors are alive and well, they are big

3   institutional investors.

4        Q.      Who are the institutional investors who

5   retained you?

6        A.      Just trying to determine what I'm

7   allowed to talk about.  Well, Dexia would be one; I

8   think I'm allowed to say that.  I'm not -- I'm not

9   supposed -- we're not supposed to talk about the --

10  as the terms of the settlement we weren't supposed to

11  disclose much of what was done.  And I will say the

12  other client was a very large pension fund.

13       Q.      Okay.  Well, I don't want to ask you

14  anything that might be protected by confidentiality

15  agreements.  But could you generally describe the

16  types of issues that you discussed and the reports

17  you prepared for those matters?

18       A.      That, I can.  It -- so it was dealing

19  with fraud, with fraud, mis -- and distinctly the

20  language that was used in the prospectus as to what

21  was actually done in the investment.  So it was -- we

22  said residential mortgage-backed securities, and the

23  investors had bought some of these securities on, you

24  know, some of their factfinding or diligence was

25  based on what the prospectus or prospectus

1    supplement, excuse me, had inside of it.

2              And it turns out that there were

3    representations made inside the prospectus that the

4    mortgages that I spoke of generally earlier about,

5    you know, they are put into the trust, they were

6    supposedly of a certain quality, and it was

7    represented that the quality was met.  And then, as

8    things unfolded, the mortgage loans failed to a high

9    degree, and so folks were questioning how that could

10   be if the quality was as good as it was purported.

11             And so this lawsuit came out of that and

12   one started digging into the details and the actual

13   underwriting documents done by the banks who put the

14   mortgages in there.  It turns out that a lot of

15   mortgages actually were not as they said they were,

16   and had many significant credit problems in there

17   that were not disclosed to the investors.  And had

18   they known those, they may or may not have invested

19   or they may -- may or may not have invested at that

20   price.  So that's the crux of the lawsuit.

21             And so my work involved explaining what

22   the prospectus detailed and how important it is to an

23   investor since I served as -- in that role for many

24   years.

25             And then, also, because I'm very

1    familiar with that space, pointing out what parts of

2    the prospectus were inaccurate and how to identify

3    what was wrong with the loans and looking at the

4    results of the -- the diligence and factfinding on

5    those loans, and pointing out the errors, and put

6    that together in a report, and maybe that's what led

7    to the settlement.  I don't -- I don't know.

8         Q.    And did you provide a similar report in

9    the other matter?  I think you said there are two

10   10b-5 cases?

11        A.    They followed the same line, different

12   banks, different procedures that each bank used.

13   Different types of loans, but followed the same sort

14   of fact finding.  It just had somewhat different

15   results, but...

16        Q.    You mentioned that part of the work that

17   you did was looking at the prospectus in -- in both

18   cases.  Why did -- or -- or why is information

19   contained in a prospectus important to investors?

20        A.    Why is -- I don't know why it's

21   important to all investors.  I can only speak to why

22   it would be important to me as an investor.  And, for

23   instance, in -- and I'll speak unless you want

24   otherwise, I'll speak to residential mortgage-backed

25   securities because that's the topic at hand.

1          If you didn't have a prospectus, there

2    would be nothing to, you know, if I'm going to put

3    out money or invest -- invest in something, it's --

4    it's what a common person would want to see, you

5    know, what -- what's behind the curtain, what are you

6    really buying.

7          I think with a -- maybe a good example

8    for the layman would be a mutual fund.  So if you're

9    going to invest in a mutual fund, there are the

10   marketing materials which can give you some

11   information.  But if you ultimately want to know what

12   the mutual fund holds, you have to read the

13   prospectus, and you actually see a more detailed

14   listing of all the holdings and actually calculations

15   of returns, and you see all the kind of detail.

16          You can see who acts as the

17   administrator, what kind of fees are involved.  In

18   the fixed income world like the R -- the residential

19   mortgage-backed securities, we -- there aren't any

20   marketing materials essentially, so you would have

21   nothing to base your investment on.  There is --

22   without some sort of documentation to flip through,

23   so the prospectus is -- contains a lot of information

24   to the tune of several hundred pages of -- of legal

25   information and actual details in these deals.

1         Q.      Well, in your experience in the fixed

2    income markets, and I'm going to ask you some more

3    questions about that, but would you typically review

4    the written prospectus before deciding to make an

5    investment in a particular product?

6         A.      The easy answer is yes, I would say

7    that, you know, I said there is several hundred

8    pages, so -- and there are also things called

9    prospectus supplements.  So a lot of times I call it

10   a boilerplate, but a certain issuer may have a

11   standardized prospectus for certain types of bonds

12   that they are issuing that doesn't have the actual

13   details of the -- for an asset-backed security it

14   doesn't have the details of the asset-backed pool, it

15   would come in a separate thing called prospectus

16   supplement that gives you all that detail.

17              So after having some comfort with the

18   standard form of the prospectus, and as far as risks

19   of investments and general details about their prior

20   performance and things like that, a lot of reliance

21   was placed on the actual assets involved because

22   ultimately that's what, you know, was backing the

23   investment.

24              So, yes, we had a -- I had a method for

25   every time to look at or have some understanding of a

1    prospectus.

2         Q.     In your experience, would you ever

3    purchase a security without -- in the fixed income

4    market without first taking a look at a prospectus?

5         A.     Well, I just want to -- I would say no,

6    except I'm trying to remember.  I've done Reg D,

7    private placement investments.  I don't know if they

8    call them -- and they come with documents and it's

9    not a prospectus, I think, because it's not a -- I

10   don't think they are legally obligated to produce

11   one.

12             I mean, you -- we collect a lot of same

13   information, but I don't know that it was called a

14   prospectus.  I would have to go look up some of those

15   to see what it was really called, but definitely

16   doing a lot of due diligence that has either --

17   either is in a prospectus or something that's very

18   similar or you would ask the same questions to get

19   the same type of information out.

20        Q.     Let's say it's a Reg D investment or

21   some other type of investment where there is no

22   prospectus, but there are written materials

23   associated with that security.  You'd want to take a

24   look at those materials.

25        A.     That would be your only, and, yes, you

[Page 30]

1    would want to save them, because if something goes

2    wrong, that would be your only -- your only recourse

3    to go back and -- and plead your case.  And whether

4    or not that would be, you know, whether or not that

5    would save the day, I think that's one reason why

6    when you operate in the public markets where it is

7    all highly regulated, you do have certain recourses

8    that are dictated by the law.

9                   And I'm not sure you get all those when

10   you start venturing into private placements and stuff

11   like that.

12        Q.    And in the two cases that we have been

13   talking about the 10b-5 actions, was the issue that

14   there was an alleged misrepresentation in the

15   prospectus documents?

16        A.    Correct.  Well, misrepresentation, and

17   then scienter, so whether or not it was an accident

18   or they knowingly -- that was the crux.  I think in

19   order to succeed, you have to prove that it was done

20   as a case of fraud, so it was knowingly

21   misrepresented.

22        Q.    Have you before this matter ever

23   provided expert testimony or an expert report or

24   expert consulting in connection with an insurance

25   coverage dispute?

1        Q.       And did you agree to the engagement in

2   July or August or did you agree at some point in time

3   later?

4                 MR. LEE:   Objection; form.

5        A.       I have to go look at the engagement

6   letter date.

7        Q.       You're not providing any opinions in

8   your report on the actual meaning of the language in

9   the insurance policy, are you?

10       A.       No.   I was asked to -- for -- what the

11   terms meant and, kind of, common parlance with --

12   within the investment community.   So, meaning, you

13   know, we talked earlier about the investment

14   industry -- people are participating in the

15   investment industry; so for people who work in that

16   universe, what do these words mean.

17       Q.       Well, you didn't play any part in the

18   actual underwriting of the insurance policy at issue

19   here, did you?

20       A.       No, I did not.

21       Q.       Were you asked to give any opinions on

22   issues other than those listed in your report?

23       A.       No, I was not.

24       Q.       And did you decline to give any opinions

25   that you were asked to give?

1    finance-oriented, but they have all sorts.

2         Q.    Does it engage in any type of consulting

3    other than providing consulting in support of

4    litigation?

5         A.    Yes.

6         Q.    What types of consulting?

7         A.    Could be -- you know, once again, I'm

8    not involved in all other aspects of the firm, but I

9    mean, just -- as I described earlier, we did that

10   work in the Peregrine matter where you're working --

11   it's not litigation.  It's sort of -- you know, could

12   be consulting on practices or review or as a result

13   of maybe a litigation or regulatory action where

14   someone's asked to come in as a third party and do,

15   you know, advisory-type work or oversight work.  We

16   would do any of those types of things.

17              I -- we -- we've -- you know, I've

18   personally attempted to do some things around rogue

19   trading, which was not going to be tied to litigation

20   or whatnot.

21        Q.    How much of your work relates to

22   providing services as an expert for litigation versus

23   work as a consultant?

24        A.    It ebbs and flows, I would say.  But

25   right now it's predominantly litigation-focused

```
 1   mostly because my expertise falls within the realm of

 2   a lot of things that are being litigated currently

 3   like the mortgaged-backed securities that we spoke

 4   of, so.

 5          Q.     Has that been true for the last several

 6   years?

 7          A.     When I started at Mesirow, I actually

 8   ended up doing a fair amount of bankruptcy-type work,

 9   which is in the courts, but it's not necessarily

10   litigation.  And then it's evolved as -- from the

11   crisis the lawsuits have come to bear, and so it's

12   been more litigation recently.

13          Q.     So would you say more than two-thirds of

14   your time?

15          A.     Yes.

16          Q.     Not a hundred percent?

17          A.     No.

18          Q.     Somewhere between?

19          A.     Correct.

20          Q.     Does Berkeley Research Group engage in

21   any sort of trading activity in the securities or

22   commodities markets?

23          A.     No.

24          Q.     Now, back to paragraph 3 of your report,

25   you mentioned that other Berkeley Research Group
```

1          Q.      Okay.  Well, what's King Street Capital

2     or what was King Street Capital at the time that you

3     worked there?

4          A.      It is and was a preeminent distressed

5     hedge fund.

6          Q.      What is a preeminent distressed hedge

7     fund?

8          A.      It's a hedge fund that attempts to use

9     their expertise to make money in distressed

10    securities market -- distressed asset market.  I

11    should widen it.

12         Q.      Has that always been their business?

13         A.      Yes.

14         Q.      What were your duties as a trader at

15    King Street Capital?

16         A.      I -- because of my background, they did

17    not have anyone that was an expert in asset-backed or

18    mortgaged-backed securities and the nuances that came

19    with the consumer credit profile.  So I was looking

20    for a place to -- to use the knowledge that I had

21    gathered at GE Asset Management to use that

22    background.

23         Q.      Well, how did you use that background?

24         A.      I managed a portfolio of securities in

25    the -- or in derivatives in the mortgaged-backed --

1   commercial mortgaged-backed space.

2          Q.     Were there other traders at King Street

3   Capital who did the same type of work?

4          A.     No.  I was one of six, but the only one

5   in that space.

6          Q.     Did you run a team at King Street

7   Capital?

8          A.     Not an official team.  I had folks that

9   I worked with.

10         Q.     Anyone reporting to you?

11         A.     That's not -- that's not the way we were

12   structured, no.

13         Q.     Okay.  How -- how were you structured?

14         A.     Pretty much everyone reported to the two

15   founders of the firm.

16         Q.     And who were the two founders of the

17   firm?

18         A.     Brian Higgins and Fran Biondi.

19         Q.     How many people worked at King Street

20   Capital when you were there?

21         A.     When I started it was probably like

22   50 -- somewhere between 50 and 60.

23         Q.     Are you familiar with the term

24   "sell-side firm"?

25         A.     Yes, I am.

1          Q.      When you worked at King Street, was it

2    considered a sell-side firm?

3          A.      No.  They've always -- they're a

4    buy-side firm.

5          Q.      What's a buy-side firm?

6          A.      Buy-side firms are -- they would be

7    investors, predominantly.  If I was trying to explain

8    it to somebody at a cocktail party, generally the

9    buy-side are the folks that are investing, and

10   sell-side the folks that are, you know, providing

11   the -- selling the securities to be invested.

12         Q.      When you were at King Street Capital,

13   was King Street Capital considered to be a broker?

14         A.      No, they're not a broker.

15         Q.      Why not?

16         A.      Because they don't -- they're not

17   licensed to be a broker.  They're purely a -- they're

18   a hedge fund; they're a private investment company.

19         Q.      Have you ever worked at a sell-side

20   firm?

21         A.      I -- not directly.  I may -- GE may have

22   had a broker-dealer.  But no, me personally it's

23   always been buy-side.

24         Q.      Have you ever worked for a firm that was

25   considered a broker?

[Page 63]

```
 1          A.      Like I said, actually at GE and at

 2   Mesirow.  Mesirow, the parent company, it has a

 3   broker-dealer, but I -- there was a wall.  I mean,

 4   I -- I didn't work for that part of the institution,

 5   no.

 6          Q.      Okay.  Why did you leave King Street

 7   Capital?

 8          A.      They -- it's a mutual agreement.  They

 9   are no longer doing things in the residential

10   mortgage-backed -- asset-backed space.  In other

11   words, the time came and went for that investment

12   strategy.

13          Q.      To your knowledge is King Street Capital

14   still engaged in that business?

15          A.      Not -- they're engaged as a hedge fund,

16   but they're not in the -- to my knowledge in the

17   mortgaged-backed sector anymore.

18          Q.      Do they still own mortgaged-backed

19   securities for their proprietary accounts to your

20   knowledge?

21                  MR. LEE:  Objection; speculation.

22          A.      Yeah, I don't -- I don't know, and I

23   would doubt it.

24          Q.      When you were at King Street Capital,

25   was it King Street's practice to hold
```

1    the difference would be in -- a PreTSL is the assets

2    that we're speaking of are preferred -- preferred

3    stock and generally in banks.

4              So before I think we talked about, I had

5    explained auto loans or something like that, but I

6    mean, mortgages.  In this case, it's preferred stock

7    from banks.  And then it's carved up to a -- it's a

8    CDO, but that would be the SPV that we talked about

9    earlier.

10        Q.    When you were at King Street Capital,

11   did King Street Capital invest in PreTSLs?

12        A.    No, not -- I didn't, and I don't -- I

13   don't think they had, anybody else had some of those.

14        Q.    Do you know what a trust preferred

15   product is?

16        A.    A trust, yes.

17        Q.    Is that the same thing as a PreTSL or is

18   it something different?

19        A.    No.  Trust preferred by itself is -- is

20   either stock or debt that's issued by a -- it could

21   be offered by many different companies.  That's part

22   of what goes into a PreTSL.

23        Q.    Did you, while at King Street Capital,

24   invest in any trust preferred products?

25        A.    I didn't.

1          Q.     Do you know if anyone else at King

2     Street did?

3          A.     No, I don't.

4          Q.     Now, on page 2 of your CV, near the

5     bottom of the page, you talk about some of the work

6     you did at King Street Capital.  And it's the

7     paragraph at the bottom of page 2 of Appendix A,

8     prior to working as a consultant, and then your first

9     bullet you say that you initiated the MBS, ABS, CMBS

10    strategy for this $9 billion hedge fund.

11               Could you define the term "hedge fund"

12    as you understand it?

13         A.     Private investment company.

14         Q.     Anything else?

15         A.     No.  I mean, hedge funds are -- that's

16    just a -- they are generally -- they are -- they are

17    investment vehicles for people, either institutions

18    or other qualified people.  There are certain, you

19    know, certain rules that they have to abide by to

20    be -- not registered under the '40 Act, whereas at GE

21    most of our stuff was underneath the '40 Act.

22               So to do certain types of investments

23    and riskier types of things it's -- you know, it

24    benefits you not to be regulated by the '40 Act.

25         Q.     What's the '40 Act that you're referring

1   portfolio manager.  I got to trade and be a portfolio

2   manager.

3          Q.     Is a trader a transactor?

4          A.     Ultimately, right, you're buying and

5   selling.

6          Q.     And paragraph 8 of your report, we'll

7   turn back to that, we may jump back to your CV, but I

8   want to ask you about that paragraph in particular,

9   you state that while you were a portfolio manager for

10  GE Capital and GE Asset Management you analyzed,

11  invested and traded many different varieties of CDOs,

12  including trust preferred CDs and, in particular,

13  PreTSLs.

14         A.     Correct.

15         Q.     What's a CDO?

16         A.     It's a collateralized debt obligation.

17         Q.     And is a PreTSL a type of collateralized

18  debt obligation?

19         A.     They are.

20         Q.     And what trust preferred products did

21  you invest in or did GE invest in while you were at

22  GE?

23         A.     I -- I inherited, one of our clients had

24  a portfolio that had Alescos, for sure.  And that's

25  the only one I can remember off the top of my head as

1    being, you know, like I said, I didn't -- I had it

2    and so I had to maintain it and get rid of it or

3    monitor it and understand it.

4              And I analyzed PreTSLs and tabernas,

5    meaning that they were shown to me and primary and

6    secondaries, and so I'm very familiar with everything

7    about them.

8         Q.    Well, did you ever actually invest in

9    any trust preferred products or PreTSL products

10   yourself when you were at GE?

11             MR. LEE:  Objection; form.

12        Q.    When I say yourself, I mean on behalf of

13   GE.

14        A.    No, I did not.  I did not make

15   additional purchases of trust preferred vehicles

16   while in the seat.  I had to -- I said I had

17   inherited positions that I had to -- I end up did

18   trading with -- I almost considered them somewhat

19   distressed or impaired, whatever, it was just legacy

20   positions.

21        Q.    So you didn't invest in trust preferreds

22   other than the portfolio that you inherited.

23             Is it also correct that you did not

24   invest in PreTSLs on behalf of GE?

25        A.    No, we declined, declined the

[Page 84]

1    investment.

2         Q.    What was the approximate volume of

3    the -- of the -- or value of the trust preferred

4    portfolio that you inherited?

5         A.    I don't know the exact number.  I would

6    say in excess of $10 million.

7         Q.    10 million?

8         A.    I mean, like I said, it was -- it was a

9    client, so they are a subaccount.  Because of the

10   size of the subaccount, it would probably have to be

11   in excess of 10 million, but that's -- it was a while

12   ago.

13        Q.    Were there multiple products in that

14   portfolio?  Or was it just one note?

15        A.    The -- their whole portfolio or...

16        Q.    The trust preferred portfolio that

17   you're describing.

18        A.    There were multiple line items.

19        Q.    Were any of the trust preferred products

20   in that portfolio, to your knowledge, issued by FTN?

21        A.    A long time ago.  I don't know.  I would

22   doubt it because to my knowledge they were pretty

23   much PreTSL.  I think that may have been their only

24   preeminent product.

25        Q.    So you don't know?

1    that's what the byte size would be.

2         Q.    When you were at GE, were you primarily

3    on the buy-side like you were at King Street or were

4    you primarily on the sell-side?

5         A.    We -- where GE Asset Management and

6    before that at GE Capital, it was always the buy-side

7    operation.  If they had -- I'm not positive that GE

8    Capital had a brokerage, but probably did somewhere

9    within the company.  It would be walled off from us,

10   so.

11        Q.    Do you recall any of the individuals who

12   were involved in the transactions where GE sold trust

13   preferred products in 2002 to 2006?

14        A.    No.  I would just be speculating if I

15   was trying to figure out who bought them.  They would

16   probably have been off of a list when it was done.

17        Q.    When you were at GE did you have any

18   involvement in purchasing professional liability or

19   directors and officers insurance for GE?

20        A.    No.

21        Q.    It's a different department, wasn't it?

22        A.    I imagine.

23        Q.    I would like you to look at paragraph 4

24   of your report, and you'll see that in paragraph 4

25   you list some of the types of consulting and

1   and what they did with the customers' assets and was

2   their co-mingling -- it wasn't fraudulent conveyance

3   per se, but it was sort of the same aspects.  So

4   tracing the path of the monies and what -- were

5   things handled correctly and was there any sort of

6   malfeasance and what happened in the bankruptcy.

7          Q.     And is that the type of work that you

8   were doing in connection with Sentinel bankruptcy as

9   well?

10         A.     I was employed, once again, because it

11  was a financial institution, Sentinel being the

12  financial institution, and as the one at Mesirow, the

13  expert in all financial instruments just because no

14  one else there has any -- any securities background,

15  so everything with securities kind of fell under my

16  purview.  So helping them understand the portfolios,

17  the repos, the accounts, the trading, the trade logs,

18  that's my role.

19         Q.     During what time period were you engaged

20  to work on the Sentinel bankruptcy matter?

21         A.     It was soon after I started.  So I

22  started in 2008.  It may have been -- it's either the

23  summer of 2008 or summer of 2009.  I don't know exact

24  year, but it was one of those summers and I don't

25  know if it was right away or a year into it, but...

1    actual drafting of the Feltman report?

2         A.    Yes.  But it's his content, so...

3         Q.    But you as an employee of Mesirow, you

4    would want the report to be accurate.  Correct?

5         A.    Yes.

6         Q.    Now, in forming your opinions in this

7    matter, are you relying in any way on information

8    that you obtained in connection with the work you

9    performed for the trustee in the Sentinel bankruptcy?

10        A.    No.

11        Q.    I would like you to turn to page 7 of

12   your report -- I'm sorry, paragraph 7 on page 4.  In

13   paragraph 7 you state that you were involved for

14   nearly 15 years in investing predominantly as a

15   portfolio manager and trader for a variety of

16   institutional and accredited investors.

17               I just want to make sure I understand

18   the terms you're using.  What is an institutional

19   investor?

20        A.    An institutional investor is a QIB, is

21   what we use in the parlance, which I think is a

22   Qualified Institutional Buyer.  It's a form you have

23   to fill out and you have to meet certain requirements

24   to qualify as one.

25               And I -- honestly, I don't even know

1    CFA.

2            Q.      Okay.

3            A.      And so your question was does being a

4    CFA charter holder allow me --

5            Q.      Qualify you to serve as a securities

6    broker or dealer?

7            A.      No, it does not.

8            Q.      Now, you mentioned earlier the Series 7.

9    What's the -- what's a Series 7?

10           A.      It's a FINRA license and it's --

11   it's what a -- you know, it's a general securities

12   registered representative license.  So it's -- I'm

13   not sure I would call it a broad license for folks on

14   the -- predominantly sell -- sell-side sort of

15   license.  Most of them are required to have that if

16   they want to operate.  And then there are other

17   licenses they may be -- have to hold on top of that.

18   But that's the reason I took it was because if I was

19   going to work for a broker-dealer, which could be a

20   sell-side sort of entity and it's regulated a certain

21   way and you have to hold those licenses.

22           Q.      So it's a license to trade as a

23   securities broker-dealer?  What's it a license to do?

24           A.      I don't know.

25           Q.      Okay.

[Page 104]

```
 1          A.      I just know that most broker-dealer

 2    folks who work for broker-dealers are going to have

 3    that, and probably more on top of it, 63, 65, et

 4    cetera.

 5          Q.      You have to take a test to get a Series

 6    7?

 7          A.      Yes, I did.

 8          Q.      Has your Series 7 lapsed?

 9          A.      Not yet, because I left Mesirow in --

10    it's two -- it stays live for two years with Mesirow,

11    and then it will lapse.

12          Q.      When did you get your Series 7?

13          A.      Right before I left Mesirow, so 2012.

14          Q.      Did you ever have a Series 7 license

15    before you were at Mesirow?

16          A.      Nope.

17          Q.      Why did you get a Series 7 license at

18    Mesirow?

19          A.      Because I was the -- like I said, I was

20    the only -- on for Mesirow Financial Consulting, I

21    was the securities expert, and they wanted to

22    establish a broker-dealer to potentially assist in

23    restructurings and that involved either selling or

24    securities or whatnot, and so it made the most sense

25    for the person with the most experience in that space
```

1    to be one of the people that held the licence.

2         Q.    And I think you said earlier that

3    Mesirow did not trade in securities.  Did you ever

4    use your license to buy or sell securities?

5         A.    No, we never -- I don't think they still

6    haven't -- it's been kind of dormant, but, you know,

7    they set it up.

8         Q.    And you never managed a trading book at

9    a broker-dealer, have you?

10        A.    No.

11        Q.    Do you consider yourself a securities

12   broker or dealer?

13        A.    No.

14        Q.    Why not?

15        A.    Because the securities broker-dealer's

16   involved in brokering or dealing in securities and I

17   have always been an investor.

18        Q.    Is it fair to say that you've never

19   acted in your capacity as a registered rep or a

20   broker-dealer?

21        A.    Correct.

22        Q.    Now, is a company stock that trades on a

23   national exchange like the New York Stock Exchange,

24   is that a security or is it a commodity?

25        A.    So you -- you said does a company stock,

1          A.      No.   These are -- yeah, she just missed

2     the -- the correct terminology in the title.

3          Q.      Well, I think you cite some statutes in

4     the documents considered.   Does this list of

5     documents list all of the statutes you considered in

6     preparing your report?

7          A.      Yes.   Mostly, they were in reference.

8     Once again, I said the -- the other experts,

9     certainly the Investment Company Act we spoke of,

10    that came up, and, you know, Mr. Atkins -- some of

11    the other references were either from FINRA or SEC

12    type, so I'd have to go see the context of where

13    those definitions were coming out of to go review.

14         Q.      Are statutes relevant in any way to your

15    opinions?

16         A.      No, because I'm taking the -- I was

17    asked sort of what the broad industry sort of

18    understanding is, and the other side chose not to

19    take that path, but from my perspective, I was sort

20    of broader, but I still needed to understand what

21    they were talking about.

22         Q.      Is it fair to say -- and we'll get into

23    your specific opinions in a minute, but, generally,

24    with respect to the issues or terms that you were

25    asked to opine on, your understanding of those terms

```
 1                THE VIDEOGRAPHER:  Back on.  2:01.

 2                MR. GUILBERT:  Okay.  We just went off

 3   the record, and counsel for the insurers represents

 4   that a copy of this memorandum that we just discussed

 5   was produced by First Horizon and will get us the --

 6   the Bates number reference at the next break.

 7   BY MR. GUILBERT:

 8        Q.    Let's turn back to your report,

 9   Mr. Vahey, to section 4, which starts on page 4, and

10   then I would like to ask you some just general

11   questions about paragraphs 13 through 16.  And you

12   summarize the primary opinions that you're giving in

13   this case.  Do you see that?

14        A.    Yes.

15        Q.    Are these the only opinions that you're

16   offering in this case?

17        A.    Yes.

18        Q.    And just to make sure I've got it right,

19   the three opinions are generally that FTN was a

20   market maker as the term is commonly understood for

21   PreTSL securities?

22        A.    Yes.

23        Q.    The second opinion is that Sentinel was

24   a company engaged in investing in securities on

25   behalf of others for a fee and, therefore, it is an
```

[Page 128]

1    investment company as the term is commonly

2    understood?

3         A.    Yes.

4         Q.    And the third is that Sentinel was a

5    commodities broker-dealer?

6         A.    Correct.

7         Q.    Does a commodities broker-dealer invest

8    in securities on behalf of others for a fee?

9         A.    They could.

10        Q.    So --

11        A.    So, in other words, an FCM could be an

12   investment company, as --

13        Q.    Are all --

14        A.    -- as could a broker-dealer, so --

15        Q.    So a securities broker-dealer invests in

16   securities on behalf of others for a fee, doesn't it?

17        A.    No, not always, so that's why I'm saying

18   it could.

19        Q.    It could?

20        A.    The same thing, an FCM could, but not

21   all of them did, so the avenue is certainly

22   available.

23        Q.    When would a securities broker-dealer

24   not invest in securities on behalf of others for a

25   fee?

1          A.      Many do not.

2          Q.      Can you give me some examples?

3          A.      Because -- certainly many of the smaller

4    regional broker-dealers, their bread and butter is

5    really matching up buyers and sellers and they don't

6    have a lot of balance sheet, and that's what they --

7    they earn the spread, the bid-ask, and maybe other,

8    like servicing -- service-type fees.  Maybe they

9    might do some custodial or clearing work.

10               But to invest on behalf of others,

11   they -- certainly there are some broker-dealers that

12   set up investment arms or have some people under

13   their umbrella, but that broker-dealer's primary

14   responsibility -- or their primary job is being a

15   broker or a dealer, not necessarily being an

16   invest -- you know, investing, but they can, and this

17   broker rule may -- certainly may change how that's

18   done and whatnot, so...

19         Q.      Do insurance companies invest in

20   securities on behalf of others for a fee?

21               MR. LEE:  Objection; speculation.

22         A.      Yeah.  Well, I mean, in general terms,

23   they are investing other people's money that was put

24   towards policies.  So, I mean, that's other people's

25   money and they certainly do charge.  It's called cost

[Page 134]

1    institutional spaces, you know, big investors, so,

2    they are a type of investment company.

3          Q.    If a broker-dealer invested in

4    securities on behalf of others for a fee, would it be

5    an investment company under your definition?

6          A.    Oh, yes, yeah, um-hmm.

7          Q.    I would like to look at paragraph 14 of

8    your report, you state that making a market, in

9    quotations, is a common and widely used term in the

10   financial services industry.  How are you defining

11   the financial services industry for the purposes of

12   that paragraph?

13         A.    I believe the net can be cast widely as

14   we spoke earlier, I mean, of folks that are -- it

15   probably helps to be closer as far as to someone

16   understanding it, the folks that are closer to actual

17   trading operations, but anyone connected to, you

18   know, any part of the trading of securities, I think,

19   can opine on -- on that.  And I don't know if back

20   office people necessarily would know that, but,

21   certainly, what we call front and middle office

22   people would have familiarity with that sort of

23   market activities.

24         Q.    Would someone who is closer to actual

25   trading operations as you use that -- that phrase,

1  have a better understanding as to what making a

2  market means than someone who is farther away from

3  actual trading operations?

4              MR. LEE:  Objection; calls for

5  speculation.

6      A.    I mean, generally one would hope.

7      Q.    Is there anyone that -- you cast the net

8  widely I think with respect to financial services

9  industry.  Is there anyone that you might think of in

10 the financial services industry who is out of that

11 net that's not part of the financial services

12 industry?

13             MR. LEE:  Objection to form; unclear.

14     A.    Could you rephrase that maybe?

15     Q.    Yeah.  I'm just trying to figure out who

16 is in the net when you referred to the financial

17 services industry and who is out, if anyone.

18             MR. CONRAD:  Objection to form.

19     A.    Yeah, I mean, I can't -- I mean, it's --

20 it's all going to be dependent upon a person's

21 experience and how involved they are with

22 understanding their job and surrounding environment,

23 you know, I mean, need to know, want to know.

24     Q.    Well, is somebody who works for a

25 pension plan part of the financial services industry

1    as you define?

2         A.    Once again, based on experience, I know

3    people who are extremely disinterested in that role

4    and others that are extremely capable and

5    knowledgeable in that role.  So, I mean, ideally, you

6    would want people to know what things like that mean.

7    It's just dependent on the people involved.

8         Q.    Let's say someone who runs a pension

9    fund, for an example, would that individual be part

10   of the financial services industry as you define it?

11        A.    When you say -- pension funds can be

12   kind of convoluted structures, meaning it can be

13   somebody who has outsourced everything to other

14   people or it can be a person who actually trades on

15   behalf of a pension fund.  So in the latter instance,

16   probably a very, you know, decently knowledge person;

17   in the first part, probably not so much because

18   they've delegated everything.

19        Q.    Is a payday lender part of the financial

20   services industry, someone who runs a payday lending

21   operation?

22             MR. CONRAD:  Objection to form.

23        A.    They are in financial services; they are

24   a lender.

25        Q.    Well, would a payday lender have any

1  understanding as to what it means to make a market in

2  securities?

3            MR. CONRAD:  Objection to form.  Calls

4  for speculation.

5            MR. LEE:  Objection.

6      A.    I don't know, but, but there is a good

7  chance they would.

8      Q.    What about someone who works for an auto

9  finance corporation whose job is to work on issuing

10 credit and car loans to consumers, are they part of

11 the financial services industry as you define it?

12     A.    They are a lender, so they are -- they

13 are probably some of the foundation of the securities

14 I dealt with.

15     Q.    And would someone working for a lender

16 who specializes in automobile consumer finance be

17 qualified to or even know what making a market means?

18            MR. CONRAD:  Objection to form; calls

19 for speculation.

20     A.    Yeah, I don't know.

21     Q.    I would like to look at paragraph 18 of

22 your report.  You state, "It is my understanding that

23 common industry terms such as 'market maker,'

24 'broker-dealer' and 'securities' or 'commodities' and

25 'investment company' were not defined elsewhere in

1    the insurance policies."  Is that right?

2            A.     Yes, that's what I wrote, yeah.

3            Q.     What do you mean by "common industry

4    terms"?

5            A.     Meaning that, you know, market-maker

6    investment company that had -- that term gets used a

7    lot in our industry just in common nomenclature, same

8    thing of broker-dealer.  It wouldn't be in securities

9    or bonds, but broker-dealer is certainly another

10   common phrase.

11           Q.     So the fact that a term is used a lot

12   makes it a common industry term?

13           A.     Yes.

14           Q.     Used a lot by whom?

15           A.     Those of us that are in the industry.

16           Q.     The last sentence of paragraph 18, you

17   talk about your opinion that FTN functioned as a

18   market maker and that Sentinel is an investment

19   company and a broker-dealer in commodities as the

20   respective terms are generally understood, and,

21   again, I just want to make sure I'm clear on this.

22   Generally understood by whom?

23           A.     You said, you know, common parlance in

24   the general industry, so folks in the space.  So in

25   the -- in the -- in the environment, which I'm

[Page 139]

1    familiar with the institutional environment or, you

2    know, investment community, that's what I meant by

3    understood by the participants in that market.

4         Q.    We spoke this morning a bit about some

5    of the regulatory authorities that are involved in

6    the financial services industry.  Wouldn't you agree

7    that the financial services industry in the United

8    States is heavily regulated?

9              MR. LEE:  Objection; form.

10        A.    Heavily is an adjective that -- it's

11   definitely regulated.

12        Q.    So you would agree the financial

13   services industry is regulated?

14        A.    Oh, yes.

15        Q.    By lots of regulatory agencies?

16             MR. LEE:  Objection to form.

17        A.    I believe there are a lot -- there are

18   several industries that perform some sort of

19   regulatory duty in the United States, yes.

20        Q.    Do regulatory definitions, definitions

21   of terms promulgated by regulators, impact in any way

22   the way common industry terms, as you refer to them,

23   are understood?

24             MR. LEE:  Objection; form, speculation,

25   incomplete hypothetical.

1    Atkins both referred to market making definitions

2    that were either from FINRA or from SEC side of the

3    house, it certainly showed that they -- they were

4    putting it, you know, they were using that foundation

5    for their -- their reports.

6              So, yes, I mean, I considered that when

7    I was, you know, making -- crafting my response

8    because I view it -- I was asked -- what I was asked

9    to do was to look at it in a broader -- broad

10   context.  But when I saw the other side, they were

11   not, as I understand it, reviewing it in a broad

12   context, so...

13        Q.      Now, elsewhere in your report you refer

14   to how terms are used in, quote/unquote, common

15   parlance.  What do you mean by "common parlance"?

16        A.      Generally, like I said, just

17   communications within the industry, outside of, like

18   I said if there is, you know, it was all in context

19   so -- but in the day-to-day sort of operations where

20   you're not, you know, sitting down with a regulator

21   or sitting down to discuss compliance with

22   regulations, just how the people talk about

23   investment company, and certainly market making, I

24   actually don't -- in my -- my experience, fixed

25   income side, very rarely speak about the regulated

1    version of market making.

2              It's not a -- it just doesn't happen.

3         Q.    Do you think that you were ever a market

4    maker in the fixed income products that we discussed

5    earlier this morning when you were at King Street

6    Capital?

7         A.    We could have been, but I did not -- it

8    wasn't something that we endeavored to do.  Certainly

9    had inventory and all the traders had the ability to,

10   you know, put bid-ask out.  But, I mean, we don't

11   have buy-side firms with, you know, to send out our,

12   you know, the parties, you know, putting those quotes

13   out to a broad set of participants is sort of, I

14   think why buy-side firms don't do more of that,

15   although I -- certainly there is nothing -- and then

16   I don't know if they would start running afoul of

17   compliance, regulatory compliance rules.  But, no, we

18   didn't.

19        Q.    Well, if you're at a cocktail party back

20   in 2007 at King Street Capital and someone asked you

21   if you were a market maker, what would you say?

22        A.    No.

23        Q.    Why not?

24        A.    Because I'm an investor.

25        Q.    Any other reasons?

1          A.      No.   That -- because I'm an -- that's

2      what -- I mean, I'm a trader, portfolio manager,

3      investor.   That's what we do as a firm.   I don't

4      think it would be wise for us to hold ourselves out

5      as anything else.

6          Q.      Well, why does how you hold yourself out

7      matter with respect to whether you're a market maker

8      or not?

9          A.      Generally, when there is, you know,

10     potential for -- there are laws involved and it's not

11     my -- I mean, I know what I do at King Street and I

12     certainly wouldn't step outside my box to claim to be

13     doing something that I don't, so I was an investor.

14         Q.      So the laws do have consequences when

15     you use certain terms in the industry, don't they?

16              MR. CONRAD:   Objection to form.

17         A.      Many do, and you certainly don't want

18     to -- in that hypothetical you gave me, it would be

19     foolhardy to, like I said, to claim something that I

20     wasn't doing, so...

21         Q.      Paragraph 19, you state that, let me see

22     if I got this right, that PreTSLs are a type of CDO,

23     and we talked about what CDOs were earlier.   And then

24     in the second sentence you say, "The CDOS then issue

25     bonds."

[Page 159]

1                      And then they may or may not have made

2       money in making a market.  It was almost on the

3       bid-ask, certainly putting things in and out, and

4       that's what I've said a market maker does.

5              Q.     How does a market maker make money from

6       market making activities?

7              A.     So, in theory, I mean, you're supposed

8       to buy high and, you know -- or sell high and buy

9       low.  But you're also -- you're facilitating that

10      market, and so you -- if the market sort of moves the

11      way they are anticipating, then they'll make that,

12      you know, bid-ask spread.  But, you know, part of the

13      other thing, you're not necessarily guaranteed to

14      make a profit as a market maker.

15                     So that's why they take risks.  So, it

16      doesn't always work out the way they want to.

17                     So in the market making and, for

18      example, so you look at FTN, they made a ton of money

19      in the new issue side.  It wasn't the market making

20      that was their profit center.

21             Q.     So do you think FTN made any money from

22      market making activities?

23                     MR. LEE:  Objection; calls for

24      speculation.

25             A.     Yeah, I would have to go look at the

1    records.

2          Q.    What would you have to look at?

3          A.    I would look at their P&L on Jankowski's

4    trading logs.  You can see where they bought stuff

5    and sold it.  They tracked it.  You can get that

6    information.

7          Q.    Did you ask for it?

8          A.    No, because I didn't care whether or not

9    they -- whether they made a profit.  That wasn't part

10   of my opinion.

11         Q.    If FTN didn't earn revenues for market

12   making activities, would that impact your opinion one

13   way or the other?

14               MR. CONRAD:  Objection to form.

15               MR. LEE:  Objection; calls for

16   speculation; incomplete hypothetical.

17         A.    No, because that's not part of the

18   definition of market making.

19         Q.    Do you know what a mark-up is?

20         A.    Yes.

21         Q.    What's a mark-up?

22         A.    It is the ability of the sell side to,

23   if they own a piece of -- a security, they can then

24   just automatically before they reoffer it, they can

25   move the price up to a certain amount.  And there is

[Page 165]

1    of foundation.

2              A.      There are buy-and-hold investors, yes.

3              Q.      And were there buy-and-hold investors in

4    the structured finance markets in which you operated

5    when you were at King Street Capital and GE?

6              A.      There are buy-and-hold investors

7    scattered all throughout the world.  And I cited the

8    Bond Market Association, which I think he talks

9    about, the head of that talks about there would be a

10   certain, yeah, certain investors and fixed income are

11   buy-and-hold, um-hmm.

12             Q.      Who is that you're referring to?

13             A.      Micah Green.

14             Q.      Who is Micah Green?

15             A.      He's the president of the Bond Market

16   Association back, for a very long time, certainly in

17   2004 when he was quoted, and before that he was --

18   he's been active in Washington, D.C. for a long time.

19             Q.      Would you agree with me that he's a

20   lobbyist?

21                     MR. LEE:  Objection; form; foundation;

22   speculation.

23             A.      Yeah, I'm not -- I do know that the Bond

24   Market Association, even one of the reasons it was

25   used here is because the -- the breadth of people who

[Page 166]

1    are members is significant, and they hold industry

2    events, not unlike the CFA industry we talked about,

3    and its many buy-side participants are there.

4                   So the fact that one of the things that

5    that industry -- or that organization did was

6    advocate, yeah, that was certainly one of his roles.

7    But they also -- and SIFMA continues to be a very

8    important industry organization, you know.

9          Q.      And SIFMA is --

10         A.      That's what it changed to.

11         Q.      Okay.  So SIFMA is what was formerly

12   known as the Bond Market Association?

13         A.      The Bond Market Association, and then

14   there was something for equities, and then they

15   merged.

16         Q.      Do you know where Micah Green is now?

17         A.      I think he did something very wrong and

18   is in -- I didn't read all the details, but I thought

19   he was still doing this sort of stuff, but he did

20   something -- I don't know exactly what it was, but he

21   got in trouble.

22         Q.      What did he get in trouble for?

23         A.      I don't know what exactly it was.  I

24   Googled it.  It might have been like a personal

25   thing, so -- something, you know, something

[Page 167]

1    unethical.

2         Q.     So -- go ahead.

3         A.     I think he --

4              MR. CONRAD:  Come on, tell us, Shelby,

5    you know.

6         A.     Was he a lawyer and he did something

7    that disbarred him?  I think he did something wrong.

8    I was surprised because, I forget when he did that,

9    but he messed up a good career.

10        Q.     Well, is someone who is disbarred a good

11   source of information for what market participants

12   may or may not think?

13             MR. LEE:  Objection --

14             MR. CONRAD:  Objection.

15             MR. LEE:  -- form; foundation;

16   speculation; incomplete hypothetical.

17        A.     I would just say all people make

18   mistakes, and I'm not going to be the first one to

19   say -- so I will say that he's on the record quite a

20   bit and none of the -- the members of the Bond Market

21   Association did not move to censure or disavow the

22   comments that he made in 2004 or other things on this

23   topic.

24        Q.     Okay.  Well, I might take out some of

25   his statements in a minute, but I would like to just

1    jump back to paragraph 24 when we were talking about

2    the sentence about the profits being achievable near

3    the top of page 7, you state that, "Clearly, FTN had

4    both the means and the incentives to make markets in

5    PreTSLs."  Do you see that?

6         A.    Yes.

7         Q.    What means did FTN have to make a market

8    in PreTSLs?

9         A.    They had a sales force, a trader and

10   some balance sheet.

11        Q.    Anything else?

12        A.    I'm sure there is a lot of smaller

13   things, but those -- you really -- yeah, you kind of

14   need those big ones.

15        Q.    Do you need anything else to make a

16   market in a security?

17        A.    I mean, we -- we can get into the

18   nitty-gritty about a telephone and Internet.  But as

19   I've described it, you know, in order to promulgate

20   you would use the sales force to promulgate the

21   inventory, to have the inventory you need a balance

22   sheet, and to actually facilitate the trades, you

23   need a trader.  So that's sort of the building

24   blocks.

25        Q.    In your view, where do market makers

1    typically exist?

2              MR. CONRAD:  Objection to form.

3              MR. LEE:  Form.

4         Q.    Are they at banks, broker-dealers, or

5    can you just hang up a shingle and say:  I'm a market

6    maker?  How does it -- where do you find them?

7         A.    You -- I guess you could.  I'm -- my

8    experience certainly sort of for writing this report

9    and my experience is dealers are a pretty good

10   source.

11             I mean, so that's my experience, so

12   that's where I would say I found most of them.

13        Q.    And that sentence that I just read, what

14   incentive did FTN have to make markets in PreTSLs, in

15   your view?

16        A.    I cite it elsewhere in the report.  It

17   might have been Mr. Gusmus.  They made -- and one of

18   the reasons they hired de Saint Phalle is they made

19   off a lot of money off the new issuance side.

20             So, in other words, they -- when we

21   described how these things were made, a lot of times

22   we just have been focusing on selling them to

23   investors, and there certainly is fees associated

24   with that, but for a while they also were making

25   money from -- which I think is one of the reasons

1   document that you're citing for that proposition?

2          A.      It is.

3          Q.      Do you agree that this document doesn't

4   refer to PreTSLs at all?

5          A.      That's correct.

6          Q.      And in the second paragraph of the

7   article, there is a discussion about investment banks

8   devoted tremendous resource to CDO production.  Do

9   you see that?

10         A.      Yes, I do.

11         Q.      Would CDO production be the same thing

12  as a primary issuance of a CDO?

13         A.      You are correct.

14         Q.      Do you see any reference in this

15  document to trading in secondary markets?

16         A.      No.  Well, they may.

17                 MR. LEE:  Take your time and read the

18  whole document if you want.

19         A.      Well, in the last paragraph on this

20  page, the accompanying listing covers head CDO

21  bankers and traders in the U.S. and Europe, so the

22  traders would not have anything to do with the

23  primary issuance.

24                 And it says the CDO traders are in

25  charge of buying and selling the securities for their

[Page 175]

1    for itself.

2              A.     Yes.

3              Q.     Mr. Jankowski's name appears under the

4    header "Head CDO Trader."  Right?

5                     MR. LEE:  Same objection.

6              A.     Yes.

7              Q.     Do you know if First Tennessee is the

8    same thing as "FTN" where it's referenced on page 2

9    of the document?

10                    MR. LEE:  Calls for speculation.  The

11   document speaks for itself.

12             A.     As market participants, that's what I

13   would understand it to be, just as many of these

14   other banks, it doesn't list the proper -- like Bank

15   of America doesn't say Bank of America Securities;

16   it's Bank of America.

17             Q.     Do you know who prepared this document?

18             A.     The actual author?

19             Q.     Um-hmm.

20             A.     It usually does indicate the actual

21   author.  I don't --

22             Q.     There is not one listed here, is there?

23             A.     No.  They usually do.

24                    I wonder if this is just because this is

25   this one article.  Usually they do say who the author

1   or Securitization News, maybe.  I think it involved

2   the Securitization Net, and it was quite a -- it was

3   very expensive, also, which maybe you guys discovered

4   when you were trying to get this, but it's not

5   exactly -- I mean, it's not like it was some free

6   piece of information that was flying around.  People

7   paid a lot of money to get that every week.

8          Q.     Take a look at paragraph 25.  You state

9   that, "For original investors of PreTSLs, an

10  effective way to exit their investments was to

11  directly contact FTN or KBW."  What does "exit

12  investment" mean?

13         A.     To no longer own it.  To --

14         Q.     To sell it?

15         A.     Yeah, to sell.

16         Q.     Have you examined the record to

17  determine whether contacting FTN was an effective way

18  to exit investments in PreTSLs?

19         A.     No.  It's from industry experience.

20         Q.     So there is no basis for that statement,

21  other than your general experience in the industry?

22         A.     Well, if we were to go -- if you want to

23  go back to the records, we could certainly pull --

24  this is, once again, I have to look at all the

25  records, but I saw the Bloomberg Exchanges and

[Page 178]

1  trading records of Mr. Mosley, and you could go see

2  all the different firms that he reached out to when

3  he was transacting in PreTSL securities and you could

4  see the performance of the different investment banks

5  on bidding the paper.  And I'm pretty darn confident

6  that you'll find those are the most two effective

7  bidders on the paper.

8       Q.    Well, have you actually examined the

9  record to determine whether contacting FTN actually

10 was an effective way to --

11      A.    I have not, but I would gladly do so, if

12 given the information.

13      Q.    But you didn't do it before you wrote

14 your report, did you?

15      A.    I did not need to because I'm that

16 confident.

17      Q.    As someone who worked for the trustee,

18 do you know whether Sentinel actually was able to

19 exit all of its investments in PreTSLs by contacting

20 FTN?

21            MR. LEE:  Objection; form.

22      A.    Can you repeat back that?  I think I got

23 it, but...

24            (Record read.)

25      A.    Oh, the bankruptcy trustee, so...

[Page 182]

1     you know, going to bid your bonds, so it's -- I mean,

2     even in -- in market makers, you can't -- you can't

3     make an eternal promise of a price, so I'll bid the

4     bonds and the expectation is you'll bid them in

5     market context.

6          Q.     And FTN had the discretion in that

7     instance that you're referring to in the phone call

8     to pick the price on which it would bid the bond?

9               MR. LEE:  Objection; speculation.

10         A.     Yeah, all market makers have the ability

11    to put the market out wherever they want to put it

12    out.  Nobody ever said you had to be happy where the

13    market is for your securities and, in fact,

14    Mr. Mosley, I think some of the ones he just didn't

15    want to sell where he was at.

16         Q.     So in paragraph 25 you state that, in

17    the second sentence, "FTN promised to stand by their

18    securities," and I think you're citing the transcript

19    of the phone call you were just referring to.  Is

20    that correct?

21         A.     That's correct, I think that's their

22    words, too, "stand by."

23         Q.     Do you have any other support for that

24    statement that FTN promised to stand by the

25    securities?

[Page 183]

1        A.      Not that I had a chance to review.

2        Q.      And do you know why that telephone call

3   took place that day?

4                MR. LEE:  Objection; calls for

5   speculation.

6        A.      I had seen it before.  I obliquely

7   remember something about I think it was a list.  It

8   may have been a list that actually that FTN wasn't

9   included on erroneously by Mr. Mosley.  But I would

10  have to go review and listen.

11       Q.      And you said that the promise to stand

12  by their securities was a quote from that telephone

13  call.  Are you sure?

14       A.      Not positive.  I mean, that's -- that's

15  used by many market participants, but I'm trying to

16  remember Folan's exact -- it's either Jankowski --

17  Jankowski also made, you know, representations they

18  want to support their bonds, so, you know, which is

19  typical.

20       Q.      So that's just your interpretation of

21  what was said on the phone calls?

22                MR. CONRAD:  Objection to form.

23       A.      Yeah, I would have to go -- if you have

24  it, I can read over it and...

25       Q.      So you're not sure?

[Page 184]

```
 1          A.      No, I'm not positive, but...

 2                  MR. LEE:  If you have the transcript and

 3     you want to show it to him, he can look at it.

 4                  MR. GUILBERT:  That's all right.  It

 5     says what it says.

 6          Q.      Now, you also state in paragraph 25 that

 7     FTN made an effort to satisfy their customers'

 8     wishes.  What do you mean by that?  Wishes to do

 9     what?

10          A.      Yeah, I think Mr. Atkins and Mr. Pak

11     referred to a customer accommodation and, ironically,

12     market makers, when you're facilitating a market, you

13     are accommodating customers, because everybody

14     participating in the market is a customer buying and

15     selling, so -- and so in the fixed income world where

16     it's in this type of market where maybe it's a little

17     less liquid, it -- it becomes -- in fact, maybe a

18     little bit more personalized because it's -- they --

19     they very well knew every single customer because it

20     may be a hundred, 150.  So, you know, they probably

21     knew how much the people owned, when they bought it,

22     where they bought it at, as far as price level.

23                  So -- and they went out of their way to

24     -- that's why it was easiest for them to match buyers

25     and sellers together or to go find people who would
```

1      Q.      Okay.  And FTN wasn't obligated to

2  satisfy their customers' wishes, whatever those

3  wishes might have been, was it?

4              MR. CONRAD:  Object to form; calls for

5  speculation; calls for legal conclusion.

6      A.      Yeah.  I spoke to the earlier oral

7  commitment just to Sentinel, so I feel that they were

8  obligated by that conversation.

9      Q.      At any price?

10             MR. LEE:  Objection.

11             MR. CONRAD:  Objection.

12     A.      That's not -- I said that I believe that

13  it was -- it's to bid it, to -- you know, in essence

14  make a market.  You know, may not be, like I said,

15  it's not always where the customer hopes that market

16  is, but it's there.

17     Q.      And paragraph 26, what's the basis for

18  the -- your statement on the first sentence of that

19  paragraph?

20     A.      There is data in --

21     Q.      I guess the first two sentences.

22     A.      There is data in the Olvany report for

23  the first -- I mean, their trading activities,

24  delineated as far as PreTSLs are concerned.  And I

25  did not see behaviors or activities on the part of

1    volume is being done.

2         Q.    Okay.  Let me ask you about

3    paragraph 27.  I don't see any footnotes for the

4    proposition that FTN and KBW were the premier market

5    makers for PreTSL securities and conducted much of

6    the secondary trading.  What do you attribute that

7    to, if anything?

8         A.    The secondary trading data, I believe,

9    was -- I believe it's from the Olvany, sort of

10   indications that they were the -- for a large amount

11   of trading was seen.  And I -- as far as the amount

12   of inventory, that's not -- I'm not citing that, but

13   I'm -- I would not expect anybody else to be holding

14   inventory in PreTSLs of size.  I mean, there may be a

15   random bond or two in different investment banks, but

16   they are territorial in a way with these types of

17   products, and they feel that that's supporting

18   somebody else's brand.  So just didn't happen much.

19        Q.    In paragraph 29, you say that Sentinel

20   purchased PreTSLs from FTN and sold them back to FTN

21   numerous times from 2004 to 2007.  What do you mean

22   by "numerous"?

23        A.    Well, numerous is more than once,

24   technically, and -- I mean, and we could just

25   anecdotally just point to the -- the dubious -- well,

1    the combo note transactions that were -- I mean,

2    that -- that's one example.  There are -- there are

3    more.

4              But that -- if you want to, we can just

5    look at those.  I know they did that starting in 2006

6    and they kind of continued that practice, and it

7    required them to buy them and then sell them back and

8    then buy them again --

9         Q.     There was only one of those, wasn't

10   there?

11        A.     I think they did a few, but I'm not -- I

12   mean, we ought to look at the data.

13        Q.     Well, what's the basis for this

14   understanding?  Is it the Olvany report or did you...

15        A.     Yes, um-hmm, and then reviewing -- well,

16   it's even in the transcripts from Folan and Jankowski

17   talking about bidding the bonds from, you know, what

18   their interactions were with Sentinel, so.

19        Q.     Did you, in the course of your preparing

20   your report, do an independent valuation of the

21   transaction history in PreTSLs between FTN and

22   Sentinel?

23        A.     I did not view that to be -- given my

24   experience in the space and the previous work done by

25   Olvany and others, I figured that would be excessive.

1    I certainly could, if you would like me to.

2         Q.    So you relied on the experts in the

3    other matter?

4         A.    And my experience in the space, yeah, as

5    far as their behavior in that -- in their sector.

6         Q.    Now, let's move to paragraph 30.  And

7    this is where you get really into your -- the

8    substance of your opinion on the market making

9    activities.  And in the header before paragraph 30,

10   you ask the question, "What is a market maker?"

11              Now, I don't see a definition of that

12   term in your report, and I understand that you're

13   rebutting Mr. Atkins' report and Mr. Pak's report,

14   but how would you, sitting here today, define the

15   term "market maker"?

16        A.    Well, I -- I sort of was hoping that it

17   came across a bit as a little bit of a definition in

18   paragraph 31, but, so I'll read:

19              "Based on my experience as a participant

20   in the securities marketplace, the fundamental

21   activities of market making are:  Willingness to hold

22   inventory; regular contact with customers to both buy

23   and sell securities; supporting and facilitating a

24   market; and earning a profit from the bid-ask spread

25   or other fees in the transactions instead of earning

[Page 196]

1    securities, you're certainly not much of a market

2    maker, so that's pretty darn important.  So is the

3    first two.

4              Those two together, by definition, sort

5    of, are a big part of the third bullet, supporting

6    and facilitating a market.  So, like I said, they are

7    very intertwined.

8              And, really, the fourth one about the --

9    it could be a profit or a loss from the bid-ask

10   spread, like we talked about earlier, but that caveat

11   is trying to discern Mr. Pak was focused on

12   proprietary trading.

13             The proprietary trading there -- it has

14   to -- you know, they are in the market to extract

15   profits.  You know, they are using balance sheet, but

16   it's a unique -- I would have to show you examples,

17   but -- but I was trying to -- that's why it's in

18   there, to kind of delineate from that.

19        Q.    Isn't someone who is engaged in

20   proprietary trading also demonstrating willingness to

21   hold inventory?

22        A.    Yes.  Yes.

23        Q.    So isn't proprietary trading

24   fundamentally different from trading as a market

25   maker as you define it?

1    A.    No.  I -- that's why we -- I tried to

2    cull that out.  That's why there is so much angst in

3    the paper every day about the Volcker Rule.  It's --

4    it's going to be a pain for regulators to -- you need

5    a lot of details.  You -- you need to do some

6    examination to discern that, and it will be probably

7    an expensive and painful things for regulators to

8    be -- it can be done, but it's not going to be easy.

9    Q.    So it's possible that those who hold

10   inventory for purposes of proprietary trading may not

11   be market makers.  Correct?

12   A.    It is possible that --

13   MR. LEE:  Objection; incomplete

14   hypothetical; calls for speculation.

15   THE WITNESS:  Can you please read that

16   one back.

17   (Record read.)

18   A.    Yes.

19   Q.    Now, I'll ask you about these bullets

20   specifically in paragraph 31 and maybe break them

21   down a little bit.  And the first bullet where you

22   say "willingness to hold inventory," we've been

23   talking a little bit about that, but how much

24   inventory does someone engaged in market making

25   activities have to hold?

1        A.      Once again, this is, you know, facts and

2   circumstances and relative, so I would be

3   hard-pressed to put up percentage or dollar amount

4   because I wouldn't expect an FTN or a BB&T or a Key

5   Bank guy to be able to pony up the same amount of

6   balance sheet as J.P. Morgan or Goldman.

7               But as a buyer in the space, you -- you

8   know, you have to understand that.  It primarily

9   means that it's sort of goes hand in hand, you're not

10  going to be an effective market maker if you don't

11  hold enough inventory.  Like if you don't have the

12  capacity, you'll fail; you won't be an effective

13  market maker.

14       Q.     Well, can an outsider looking in ever

15  know whether an entity such as FTN actually is a

16  market maker?

17               MR. LEE:  Objection; calls for

18  speculation.

19       A.     Yeah, I don't know what other people

20  could do, but I would say that at a spot instant in

21  time, it would be -- I couldn't just give you one

22  day's holdings report and say is this guy a market

23  maker.  You would have to either be a participant in

24  the space or be able to look at a body of work and

25  say and see the behaviors, and you could even

1    actually even ask other participants in the space and

2    you could figure it out that way.  And I believe

3    that's what the regulators are going to -- they have

4    to do it that way.  They can look at trading records

5    over time and then probably anonymous interviews of

6    participants to figure out who is telling the truth.

7         Q.      How long must a market maker hold

8    inventory to be considered a market maker?

9         A.      What do you -- can you clarify what you

10   mean by how long?  Like how long to hold one security

11   or --

12        Q.      No.  For a particular security, do they

13   have to hold that in inventory for a day?  A month?

14   A year?

15        A.      There is no -- that would be, I think I

16   used the term, you know, market making is dependent

17   on the market itself, you know, the security itself,

18   really the -- and the participants and the time,

19   really, and the time.  I mean, this particular

20   marketplace -- and you can see it in the fact pattern

21   here, PreTSLs were way more liquid than maybe they

22   should have been to suddenly not very liquid.

23             So depending on when you did your

24   analysis, my answer could -- could change because I

25   bet you they didn't hold inventory very long at all

1    at some points and then probably held it very long in

2    2007, so.

3         Q.    If a market participant holds a lot of

4    inventory in a particular security that it doesn't

5    intend to trade, it just wants to hold the security,

6    is it a market maker?

7              MR. LEE:  Objection; speculation;

8    incomplete hypothetical; form.

9         A.    Yeah, I guess I would have to know what

10   side of the market they are coming from and, you

11   know, a little bit more detail on that.  I mean, it

12   sounded like you described an investor, but...

13        Q.    So it may or may not?

14        A.    Well, like you say, I -- at GE if I was

15   a big fan of these and I -- I mean, I really wouldn't

16   call that inventory necessarily; it's an investment.

17   I mean, I could buy a bunch of them and not really

18   intend to sell them again, so.

19        Q.    So GE held these in inventory when you

20   were at GE?

21        A.    Yeah, see, I don't -- most buy-sell

22   people don't refer to them -- refer to them as

23   investments.  But, I mean, I could sell them, but,

24   you know, we don't think -- we don't think -- those

25   -- that's a sell-side -- inventory is a sell-side

1    term.

2         Q.    So when GE was holding PreTSLs in

3    inventory --

4         A.    Call it --

5         Q.    -- was that market making activity or

6    something else?

7              MR. CONRAD:  Object to form.  He just

8    said twice GE didn't hold them in inventory.

9         A.    Yeah, we held them in our portfolio, so.

10        Q.    Okay.  When GE held them in their

11   portfolio, did that signal a willingness to hold

12   inventory?

13             MR. CONRAD:  Again, objection; GE

14   wouldn't refer to this as inventory.

15        A.    If we wanted to call them that,

16   that's -- sure, we were holding something in our

17   portfolio.

18        Q.    GE wasn't a market maker in that

19   security, was it?

20        A.    I didn't have regular contact with

21   customers to buy and sell.  I said that would be one

22   of the -- besides the regulations and whatnot --

23        Q.    Okay.

24        A.    -- the reason the sell side guys, you

25   know, they have components to -- to be effective

1    market makers, and that may change in the future.  I

2    mean, it's -- there's, you know, PIMCO's -- some of

3    the bond -- some of the large bond buyers could

4    always, if they -- I guess they could become market

5    makers.

6         Q.    So the definition of market making may

7    change over time?

8              MR. CONRAD:  Objection to form.

9         A.    Participants.  The definition stays the

10   same.

11        Q.    Okay.  Now, the second activity that you

12   identify, and you just referenced it, was the regular

13   contact with customers to both buy and sell

14   securities.  What do you mean by contact?

15        A.    Well, that could be oral, electronic.

16   Mr. Atkins kept referring to a previous case, which I

17   actually -- I think back then they actually were

18   mailing things, so, you know, it's -- it's an

19   established mode of communication.  In this time

20   frame when I was in the market, the bulk is, believe

21   it or not, phone -- phone and then Bloomberg, which

22   is a type of email, and their inventory would have --

23   that Folan refers to either went out on that email or

24   he may have used regular Outlook email to probably

25   send a spreadsheet over an email listing inventory

[Page 203]

1    and prices.

2         Q.     Well, don't most broker-dealers meet at

3    least this criteria in regular contact with their

4    customers to both buy and sell securities?

5                MR. LEE:  Objection.

6         A.     Sorry.

7                MR. LEE:  Speculation; form; incomplete

8    hypothetical.

9         Q.     You can answer.

10        A.     I would -- I would say based on my

11   experience, yes, most of them, to be effective

12   broker-dealers, should contact customers to buy and

13   sell securities or they would probably go out of

14   business.

15        Q.     Now, your third activity that you list

16   in paragraph 31 is supporting and facilitating a

17   market.  What does it mean to support and facilitate

18   a market?

19        A.     That -- and I believe I described it

20   here, if you're -- if you are -- trading is one.

21   Education is another.  Providing input on, although

22   they have to be careful with this, how to account for

23   the securities, which FTN or -- I think it was FTN

24   did that, you know, because Mr. Mosley was not using

25   the preferred method of accounting for his income

1    notes.  Providing financing would be another thing

2    that -- anything that -- just like in -- to put it in

3    layman's terms, if you're -- you know, you go into a

4    Nordstrom's or whatever, anything that helps the

5    customers, you know, make you you're a preferred

6    retailer of choice for suits, for example, made for

7    Nordstrom's, and so it's very applicable to -- I

8    would say to facilitating and developing a market.

9    And definitely in the OTC market, if you don't do

10   those things, you risk not having any customers.  And

11   then we talked about new issuance and how they make

12   money and...

13        Q.    Now, I'm kind of late with the Christmas

14   shopping this year.  If I go down to Nordstrom's and

15   ask a sales clerk to help me pick out a gift for my

16   wife, would that sales clerk be supporting the market

17   the way you define it?

18        A.    Uniquely at Nordstrom's, I bet you,

19   depending on what department you're in -- did you say

20   a purse or something?  Yes, I believe that you would

21   be supporting the Nordstrom purse market for -- for

22   sure and trying to make you a repeat customer so

23   you'll come by and buy more.

24        Q.    I know she wants a handbag this year,

25   so.

[Page 205]

```
 1                    Let me ask you about the last one, last
 2    characteristic in 31.  You say, "Earning a profit
 3    from the bid-ask spread or other fees in the
 4    transactions."  And we've talked a fair bit about
 5    this, but I just wanted to make sure I understand
 6    what you mean by "other fees."  What other fees are
 7    you talking about?
 8         A.    Well, that -- you could, you know, we
 9    have soft dollar transactions and you have mark-up
10    that we -- we spoke of.  Essentially, it's confining
11    the -- anything tied to the trading essentially,
12    meaning I'm not getting some -- not submitting you a
13    bill every year for being the person to help you pick
14    out purses, you know.  It's really tied to the actual
15    purchase of the purse, or the bonds in this case.
16         Q.    Well, in FTN's case, do you know if FTN
17    earned other fees from anyone that it transacted with
18    in the secondary market for PreTSLs?
19         A.    I would have to look at the data.  I
20    don't know.  Not that I saw.
21         Q.    How about -- in paragraph 32 you state
22    that some attributes of a market maker's activities
23    may depend, and the last thing you state is the
24    market maker's capabilities.  Is that the amount of
25    capacity they have to engage in trades or is it
```

1    not on an exchange.  And I believe that at least one

2    of those actually refers to the equity markets, so

3    which by definition -- I forget the debt market --

4    the FINRA one, I'm sure it probably refers to equity

5    markets.  So they are very specific, so that's why I

6    said market making in the context that we talked

7    about and what we experience is sort of -- here is

8    your universe is rather broad.  I would say that the

9    way that they were defining particular markets were,

10   you know, very definitive particular markets they are

11   speaking to and...

12        Q.    Is it your opinion that the definition

13   of market maker that's found in the Exchange Act is

14   not talking about the FINRA rules; it's just talking

15   about the Exchange Act?

16        A.    Hm-hmm.

17        Q.    Is it your opinion that that definition

18   does not apply or did not apply to illiquid markets

19   during the time period 2004 to 2007?

20        A.    Well, that -- it would be helpful if we

21   could refer to that and I could point out how it does

22   or doesn't apply.  Because I'm kind of guessing.  I'm

23   remembering parts that are from it, but do we have a

24   copy of that so I can --

25        Q.    I don't have a copy with me.  I was just

[Page 222]

```
 1    "liquidity" because we talked about it's all relative

 2    in how it's defined.  So, I mean, the SEC definitely

 3    is a regulator and oversees trading of securities.

 4         Q.    And oversees the debt markets, too,

 5    doesn't it?

 6         A.    Yeah, securities, yeah.

 7         Q.    If you look at the bottom of page 48,

 8    you see that Mr. Green states, "It's the

 9    Association's view that the bond markets need strong

10    and sufficiently funded regulators to assure

11    integrity, efficiency, fairness and safety."

12         A.    That's very nice of him.

13         Q.    Do you agree with him?

14         A.    I mean --

15               MR. LEE:  Objection.

16               MR. CONRAD:  Objection to form; lacks

17    foundation.  It was a sentence out of a 100-page

18    document, 80-page document and asked completely out

19    of context whether you agree with it.

20         A.    Yeah, I think he's just kowtowing to his

21    audience, in all honesty.

22         Q.    How would the Bonds Market Association

23    kowtow to his audience?

24         A.    When you're trying to get something that

25    you want from somebody who has power.  If you read
```

1    the rest of that sentence, it becomes more evident.

2         Q.    What did he want?

3         A.    He's leading with saying a nice thing

4    and then he goes, "The scope and nature of

5    regulation, however, should not dilute the market's

6    dynamic ability to create a structure that best meets

7    the needs of all participants for a fair and

8    efficient system."  So he's saying we want good

9    regulation, but we want to be able to do what we

10   want.

11        Q.    Right.  Do you know if after Mr. Green

12   gave this testimony in Congress, whether Congress or

13   the regulators gave Mr. Green what he wanted?

14        A.    I'm not sure.  I know there were a lot

15   of things going on.  I mean, I read this.  So you

16   asked me before and I said I wasn't sure about what

17   different things they've asked for.  I mean, TRACE, I

18   don't know -- I don't know where the BMA stood on

19   TRACE, but I know TRACE is now -- it's a fact of life

20   and it's -- you can view it different ways.  I think

21   as an investor it's a good thing, but I may be --

22   some of the investment banks that are also in the

23   Bond Market Association probably are not big fans of

24   TRACES, so, you know, he represents a big swathe of

25   buyers and sellers or buy-sides and sell-sides.

[Page 224]

```
 1        Q.      Okay.  Put that to the side.

 2                Did you want a quick break?

 3                MR. LEE:  Yeah, I want to take a quick

 4   break.

 5                THE VIDEOGRAPHER:  Off 4:28.

 6                (Recess 4:28 p.m.- 4:43 p.m.)

 7                THE VIDEOGRAPHER:  Back on 4:43.

 8   BY MR. GUILBERT:

 9        Q.      Mr. Vahey, would it be fair to say that

10   you agree with Mr. Pak that there are basically three

11   ways to transact in a secondary market that is

12   illiquid -- transact in securities in a secondary

13   market that is illiquid; you just draw different

14   conclusions as to what that means as far as what

15   market making goes?

16                MR. LEE:  Objection.  Are you pointing

17   him to specific parts of Pak -- Mr. Pak?

18        Q.      Look at paragraph 42 of your report.

19        A.      Yes, I was going to say.  Or how about

20   my report?

21        Q.      Yeah, your report.

22        A.      Yes.

23        Q.      Do you agree with Mr. Pak that those are

24   the ways that securities generally trade in illiquid

25   markets?
```

[Page 225]

1              MR. LEE:  Objection; lacks foundation.

2         A.    Yes.

3         Q.    Have you ever taken down a bond?

4         A.    No, I've never been a dealer.

5         Q.    You state in paragraph 43 that taking

6    down bonds can place a strain on a dealer's balance

7    sheet.  Right?

8         A.    Yes, that's what I say.

9         Q.    Why does a dealer care about a strain on

10   its balance sheet if it's acting as a market maker?

11        A.    From your earlier line of questioning

12   about risk, that's -- it's a risk to the company

13   itself and a dealer -- dealers use their capital to

14   do all sorts of things like provide financing, you

15   know, they have probably a -- it's a bit of

16   speculation here, but they probably have some sort of

17   return on capital or cost of capital that they keep

18   an eye on and that may not be the most effective --

19        Q.    But you haven't been part of that

20   process before, have you?

21        A.    No.  I've just analyzed companies in the

22   space and that's sort of my perspective.

23        Q.    In paragraph 4 you discuss one of the

24   other methods that Mr. Pak discussed, and this is the

25   running of a list process, and we talked a little bit

[Page 226]

1    about this earlier today.

2            A.      Which paragraph?

3            Q.      Paragraph 44.

4            A.      Oh, 44.  Yes.

5            Q.      Have you ever been involved in the

6    process of receiving an offer wanted in competition

7    or a bid wanted in competition?

8            A.      Yes, I have.

9            Q.      How does that process typically work?

10           A.      Usually electronically.  You would --

11   well, I -- I've sent those out myself and seen them

12   distributed, and I've also been on the receipt of

13   other people's through a dealer.

14                   So what would happen is to be in receipt

15   of one, we would see one or multiple dealers put out

16   a bid wanted in comp, for example, and it would be a

17   spreadsheet or even just a listing of a bond and the

18   amount of the bond and the time when bids were

19   expected or needed.  And if I were to want to be

20   interested in that bond, I could call up any of the

21   dealers that sort of send it out and say I'm -- I'm

22   interested in that bond and where do you think it

23   trades at and this is what I was thinking, that's

24   what were they thinking, and we would work out how

25   they were to be paid if we were to win that bond.

1          A.      To the earlier example, but the one

2    where I explained you're looking at as inventory over

3    multiple days, I mean, it's -- you're correct in

4    saying it doesn't necessarily mean that, but it

5    also -- once they buy it and if there isn't another

6    person identified, they are going to hold it until

7    they find somebody to buy it.

8          Q.      Okay.  Well, let's talk about the third

9    type of transacting, the matching up of buyers and

10   sellers.  Have you ever been involved in that

11   particular type of activity?

12         A.      I'll caveat it with that it's very hard

13   to know that because the -- a dealer doesn't -- a

14   broker -- a broker-dealer does not have to tell you

15   that he's necessarily doing that.  They can do what's

16   called a riskless principal transaction, where they

17   technically are buying it in and out of their own

18   portfolio for minutes, but that way I don't -- it's

19   not - I don't see a trade happening between me and

20   MetLife when I was at GE, even though the trade

21   essentially was between me and MetLife because they

22   met -- they had both sides, so I -- but I would

23   imagine all of the trading I've done that certainly

24   must have occurred, yes.

25         Q.      So you personally were involved in the

1    matching up or someone else --

2         A.    No, it's CMs.  I'm a buy-side guy, so

3    the broker-dealers are the ones who facilitate the --

4    that's what they do, and like we talked about

5    earlier, some just trying to do that and other ones

6    do more than that, so.

7         Q.    When you were at GE, how long did that

8    process typically take to match up buyers and

9    sellers?

10        A.    Well, we might not -- you might not

11   know, meaning it's -- it's impossible to know.  I

12   mean, they don't -- many times you don't even have --

13   they don't ask any permission.  The trade can just

14   occur.  They may have had a conversation in the

15   morning with Met -- to give you my hypothetical, a

16   MetLife guy said he wanted to buy credit card bonds,

17   and then I happened to come to that same

18   broker-dealer two hours later and say I'm looking to

19   sell some credit card bonds.

20              And so he sort of already knows somebody

21   is going to buy them, and he knows I have them.  And

22   essentially they're going to put the two of us

23   together, but I -- my -- to me the trade's

24   instantaneous.  But...

25        Q.    Well, in that circumstance the broker's

[Page 232]

1    not really demonstrating a willingness to hold

2    inventory and the security that's being traded, is

3    he?

4         A.    No.  We talked about that earlier about

5    some guys don't.  You know, it's -- like I said, it's

6    all relative on the market and the securities.

7              And that example I just gave you, there

8    are people that do a lot of credit card stuff and

9    they hold inventory.  So it's easier for them to do

10   that than folks who don't.  So...

11        Q.    Mr. Vahey, you've referenced the report

12   of Mr. Olvany several times today.  I'd like to put

13   that in front of you as Exhibit 136.

14              (Exhibit P-136, Expert Report of John J.

15   Olvany, marked for identification.)

16        Q.    Is this the report you were referring to

17   when you gave the testimony earlier?

18        A.    I believe so.

19        Q.    And this is the report you relied upon

20   to learn more about the transaction history of

21   PreTSLs?

22        A.    Excuse me.  Yes.

23        Q.    Do you know Mr. Olvany?

24        A.    No, I do not.

25        Q.    Take a look at page 62 of the report,

1    they had anybody lined up right away.  So it wasn't

2    as if they weren't taking on risk.

3                So I'm -- I go back to my definition of

4    market making.  It actually seems to support what I

5    was -- their willingness to hold in inventory,

6    they're in contact, and they supported the market.

7         Q.    And that particular example, would you

8    agree that while they bought $19 million from

9    Sentinel, that Mr. Mosley wanted them to buy 40 to

10   $60 million?

11        A.    Yeah.  If I -- if you go back to that

12   thing, it's -- I don't know if you would like to read

13   that whole --

14               MR. LEE:  Objection; lack of foundation.

15        A.    Well, we could read the deposition if

16   you have that handy, and you could read the whole

17   context, because I think if we do that, you could see

18   what their intent was there.

19        Q.    Let's take a look at Appendix 2 to the

20   report of Mr. Olvany.  It's -- if you look at the

21   bottom right-hand corner, you'll see the Bates stamp

22   88822.

23        A.    Sorry.  What page are we on?  I'm sorry.

24               MR. CONRAD:  88822.  Appendix 2 --

25        A.    Gotcha, yes.

[Page 238]

1        Q.      You'll see that these are the documents

2   that Mr. Olvany considered in preparing his report.

3        A.      Um-hmm.

4        Q.      It's a -- four pages long, four or five

5   pages long.  It's small font.  And did you review all

6   of these documents in preparing your report?  You

7   didn't, did you?

8        A.      No, sir.

9        Q.      After reviewing Mr. Olvany's report, did

10  you ask counsel to review any of those documents

11  listed in his report to make sure that your

12  conclusion that FTN was a market maker was correct?

13              MR. LEE:  Objection to form.

14       A.      Once again, I was more using the market

15  data that he had.  I'm really not concerned with what

16  his opinions were.  And, to wit, what we were just

17  discussing, if we were to read that deposition,

18  de Saint Phalle, you could see how he made -- you

19  know, he was making an interpretation, and I can give

20  you my interpretation of the exact same deposition.

21       Q.      So it boils down to it, your

22  interpretation and reason for your disagreement with

23  Mr. Olvany is your reading of Mr. de Saint Phalle's

24  deposition?

25              MR. LEE:  Objection; mischaracterizes

[Page 241]

1              MR. LEE:  Objection.  He said he was

2    happy to read the paragraph and you cut him off,

3    but --

4              MR. GUILBERT:  I don't think he needs to

5    read the paragraph into the record, so.

6              MR. LEE:  Well, you asked him the

7    question --

8              MR. CONRAD:  Well, he's entitled to put

9    whatever testimony he wants on the record if it's

10   responsive to a question.  You asked him if he's

11   aware of testimony.  He said yes.  He started to read

12   it.  You cut him off and then --

13   BY MR. GUILBERT:

14        Q.    Okay.  Read the paragraph.

15        A.    I would just like to go on the record as

16   saying that I believe that making markets is a verb,

17   and a market maker is a noun.  So, unfortunately,

18   that -- you know, in their thing it's what -- must

19   not have been an instance for them to use it in the

20   form of a noun, but they were using the verb.  So I

21   made the small jump from, you know, if you could even

22   call it that, from the noun to the verb form.

23        Q.    So the answer is no, you're not aware of

24   instances where the noun "market maker" was used by

25   employees of FTN to describe its activities in the

1    PreTSL markets?

2           A.     Not that I've reported, no.

3           Q.     Mr. Vahey, I would like to hand you a

4    document that was previously marked at

5    Robert Ducklo's deposition and it is Ducklo

6    Exhibit 54.

7           A.     Um-hmm, yes.

8           Q.     Is this the document that you were

9    referring to regarding the $20 million loan?

10          A.     I am, and it's -- I was referring to

11   Wade -- I guess maybe it could be -- I don't know if

12   Wade is a woman or a man, but that's the other key

13   employee I was referring to.

14          Q.     And this is the finance agreement you're

15   referring to in footnote 31 of paragraph 54?

16          A.     Yes.

17          Q.     Do you know where this document came

18   from?

19                 MR. CONRAD:  Objection; calls for

20   speculation.

21          A.     No.  It was just the documents to be

22   considered --

23          Q.     You would agree that it's not signed,

24   wouldn't you?

25          A.     It appears to not be signed, that's

1    correct.

2        Q.    And you don't know who Wade Rhea is, do

3    you?

4        A.    Not specifically, no, I do not.

5        Q.    Did you read Robert Ducklo's testimony

6    about this document?

7        A.    I do not think I did, no.

8        Q.    Have you ever tried to enforce an

9    unsigned $20 million loan agreement?

10            MR. LEE:  Objection; argumentative;

11   calls for speculation.

12        Q.    It's a simple question.

13        A.    No, but I guess I would be speculating

14   on the fact that I know the loan occurred, so maybe

15   there is another document that we should be

16   reviewing, but...

17        Q.    But this is the document cited in your

18   report.  Correct?

19        A.    It certainly is.

20        Q.    Take a look at page 14.  Paragraph 60 at

21   the bottom that runs over to the top of page 15, and

22   you reference a complaint filed by the SEC.

23        A.    Yes, sir.

24        Q.    I hand you what I'll mark as Plaintiffs'

25   Exhibit 137.

1          Q.       In paragraph 72, you cite a prospectus

2     for Bank of America's private label residential

3     mortgage-backed securities?

4          A.       That's one, and I can give you a few

5     others.

6          Q.       Let me ask you about the one you cited.

7     I'll mark it as Plaintiffs' Exhibit 138, and this is

8     just a excerpt of a very long document --

9          A.       Yeah.

10         Q.       -- and while you cited the .txt or the

11    text version, I got the HTML version.  But is this

12    the document you're referring to?  Can you tell?

13                  (Exhibit P-138, Document excerpt, marked

14    for identification.)

15         A.       Yes, it's the '06-D, yup.

16         Q.       Turn to page S-36, which is the page you

17    cited.  And you see the header that says "Limited

18    Liquidity"?

19         A.       I'm --

20                  MR. CONRAD:  It's the last page.

21                  MR. LEE:  It's the last of the three

22    pages.

23         A.       Oh, there.  I'm sorry.  Okay.

24                  Limited -- limited liquidity provision,

25    um-hmm.